## UNITED STATES COURT OF APPEALS
## FOR THE DISTRICT OF COLUMBIA CIRCUIT

| | | |
|---|---|---|
| Sierra Club, et al. | ) | |
| | ) | |
| Petitioners, | ) | |
| | ) | |
| v. | ) | No.   24-1099 |
| | ) | |
| Federal Energy Regulatory | ) | |
| Commission, | ) | |
| | ) | |
| Respondent. | ) | |

## MOTION OF RESPONDENT
## FEDERAL ENERGY REGULATORY COMMISSION
## TO EXTEND THE DATE FOR
## FILING THE CERTIFIED INDEX TO THE RECORD

Pursuant to Rules 17 and 27 of the Federal Rules of Appellate Procedure,

Respondent Federal Energy Regulatory Commission ("Commission" or "FERC")

moves this Court to extend the date for filing the Certified Index to the Record to

August 1, 2024.  Furthermore, if the Commission is granted this extension but

issues an order denying rehearing prior to August 1, it will file the Certified Index

no later than seven days after issuance of that order.  The Commission requests this

extension because it has given notice of its intent to issue a further order on

rehearing in the underlying proceeding.  Counsel for Movant-Intervenors

Tennessee Gas Pipeline Company, L.L.C. ("Tennessee Gas"), Tennessee Valley

Public Power Association, and Tennessee Valley Authority have indicated that they

do not oppose this motion. Counsel for Petitioners Sierra Club and Appalachian Voices have indicated that they oppose this motion.

## Background

This case arises from a proposal by Movant-Intervenor Driftwood Pipeline LLC to construct and operate a new interstate natural gas pipeline and related facilities in middle Tennessee. *See Tenn. Gas Pipeline Co.*, 186 FERC ¶ 61,046, P 1 (Jan. 18, 2024). On January 18, 2024, the Commission issued an order granting a certificate of public convenience and necessity for the project under the Natural Gas Act, 15 U.S.C § 717f(c). *Id.* P 1, Ordering P (A). On February 20, 2024, Petitioners applied to the Commission for rehearing of that order pursuant to 15 U.S.C. § 717r. *See* Ex. A at 1. Petitioners did not request that the Commission stay its order.

The Commission issued a Notice of Denial of Rehearing by Operation of Law and Providing for Further Consideration ("Notice of Denial") on March 22, 2024. *See* Pet. for Review Ex. B. The Notice of Denial explained that Petitioners' request for rehearing "may be deemed to have been denied" "[i]n the absence of Commission action . . . within 30 days from the date [the request] is filed." *Id.* (citing, *inter alia*, 15 U.S.C. § 717r(a)). The Notice of Denial also stated that, "[a]s provided in 15 U.S.C. § 717r(a), the request[] for rehearing . . . will be addressed in a future order." *Id.* The Natural Gas Act permits the Commission to "deem proper,

2

modify or set aside, in whole or in part," its original order "[u]ntil the record" in this proceeding is "filed in a court of appeals."  15 U.S.C. § 717r(a).

This motion seeks to preserve the Commission's opportunity to exercise that authority.

## Argument

## I.    The Natural Gas Act requires exhaustion of the rehearing process

1.  Section 19 of the Natural Gas Act requires a petitioner to exhaust its claims through the Commission rehearing process.  A party must state "specifically" all objections in an "application to the Commission" of an initial order as a prerequisite to seeking judicial review.  15 U.S.C. § 717r(a), (b).  *Cf. Coit Indep. Joint Venture v. Fed. Sav. & Loan Ins. Corp.*, 489 U.S. 561, 579 (1989) ("[E]xhaustion of administrative remedies is required where Congress imposes an exhaustion requirement by statute.").  This Court construes Section 19's exhaustion requirement "strictly."  *Tenn. Gas Pipeline Co. v. FERC*, 871 F.2d 1099, 1109 (D.C. Cir. 1989).

The rehearing process serves several functions:  It (1) recognizes FERC's primary jurisdiction to "correct its own errors" in an initial order, *Save Our Sebasticook v. FERC*, 431 F.3d 379, 381 (D.C. Cir. 2005); *Granholm ex rel. Mich. Dep't of Nat. Res. v. FERC*, 180 F.3d 278, 281 (D.C. Cir. 1999); (2) "afford[s] the Commission an opportunity to bring its knowledge and expertise to bear on an

issue before it is presented to a generalist court," *Nw. Pipeline Corp. v. FERC*, 863 F.2d 73, 77–78 (D.C. Cir. 1988); and (3) promotes judicial efficiency by potentially narrowing the issues a court must decide or "obviat[ing] the need for [judicial] review" altogether, *Clifton Power Corp. v. FERC*, 294 F.3d 108, 111–12 (D.C. Cir. 2002).

2. To be sure, the Natural Gas Act sets a triggering event for judicial review. If FERC "fails to act on such a[] [rehearing] application after thirty days," then "the application 'may be deemed to have been denied.'" *Allegheny Def. Project v. FERC*, 964 F.3d 1, 12 (D.C. Cir. 2020) (en banc) (quoting 15 U.S.C. § 717r(a)). And here, because the Commission did not act on their request for rehearing of the initial order within 30 days, Petitioners have sought judicial review. *Cf. Env't Def. Fund v. FERC*, 2 F.4th 953, 972 (D.C. Cir. 2021) (although a party may petition for judicial review if the Commission has not acted on its agency rehearing application in 30 days, it can instead choose to wait to petition for review until after the agency issues its promised order addressing the merits of rehearing arguments) (citing *Allegheny Defense*).

Even so, the Natural Gas Act does not compel moving immediately to record filing and merits briefing before the agency has issued its final order on rehearing. The Act does not require that "the Commission must actually decide the rehearing application within th[e] thirty-day window." *Allegheny Def.*, 964 F.3d at 16. To

the contrary, the Natural Gas Act permits the Commission to respond to rehearing requests by issuing a substantive rehearing order "[u]ntil the record in a proceeding shall have been filed in a court of appeals." 15 U.S.C. § 717r(a); *see also id.* § 717r(b) (Upon record filing, the court assumes "exclusive" jurisdiction "to affirm, modify, or set aside such order in whole or in part.").

Nor does the Natural Gas Act set a deadline for FERC to file the agency record with the court of appeals. And while Federal Rule of Appellate Procedure 17(a) sets a generic date of 40 days from the time a petition for review is filed, that period may be modified by the Court. *See* Fed. R. App. P. 17(a); *see also Allegheny*, 964 F.3d at 17 (contemplating motions to extend the record filing date beyond 40 days from the date of petition for review and noting that the court had allowed the agency nine months to file the agency record in that case).

## II. Principles of exhaustion and ripeness favor additional time to issue a reasoned rehearing order before the Court proceeds to merits review

### A. Administrative exhaustion principles favor setting a record filing date after FERC has issued a rehearing order

"Exhaust[ing] prescribed administrative remedies . . . serves the twin purposes of protecting administrative agency authority and promoting judicial efficiency." *McCarthy v. Madigan*, 503 U.S. 140, 144–45 (1992). In deciding whether to require exhaustion in a particular case—here, by setting a record filing date *after* FERC issues its final rehearing order—the Court generally considers

5

"'the nature of the claim presented and the characteristics of the particular administrative procedure provided.'" *Sandoz Inc. v. Becerra*, 57 F.4th 272, 278 (D.C. Cir. 2023) (quoting *Madigan*, 503 U.S. at 146). Here, both factors counsel in favor of a modest extension for filing the Certified Index.

    ***Nature of the claim presented.*** Exhaustion is appropriate for claims that require the "agency 'to apply its special expertise' and to 'produce a useful record for subsequent judicial consideration.'" *United States v. Jenkins*, 50 F.4th 1185, 1205 (D.C. Cir. 2022) (quoting *Madigan*, 503 U.S. at 145). Here, Petitioners challenge the Commission's exercise of its discretionary authority under the Natural Gas Act to authorize the construction and operation of natural gas infrastructure projects. And they specifically call for additional explanation of the Commission's initial decision. *See, e.g.*, Ex. A at 24–25 (claiming an "unexplained rejection" of certain technical methods and an "unexplained shift from Commission precedent"). But exhaustion can "'economize on effort'" for the Court and parties when the agency's "'explanation of its choices'" is at issue. *W. Watersheds Project v. BLM*, 76 4th 1286, 1294 (10th Cir. 2023) (quoting *Koretoff v. Vilsack*, 707 F.3d 394, 400–01 (D.C. Cir. 2013) (Williams, J., concurring)).

    Moreover, Petitioners' application includes 42 pages of argument and roughly 1,700 pages of attached exhibits; unsurprisingly, it presents some claims that are highly technical. For example, Petitioners' application for agency

rehearing devotes roughly fourteen pages just to the finer points of measuring

downstream greenhouse gas emissions, including the attribution of emissions

reductions from retirement of other facilities and distinctions between lifetime and

annual emissions estimates.  *See* Ex. A at 3–16.  These types of issues militate in

favor of further application of the Commission's special expertise.  *Jenkins*, 50

F.4th at 1205.

     ***Characteristics of the administrative procedure***.  The characteristics of the

FERC rehearing process also counsel in favor of extending the record filing

deadline.  Only upon completion of that process can Congress' legislative purpose

—giving FERC a second opportunity to decide an issue before merits review by a

court—be realized.  *See Save Our Sebasticook*, 431 F.3d at 381; *Granholm*, 180

F.3d at 281; *Nw. Pipeline Corp.*, 863 F.3d at 77–78*; see also Patsy v. Bd. of

Regents of State of Fla.*, 457 U.S. 496, 501 (1982) (Congress' "legislative purpose

. . . is of paramount importance in the exhaustion context because Congress is

vested with the power to prescribe the basic procedural scheme under which claims

may be heard in federal courts.").

    **B.**    **Ripeness considerations also support an extension of the record filing deadline**

    The pending petition is also not ripe for merits review.  Ripeness involves a

consideration of (1) the fitness of the issues for judicial decision and (2) the

hardship to the parties of withholding review.  *See, e.g.*, *Flint Hills Res. Alaska, LLC v. FERC*, 627 F.3d 881, 889 (D.C. Cir. 2010).

The ripeness doctrine's "basic rationale is to prevent courts, through avoidance of premature adjudication, from entangling themselves in abstract disagreements over administrative policies, and also to protect the agencies from judicial interference until an administrative decision has been formalized and its effects felt in a concrete way by the challenging parties."  *Abbott Labs. v. Gardner,* 387 U.S. 136, 148 (1967).

1.  In deciding when agency action is "fit for review," a court assesses whether "the question presented . . . is 'a purely legal one,'" *Nat'l Park Hospitality Ass'n v. Dep't of the Interior*, 538 U.S. 803, 812 (2003) (quoting *Abbott Labs.,* 387 U.S. at 149), whether it constitutes final agency action, and whether "further factual development would 'significantly advance [the court's] ability to deal with the legal issues presented,'" *id*. (quoting *Duke Power Co. v. Carolina Env't Study Grp., Inc.*, 438 U.S. 59, 82 (1978)).

The order under review here is not fit for review.  *First*, the issues on appeal are not "purely legal."  They involve, among other things, complex judgments regarding the manner in which Commission discharges its obligations under NEPA and assesses the public interest under the Natural Gas Act.  Consider, again, Petitioners' claims about estimating downstream greenhouse gas emissions.  *See*

Ex. A at 3–16.  Similarly, Petitioners' application raises questions about the market

power of a pipeline customer.  *See id.* at 35–36.

*Second*, further factual development in response to the Petitioners' many

complaints on rehearing would assist the Court in "deal[ing] with the legal issues

presented."  *Nat'l Park*, 538 U.S. at 812 (cleaned up).  If FERC, on rehearing, were

to agree with even some of the Petitioners' arguments, then "a favorable decision

from [FERC] might yet obviate the need for review by the court."  *Clifton Power*,

294 F.3d at 111–12; *see also Devia v. Nuclear Regul. Comm'n*, 492 F.3d 421, 425

(D.C. Cir. 2007) (claim unripe where merits review might "involve [judges] in

deciding issues unnecessarily, wasting time and effort" (cleaned up)).  Indeed,

FERC has reversed its initial decision in recent rehearing orders;[1] in at least one

other recent, the Commission modified its initial order in a manner that "cured any

purportedly erroneous ruling."  *Green Dev., LLC, v. FERC*, 77 F.4th 997, 1004

(D.C. Cir. 2023).  And "[e]ven if it were very likely that the Commission would

deny the rehearing petition," allowing FERC to issue a rehearing order would

mean that "a reviewing court would at least have the benefit of the agency's expert

---

[1]     *See, e.g.*, *N.Y. Indep. Sys. Operator, Inc.*, "Order Addressing Arguments
Raised on Rehearing and Setting Aside Prior Order," 183 FERC ¶ 61,130, PP 2, 31
(2023); *Broadview Solar, LLC*, "Order Addressing Arguments Raised on Rehearing
and Setting Aside Prior Order," 174 FERC ¶ 61,199, PP 3, 20 (2021); *Potomac-
Appalachian Transmission Highline, LLC*, Opinion No. 554-A, 170 FERC
¶ 61,050, P 8 (2020).

view of why it thought the petitioner's arguments failed." *Save Our Sebasticook*, 431 F.3d at 382.

*Third*, the Commission intends to issue an order responding to Petitioners' request for rehearing. While the Commission's initial order is final agency action subject to court challenge, the prospect of a future order risks "judicial interference [before] an administrative decision has been formalized" if the Court were to proceed to merits review now, *see Abbott Labs.*, 387 U.S. at 148. In any event, the finality of agency action is not determinative in the ripeness analysis. *See Nat'l Park*, 538 U.S. at 812 (even though the "question presented" was both "purely legal" and involved "final agency action," the disputed issue was not "fit for review" because the case would benefit from "further factual development" (cleaned up)).

2. The second ripeness factor—"hardship to the parties of withholding court consideration"— points in the same direction. Nothing indicates Petitioners would be harmed by less than two months of additional time for Commission consideration of their own rehearing request; they did not seek a stay of the Commission's order. In any event, any hardship here is necessarily qualified by Congress' statutory design requiring that an aggrieved party engage in the rehearing process before seeking merits review by a court of appeals.

## CONCLUSION

For the foregoing reasons, the Commission respectfully requests that the Court extend the deadline for filing the Certified Index to August 1, 2024, or seven days after the Commission issues an order denying rehearing, whichever is sooner.

Respectfully submitted,

Matthew R. Christiansen
General Counsel

Robert H. Solomon
Solicitor

*/s/ J. Houston Shaner*
J. Houston Shaner
Attorney

Federal Energy Regulatory
  Commission
888 First Street, N.E.
Washington, DC 20426
Tel.:   (202) 502-6883
Email: john.shaner@ferc.gov

May 30, 2024

## CERTIFICATE OF COMPLIANCE

Pursuant to Fed. R. App. P. 32(c)(1) and 32(g)(1), I certify that this motion complies with the type-volume limitation of Fed. R. App. P. 27(d)(2) because this motion contains 2,303 words, excluding the parts exempted by Fed. R. App. P. 32(f).

I further certify that this motion complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because this motion has been prepared in Times New Roman 14-point font using Microsoft Word 365.

*/s/ J. Houston Shaner*
J. Houston Shaner
Attorney

Federal Energy Regulatory
  Commission
888 First Street, N.E.
Washington, DC 20426
Tel.:  (202) 502-6883
Email: john.shaner@ferc.gov

May 30, 2024

## CERTIFICATE OF SERVICE

I hereby certify that, on May 30, 2024, a copy of the foregoing document was filed electronically. Notice of this filing will be sent to all parties by operation of the Court's electronic filing system. Parties may access this filing through the Court's system.

/s/ J. Houston Shaner
J. Houston Shaner
Attorney

Federal Energy Regulatory
   Commission
888 First Street, N.E.
Washington, DC 20426
Tel.:  (202) 502-6883
Email: john.shaner@ferc.gov

**EXHIBIT A**

**PETITIONERS' APPLICATION FOR AGENCY REHEARING**

(EXCLUDING ATTACHMENTS)

UNITED STATES OF AMERICA
DEPARTMENT OF ENERGY
FEDERAL ENERGY REGULATORY COMMISSION

IN THE MATTER OF                               )
                                               )
Tennessee Gas Pipeline Company, L.L.C.         )                    Docket No. CP22-493

**REQUEST FOR REHEARING OF APPALACHIAN VOICES AND SIERRA CLUB**

Under Section 19(a) of the Natural Gas Act, 15 U.S.C. § 717r(a), and Rule 713 of the

Rules of Practice and Procedure of the Federal Energy Regulatory Commission, 18 C.F.R.

§ 385.713 (2006), Appalachian Voices and Sierra Club respectfully request rehearing and

abrogation of the Order Issuing Certificate ("Certificate Order") issued by the Federal Energy

Regulatory Commission ("FERC" or "Commission") in the above-captioned proceeding. *See*

Certificate Order, 186 FERC ¶ 61,046 (Jan. 18, 2024).

Tennessee Gas Pipeline Company, L.L.C. ("Tennessee") seeks to construct and operate

the Cumberland Project ("Cumberland Project" or "Project") to provide gas to the Tennessee

Valley Authority ("TVA") to support a new gas power plant in Stewart County, Tennessee.[1] The

new gas plant ("Cumberland Gas Plant") would operate for decades and would replace one unit

of an aging and operationally challenged coal plant called the Cumberland Fossil Plant that TVA

will retire.[2] The Cumberland Project and the Cumberland Gas Plant are functionally

---

[1] Certificate Order PP1–3.

[2] *See* Certificate Order P3 & n.4; *see also, e.g.*, TVA, Record of Decision: Cumberland Fossil
Plant Retirement Environmental Impact Statement, 88 Fed. Reg. 3,767, 3,767 (Jan. 20, 2023)
("Cumberland Plant ROD") (describing operational challenges of Cumberland Fossil Plant and
retirement planning). Both the Cumberland Plant ROD and TVA's Cumberland Fossil Plant
Retirement: Final Environmental Impact Statement (Dec. 9, 2022) ("Cumberland Plant FEIS")
are part of the record for this proceeding. The Commission relied on both TVA documents in the
Certificate Order and the Cumberland Project: Final Environmental Impact Statement (June 30,
2023) ("Cumberland Project FEIS"). However, neither the Cumberland Plant ROD nor the

interdependent. The Project would have one delivery point—the site of the Cumberland Gas Plant—and TVA would be the Project's only shipper for at least twenty years.[3] TVA assumes the Cumberland Gas Plant will operate for thirty years.[4]

The Cumberland Project and the Cumberland Gas Plant are connected actions that will produce greenhouse gas emissions for decades. Yet the Commission misunderstood or mischaracterized the Project's climate impacts and sidestepped serious questions about whether the Project would be in the public convenience and necessity. The Commission took an unlawfully cramped view of its regulatory province, relied on arbitrary and capricious assumptions and unreasonable offset accounting, and more. These errors violated the National Environmental Policy Act ("NEPA"), the Natural Gas Act ("NGA"), and the Administrative Procedure Act ("APA"). Unless and until these errors are corrected, the Commission cannot lawfully approve the Project and must abrogate the Certificate Order as authorized by 15 U.S.C. § 717r(a).

## CONCISE STATEMENT OF ISSUES AND ALLEGED ERRORS

A. NEPA and the NGA require the Commission to quantify downstream greenhouse gas emissions from proposed pipelines and weigh them in deciding whether a certificate of public convenience and necessity should issue. *Sierra Club v. FERC* ("*Sabal Trail*"), 867 F.3d 1357, 1373–74 (D.C. Cir. 2017). If the Commission credits a proposed pipeline for offsets from emissions reductions elsewhere, it must ensure that any such offsets are attributable to the proposed pipeline. In this case, the Commission: (1) claimed an internally inconsistent net reduction in emissions from the Project; (2) impermissibly credited the Project for emissions reductions that are not attributable to the Project; and

---

Cumberland Plant FEIS appear to have assigned accession numbers on the Commission's docket for this proceeding. For avoidance of doubt about the content of the record, the Cumberland Plant ROD is attached as **Exhibit 1** and the Cumberland Plant FEIS is attached as **Exhibit 2**.

[3] Certificate Order PP4–5.

[4] *See* Cumberland Plant FEIS at 275 ("The operational life cycle of Alternative A was assumed to be 30 years based on current industry assumptions for typical expected operating life of a combined cycle natural gas plant.").

(3) arbitrarily assumed a single-year net change would hold constant throughout the life of the Project despite record evidence demonstrating otherwise. The Project will not reduce downstream greenhouse gas emissions. It will increase them by tens of millions of metric tons over its lifetime.

B.  NEPA and the NGA require the Commission to consider all indirect effects of proposed pipelines, *Sabal Trail*, 867 F.3d at 1373, a category that here includes methane emissions from upstream gas extraction, processing, and transportation. The Commission unlawfully refused to quantify or estimate these upstream emissions under NEPA or to weigh them in its analysis under the NGA. This was arbitrary and capricious. Upstream emissions are foreseeable on this record, and it is arbitrary and capricious to disregard them. To the extent the Commission thinks its lacks the tools to estimate these emissions, the Commission must at least comply with 40 C.F.R. § 1502.21(c).

C.  NEPA and the NGA require the Commission to determine whether greenhouse gas emissions from a proposed pipeline would be significant and weigh the significance of those emissions when determining whether a certificate of public convenience and necessity should issue. *Sabal Trail*, 867 F.3d at 1374; 40 C.F.R. § 1502.16(a). The Commission concluded greenhouse gas emissions from the Project are not significant because the Project will cause a net reduction, but the record refutes the premise. On rehearing, it would be unlawful under both the APA and NEPA for the Commission to refuse making this determination by claiming it lacked the tools. At a minimum, the Commission must comply with 40 C.F.R. § 1502.21(c).

D.  NEPA requires the Commission to consider the Project and the Cumberland Gas Plant in a single environmental impact statement. 40 C.F.R. § 1501.9(e)(1). The Commission refused to do so for reasons that have no basis in law or fact, and this error was not harmless.

E.  The NGA requires the Commission to evaluate all factors bearing on whether a proposed pipeline is needed or would be in the public interest. The Commission is aware of serious deficiencies in the record on this score that vitiate the probative value of the precedent agreement between Tennessee and TVA, but the Commission unlawfully refused to engage with these issues. *Env't Def. Fund v. FERC* ("*Spire*"), 2 F.4th 953, 960 (D.C. Cir. 2021). The Commission has the power and obligation to grapple with these issues notwithstanding the authority of TVA within its sphere. *Fed. Power Comm'n v. Transcon. Gas Pipe Line Corp.*, 365 U.S. 1, 16–17 (1961).

## ARGUMENT

### A.  The Commission Did Not Take a Hard Look at Downstream Greenhouse Gas Emissions.

The Commission is required under NEPA and the NGA to take a hard look at the climate

impacts of a proposed pipeline—including its direct and indirect greenhouse gas ("GHG")

emissions—and weigh those impacts when evaluating whether a certificate should issue. *Sabal Trail*, 867 F.3d at 1373. When a proposed pipeline will transport gas to a power plant, "the downstream greenhouse emissions that will result from burning the natural gas that the pipeline[] will transport" are an "indirect effect" of the pipeline, and the Commission must quantify them (or explain why it cannot). *Id.* at 1374. This is true even if those emissions "might be partially offset by reductions elsewhere." *Id.* at 1375. At bottom, the Commission must evaluate "whether total emissions, on net, will be reduced or increased by [a] project" and "what the degree of reduction or increase will be." *Id.*

Although the Commission purported to quantify downstream greenhouse gas emissions in the Certificate Order and repeatedly claimed the Project would cause a "net reduction" in those emissions,[5] the Commission made three fundamental errors that tainted its NEPA analysis and vitiated its conclusions under the NGA. *See Vecinos para el Bienestar de la Comunidad Costera v. FERC*, 6 F.4th 1321, 1331 (D.C. Cir. 2021) (NEPA violation regarding climate change requires reconsideration under NGA). The Commission (1) provided inconsistent descriptions of the claimed net reduction in the Certificate Order; (2) credited the Project for emissions reductions that are not attributable to the Project; and (3) ignored the Project's lifetime emissions by disclosing only the annual rate of emissions and assuming the rate would remain constant for decades despite record evidence demonstrating otherwise. The combined effect of these errors led the Commission to claim that the Project will reduce total downstream greenhouse gas emissions when the record shows the opposite: even using conservative assumptions and crediting the Project for some offsets, the Project will increase downstream greenhouse gas emissions by tens of millions of metric tons over its expected useful life.

---

[5] *See* Certificate Order PP48–49, 53–54.

1.   **The Certificate Order is internally inconsistent about the size of the claimed "net reduction" of greenhouse gas emissions.**

An agency violates the APA and NEPA when it is internally inconsistent. *Air Transp. Ass'n of Am. v. Dep't of Transp.*, 119 F.3d 38, 43 (D.C. Cir. 1997) (internal inconsistency is arbitrary and capricious); *Bluewater Network v. Salazar*, 721 F. Supp. 2d 7, 40 (D.D.C. 2010) (internal inconsistency undermines "hard look"); *Env't Def. v. U.S. Army Corps of Eng'rs*, 515 F. Supp. 2d 69, 84 (D.D.C. 2007) (internal inconsistency violates "NEPA's regulation mandating the scientific integrity of environmental impact statements").

The Commission relies extensively on the assertion that the Project will cause a "net reduction" in downstream greenhouse gas emissions because the Cumberland Gas Plant would be lower-emitting than the retiring Cumberland Fossil Plant.[6] But the Certificate Order is internally inconsistent about "what the degree of reduction . . . will be." *Sabal Trail*, 867 F.3d at 1375. In Paragraph 48, the Commission asserts the net change "would be approximately -7.06 million metric tons of $CO_2e$ per year."[7] Then in Paragraph 53, the Commission claims that "[t]he net overall reduction in GHG emissions . . . would be approximately -4,532,985 metric tons per year."[8] This is a staggering disparity. Just the difference between these figures—roughly 2.53 million metric tons ("MMT") of $CO_2e$ emissions per year—is equivalent to the expected annual emissions from operation of the Cumberland Gas Plant.[9] In other words, there is an entire gas plant lurking in the uncertainty.

---

[6] *E.g.*, Certificate Order P48.

[7] Certificate Order P48.

[8] Certificate Order P53.

[9] *See* Certificate Order P48.

The inconsistency appears to stem, at least in part, from a conflict between the Certificate Order and the final environmental impact statement ("FEIS") for the Project. The Commission explains in a footnote that the emissions calculations in its FEIS were incorrect because the FEIS relied on inaccurate data in TVA's draft environmental impact statement ("EIS") for the Cumberland Fossil Plant Retirement and "was not updated to reflect the changes to and data in TVA's final EIS."[10] Compounding the uncertainty, this footnote does not explain whether the emissions figures on which the Commission claims to have relied in the Certificate Order come directly from TVA's final EIS or whether the Commission accounted for the corrected emissions data that TVA disclosed in an errata to its final environmental impact statement.[11]

This is not a situation the Commission can cure by saying the Certificate Order controls in the event of a conflict and claiming the Commission did "not rely on or adopt any contrary analysis" in the FEIS. *WBI Energy Transmission, Inc.*, 185 FERC ¶ 61,036 P64 (Oct. 23, 2023). The Certificate Order itself contains the inconsistency and the Commission explicitly relied on both figures to characterize the Project's climate impacts. The Commission estimated the social cost of greenhouse gases for the Project based on the -7.06 million metric tons figure.[12] But the Commission also relied on the -4.5 million metric tons figure as the foundation for comparing Project emissions to national and state emissions.[13] This internal inconsistency violates NEPA and the APA.

---

[10] Certificate Order P48 & n.110.

[11] *See* TVA, Errata Document: Cumberland Fossil Plant Retirement Final Environmental Impact Statement ER-1 to -2 (July 2023), https://perma.cc/65FT-E4KW. The errata document is attached as **Exhibit 3**.

[12] Certificate Order P48 & n.112.

[13] *See* Certificate Order PP52–54.

The Commission must correct this inconsistency and confusion on rehearing. The Commission must also prepare a supplemental environmental impact statement disclosing its analysis and the data on which it relies—as the Commission should have done when it realized the FEIS was inaccurate. Corrected information about how the Commission calculated and weighed downstream emissions plainly constitutes "significant new . . . information relevant to environmental concerns and bearing on the proposed action." 40 C.F.R. § 1502.9(d)(1)(ii). It was unlawful for the Commission to forego supplementation when it realized the FEIS was incorrect and it would be equally unlawful to double down on that approach now.

### 2. The Commission credited the Project with downstream emissions reductions that are not attributable to the Project.

Because the Commission must determine under NEPA "whether total emissions, on net, will be reduced or increased by [a] project, or what the degree of reduction or increase will be," the Commission must ensure that any downstream emissions changes supporting a claimed net reduction are caused "*by this project.*" *Sabal Trail*, 867 F.3d at 1375 (emphasis added); *see also* 40 C.F.R. § 1508.1(g)(1), (2) (direct and indirect effects are "caused by the action"). NEPA also requires the Commission to ensure the professional and scientific integrity of its environmental analyses. 40 C.F.R. § 1502.23.

Even setting aside the internal inconsistency of the Certificate Order, the Commission drastically mischaracterized the net change in annual emissions caused by the Project because it credited the Project with emissions reductions from retirement of the Cumberland Fossil Plant that are not attributable to the Project. This violated NEPA for two reasons.

First, the Commission cannot credit the Project for *any* offsets associated with the retirement of the Cumberland Fossil Plant on this record. Crediting a pipeline with downstream emissions reductions may be appropriate in some circumstances where the record establishes that

the gas to be transported by the pipeline will displace a higher-emitting alternative fuel like coal. *See, e.g.*, *Sabal Trail*, 867 F.3d at 1374–75; *Consideration of Greenhouse Gas Emissions in Nat. Gas Infrastructure Project Reviews*, 178 FERC ¶ 61,108 P52 (Feb. 18, 2022) ("*Interim GHG Policy*") ("evidence of a net-reduction in GHG emissions" may be considered "where the use of transported gas displaces the use of a higher emitting alternative fuel"). But according to the FEIS, construction of the Cumberland Gas Plant as a replacement for the Cumberland Fossil Plant is a *fait accompli* and the only question is whether the Project or some other potential pipeline will provide the gas.[14] If the only difference between "action" and "no action" here is how TVA acquires the gas it craves—which is the position of the FEIS—the Commission cannot lawfully credit the Project for the retirement of the coal plant because the FEIS assumes that will happen under either scenario. *See, e.g.*, *N. Carolina Wildlife Fed'n v. N. Carolina Dep't of Transp.*, 677 F.3d 596, 603 (4th Cir. 2012) ("[C]ourts not infrequently find NEPA violations when an agency miscalculates the 'no build' baseline or when the baseline assumes the existence of a proposed project.").

If anything, the record indicates that the Project will not displace higher-emitting coal; it will displace a carbon-free alternative to the Cumberland Gas Plant. When an agency defines the "no action" alternative in an EIS for a project, its ultimate task is to compare the "environmental effects from taking no action" with "the effects of permitting the proposed activity or an alternative activity to go forward." *Forty Most Asked Questions Concerning CEQ's National Environmental Policy Act Regulations*, 46 Fed. Reg. 18,026, 18,027 (Mar. 23, 1981) ("*Forty*

---

[14] *See* Cumberland Project FEIS at App. I-83 ("[T]he new natural gas plant will be constructed by TVA and will require natural gas to be delivered to the plant. Under the No-Action alternative, the proposed Cumberland Pipeline would not be constructed; rather, a different project would have to be designed to meet the natural gas needs of the new TVA natural gas-fueled combined cycle plant.").

Questions"); *Double E Pipeline, LLC*, 173 FERC ¶ 61,074 P80 (Oct. 15, 2020) (same). "Where a choice of 'no action' by the agency would result in predictable actions by others, this consequence of the 'no action' alternative should be included in the analysis." *Forty Questions*, 46 Fed. Reg. at 18,027. The Commission regularly heeds this instruction. *See, e.g.*, *Double E Pipeline, LLC*, 173 FERC ¶ 61,074 at P80; *Alaska Gasline Dev. Corp.*, 172 FERC ¶ 61,214 P38 (Sept. 11, 2020). Choosing "no action" here and rejecting the Project would result in a pair of predictable actions by TVA: the utility would still retire the Cumberland Fossil Plant and TVA would replace it with one of the other alternatives it considered alongside the Cumberland Gas Plant during its own NEPA process.

Second, and alternatively, even if the Commission could credit the Project for *some* offsets associated with the retirement of the Cumberland Fossil Plant, the Commission significantly overstated the net reduction in annual emissions caused by the Project because the Commission credited the Project with emissions reductions from the retirement of the second unit at the Cumberland Fossil Plant that are demonstrably inapplicable here. The Certificate Order makes clear that the Commission calculated a "net reduction in emissions" by relying on "the retirement of *two* existing coal-powered units at the Cumberland Fossil Plant."[15] But the Commission's own record demonstrates that the Project and the downstream Cumberland Gas Plant are not replacing the first unit at the Cumberland Fossil Plant and cannot be credited for offsets from the retirement of that unit. The FEIS explains that "gas delivered by the Project to TVA's proposed Cumberland Gas Plant would provide fuel for two new natural gas-fired turbines (total output of 1,450 [megawatts]) that are *intended to replace one coal-fired power plant unit* in

---

[15] Certificate Order P53 (emphasis added); *see also id.* P48 ("This decrease is based on the retirement of coal-fired *units* at the Cumberland Fossil Plant[.]" (emphasis added)).

2026."[16] In fact, the draft EIS mistakenly stated that gas transported by the Project would support the retirement of both units at the Cumberland Fossil Plant, causing TVA to request a correction and clarify that the Project would provide fuel for "two new natural gas turbines [that] are intended to replace the generation lost from the retirement of the first coal unit by 2026."[17] TVA reiterated to the Commission just last month that "the Cumberland Project will facilitate TVA's retirement of unit 1 of the Cumberland Fossil Plant."[18] With respect to the second unit, the FEIS acknowledges that the proposed replacement is a separate gas plant and battery system called the Cheatham County Generation Site, which would be supported by a different pipeline.[19]

The Commission was required to disaggregate emissions from the first unit and second unit before calculating the net change caused by the Project. Instead, the Commission apparently adopted emissions figures from TVA's final EIS that bundled them.[20] Regardless of whether this bundled approach was permissible for TVA based on the scope of its own NEPA analysis, the bundled approach certainly was not permissible for the Commission where the scope of the

---

[16] Cumberland Project FEIS at 4-101 (emphasis added).

[17] Comments of TVA on Draft Environmental Impact Statement for the Cumberland Project at 2–3, FERC Dkt. No. CP22-493-000 (Mar. 27, 2023), Accession No. 20230327-5148.

[18] Letter from Jacinda B. Woodward, TVA, to Chairman Phillips and Comm'rs Clements and Christie, FERC, regarding Tennessee Gas Pipeline Company, L.C.C., FERC Dkt. No. CP22-493-000 (Jan. 3, 2024), Accession No. 20240103-5125.

[19] Cumberland Project FEIS at 4-101; *see also* TVA, Notice of Intent: Cheatham County Generation Site Environmental Impact Statement, 88 Fed. Reg. 32,267, 32,267 (May 19, 2023) ("The Cheatham County Generation Site (CHG) would generate approximately 900 Megawatts (MW) and replace generation capacity for a portion of the Cumberland Fossil Plant (CUF) second unit retirement planned by the end of 2028."); TVA, Cheatham County Generation Site Scoping Report 2 fig.1 (Nov. 2, 2023), https://perma.cc/C6EZ-XR9F (showing proposed route of pipeline lateral).

[20] *See* Certificate Order P48 & n.110 (explaining that the Commission relied on emissions data from TVA's final EIS).

Commission's NEPA analysis was explicitly limited to the "proposed action of the Cumberland (Pipeline) Project . . . to provide the required volume of natural gas needed to operate the new TVA natural gas facility"—*i.e.*, the Cumberland Gas Plant that is replacing only the first unit.[21]

By improperly crediting the Project with the retirement of the second unit, the Commission overstated the annual net change in emissions from the Project almost threefold. In Paragraph 48 of the Certificate Order, the Commission explains that it calculated the net change from the Project by comparing historical emissions from both coal-fired units at the Cumberland Fossil Plant ("9.59 million metric tons of $CO_2e$ per year") with projected emissions from the Cumberland Gas Plant ("approximately 2.53 million metric tons of $CO_2e$ per year"), resulting in a net change of "approximately -7.06 million metric tons of $CO_2e$ per year."[22] But disaggregating emissions from the first unit and second unit using data from TVA reveals that the net change in single-year downstream greenhouse gas emissions attributable to the Project is about one-third that size. TVA updated its emissions calculations in its errata document to disclose the net change in emissions during the years between the staggered unit retirements, which isolates the net change in emissions from the first unit.[23] Calculating the net change by comparing operational emissions from the Cumberland Gas Plant to the first unit alone results in an "estimated reduction" of "2,497,617 tons" or 2,265,800 metric tons of $CO_2e$.[24] In other words, the net

---

[21] Cumberland Project FEIS at App. I-32. Indeed, the Commission previously has recognized that "evidence of a net-reduction in GHG emissions" may be considered "where *the use of transported gas* displaces the use of a higher emitting alternative fuel." *Interim GHG Policy* P52 (emphasis added).

[22] Certificate Order P48.

[23] *See* TVA Errata Document at A-4 to A-5 (calculating net change in short tons from retirement of the first unit during the years the second unit will continue operating) (**Ex. 3**).

[24] *Id.* at A-5. One short ton is equal to 0.9071847 metric tons.

11

change attributable to the Project is only around -2.26 million metric tons of $CO_2e$ in a given year—not -7.06 million metric tons as the Certificate Order claims.[25]

### 3. The Commission obscured the Project's total downstream emissions by focusing on the annual rate in a single year and unreasonably assuming that rate would hold constant for decades.

Because climate change is driven by the accumulation of greenhouse gases in the atmosphere, NEPA requires agencies to consider more than just the annual rate of a project's emissions—they must also consider a project's total emissions over its lifetime. *See, e.g.*, *WildEarth Guardians v. Bernhardt,* 502 F. Supp. 3d 237, 252 (D.D.C. 2020) ("disclosing the yearly rate by itself does not paint the whole picture" of emissions and climate impacts); *see also Sabal Trail*, 867 F.3d at 1375 (Commission must understand "whether *total emissions*, on net, will be reduced or increased" (emphasis added)).

Even beyond NEPA, the record in this proceeding establishes that lifetime greenhouse gas emissions are a critical factor when the Commission is considering new gas infrastructure. The FEIS acknowledges that "[c]limate change is driven by [the] accumulation of GHGs in the atmosphere due to the increased consumption of fossil fuels."[26] And the FEIS relies on reports from the International Panel on Climate Change ("IPCC") and United States Global Change Research Program ("USGCRP"), which explain that "there is a near-linear relationship between cumulative anthropogenic $CO_2$ emissions and the global warming they cause" and that "the magnitude of human-induced climate change depends less on the year-to-year emissions than it

---

[25] *Compare id.* at ER-1, A-5 *with* Certificate Order at P48.

[26] Cumberland Project FEIS at 4-125.

does on the net amount of carbon, or cumulative carbon, emitted into the atmosphere."[27] In short, science and the Commission's administrative record demonstrate that the nature of climate change means lifetime emissions—not just annual rates—are an important aspect of the problem. *See Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983).

The Commission did not take a hard look at downstream greenhouse gas emissions because it ignored or obscured emissions over the life of the Project by fixating on the annual rate. This would violate NEPA on its own, *WildEarth Guardians*, 502 F. Supp. 3d at 252–53, but the problem here runs even deeper. Although the Commission never disclosed a figure representing its calculation of lifetime downstream greenhouse gas emissions from the Project, the Certificate Order and FEIS assign a range of monetary values to those emissions over a twenty-year period using the social cost of greenhouse gases.[28] According to the FEIS, those monetary values were calculated by "including the reduction in emissions that would result at TVA's proposed Cumberland Gas Plant" and assuming that "emissions would be at a constant rate throughout the life of the 20-year contract" between Tennessee and TVA.[29] In other words, even where the Commission obliquely considered emissions beyond an annual rate, it simply multiplied the annual rate by twenty years.

---

[27] *See* IPCC, *Climate Change 2021: The Physical Science Basis, Summary for Policymakers* 28 (Masson-Delmotte et al. eds., 2021), *available at* https://www.ipcc.ch/report/ar6/wg1/ (cited in Cumberland Project FEIS at 4-125 to 4-126 & nn. 61, 64) (first quote); USGCRP, *Climate Science Special Report: Fourth National Climate Assessment, Vol. 1* at 139 (2017), *available at* https://science2017.globalchange.gov/downloads/ (cited in Cumberland Project FEIS at 4-126) (second quote); *see also* Cumberland Project FEIS at 4-126 & nn. 62–63 (describing USGCRP as "the leading U.S. Scientific body on climate change").

[28] Certificate Order PP48, 55; Cumberland Project FEIS at 4-129 to 4-130.

[29] Cumberland Project FEIS at 4-130.

13

This was arbitrary and capricious. As discussed above, the Commission decided that the Project will cause an "overall net reduction in potential downstream GHG emissions" by comparing historical emissions from the Cumberland Fossil Plant to projected emissions from the Cumberland Gas Plant.[30] But even if this approach were a defensible way to calculate the net change in a single year, it was unreasonable for the Commission to extrapolate that net change across twenty years because the record establishes conclusively that the Cumberland Fossil Plant will shut down within several years regardless of the Project. The Commission simply had no basis on which to assume the Cumberland Fossil Plant would operate indefinitely and continue emitting in perpetuity absent the Project because all record evidence points the other way. TVA has already decided to retire both units of the Cumberland Fossil Plant by the end of 2028 and included coal plant retirement in each of the action alternatives in the Cumberland Plant FEIS.[31] And TVA has disclosed "approximately $16 million of additional depreciation quarterly" in filings with the Securities and Exchange Commission as a result of its decision to retire the Cumberland Fossil Plant.[32] Moreover, the Cumberland Fossil Plant is operationally challenged for reasons independent of the Project, and keeping the first unit operating beyond its planned retirement in 2026 would require "significant investment . . . to maintain safe and reliable

---

[30] Certificate Order P48.

[31] *See, e.g.*, Cumberland Plant FEIS at iii ("Under all Action Alternatives, two CUF units would be retired and demolished.").

[32] TVA, Form 10-K Annual Report for FY2023 at 108 (Nov. 14, 2023), https://perma.cc/7WJK-J8G3.

operations and comply with environmental regulations."[33] In fact, TVA plans to retire its entire coal fleet by 2035.[34]

Against this backdrop, the Commission could not lawfully credit the Project for reducing Cumberland Fossil Plant emissions in perpetuity. The record shows that emissions from both coal-fired units will cease no later than 2035 with or without the Project. So even under an extremely conservative 2035 retirement scenario, the Project could be credited for a net annual reduction in greenhouse gas emissions for a maximum of ten years.[35] But the Project and the downstream Cumberland Gas Plant will operate for at least thirty years, which means the Project's downstream greenhouse gas emissions will continue for at least twenty years after any conceivable offset has expired.[36]

*     *     *

The combined effect of the Commission's mistakes is profound. After disaggregating emissions from the first unit and second unit at the Cumberland Fossil Plant, Table 1 below illustrates the net change in downstream $CO_2e$ attributable to the Project by year, even using conservative assumptions to credit the Project for offsets through 2035.[37]

---

[33] Cumberland Plant FEIS at 8.

[34] Cumberland Plant FEIS at 8.

[35] TVA anticipates that the Cumberland Gas Plant will begin commercial operation in approximately June 2026. *See* Cumberland Plant FEIS at 274.

[36] *See* Cumberland Plant FEIS at 275 ("The operational life cycle of Alternative A was assumed to be 30 years based on current industry assumptions for typical expected operating life of a combined cycle natural gas plant."). It would be unreasonable for the Commission to cabin its analysis to the twenty-year term of the contract between Tennessee and TVA instead of the thirty-year "expected operating life" of the Cumberland Gas Plant. *Id.*

[37] To reiterate, the Project is not eligible for any offsets because the record establishes that the Cumberland Fossil Plant will retire by 2035—and likely much sooner—even absent the Project. *See supra* pp. 7–9. These conservative assumptions are for illustrative purposes only.

**Table 1: Net Change in Downstream $CO_2e$ Emissions by Year**

| Year | 2026 | 2027 | 2028 | 2029 | 2030 | 2031 | 2032 | 2033 | 2034 | *2035 |
|---|---|---|---|---|---|---|---|---|---|---|
| Net Change (MMT/yr) | -2.26 | -2.26 | -2.26 | -2.26 | -2.26 | -2.26 | -2.26 | -2.26 | -2.26 | -2.26 |

| Year (cont'd) | 2036 | 2037 | 2038 | 2039 | 2040 | 2041 | 2042 | 2043 | 2044 | 2045 |
|---|---|---|---|---|---|---|---|---|---|---|
| Net Change (MMT/yr) | 2.53 | 2.53 | 2.53 | 2.53 | 2.53 | 2.53 | 2.53 | 2.53 | 2.53 | 2.53 |

| Year (cont'd) | 2046 | 2047 | 2048 | 2049 | 2050 | 2051 | 2052 | 2053 | 2054 | 2055 |
|---|---|---|---|---|---|---|---|---|---|---|
| Net Change (MMT/yr) | 2.53 | 2.53 | 2.53 | 2.53 | 2.53 | 2.53 | 2.53 | 2.53 | 2.53 | 2.53 |

In sum, even using conservative assumptions, the record reveals that the Project will decrease downstream $CO_2e$ emissions by 22.6 million metric tons in the first ten years before increasing them by 50.6 million metric tons over the next twenty. The net change is an increase of 28 million metric tons of $CO_2e$ over the thirty-year expected life of the Cumberland Gas Plant.

The true magnitude of the Project's downstream greenhouse gas emissions is dramatically different than the Commission claimed in the Certificate Order. The fundamental errors in the Commission's analysis violate NEPA and vitiate its determination under the NGA. *Vecinos*, 6 F.4th at 1331.

**B. The Commission Cannot Disregard Upstream Greenhouse Gas Emissions.**

The Commission also must account for upstream methane emissions from the Project under NEPA and the NGA. In Section 7 proceedings, the Commission is obligated to consider all indirect effects of proposed pipelines, *Sabal Trail*, 867 F.3d at 1373, a category that here includes methane emissions from upstream gas extraction, processing, and transportation. Methane is an extremely potent greenhouse gas—its global warming potential ("GWP") is between 28 to 36 times greater than carbon dioxide over a 100-year period ("GWP-100") and roughly 84 times greater for its first twenty years in the atmosphere ("GWP-20")—so understanding the methane

emissions that a pipeline will cause directly and indirectly is essential to reasoned decision-making.[38] This is especially true where, as here, a pipeline is claimed to have a positive climate effect by enabling a coal plant retirement. Upstream methane emissions in the domestic gas supply chain "can eclipse, or at a minimum greatly reduce, the stated climate benefits of switching from coal to natural gas."[39] These emissions are an important aspect of the problem, *State Farm*, 463 U.S. at 43, and sufficiently important and likely that "a person of ordinary prudence would take [them] into account in reaching a decision," 40 C.F.R. § 1508.1(aa).

Neither the FEIS nor the Certificate Order attempt to quantify or even describe qualitatively the upstream methane emissions that would be an indirect effect of the Project.[40] Instead, the Commission takes the position that upstream emissions "are not reasonably foreseeable effects of the [P]roject" based on the Commission's categorical position in this and other proceedings that "[t]he environmental impacts resulting from the production of natural gas are generally neither caused by a proposed pipeline project nor are they reasonably foreseeable consequences of [the Commission's] approval of an infrastructure project, particularly here where the supply source is unknown."[41]

This blinkered approach violates NEPA and the APA. Even if there may be uncertainty about *where* upstream methane emissions will occur because of a pipeline project, there is zero

---

[38] Council on Env't Quality, National Environmental Policy Act Guidance on Consideration of Greenhouse Gas Emissions and Climate Change, 88 Fed. Reg. 1,196, 1,199–1,205 (Jan. 9, 2023) ("CEQ Climate Guidance").

[39] Comments of Conservation Groups on Draft Environmental Impact Statement for the Cumberland Project at 24, FERC Dkt. No. CP22-493 (Mar. 27, 2023), Accession No. 20230327-5150 ("DEIS Comments of Conservation Groups").

[40] *See* Certificate Order P50; Cumberland Project FEIS at 4-131.

[41] Certificate Order P50.

doubt about *whether* they will occur.[42] The record in this proceeding provides ample evidence

that the Project will cause upstream emissions and includes information the Commission could

and should have used to quantify or estimate them. Most notably, TVA estimated upstream

methane emissions from the Cumberland Gas Plant would be "1.6 percent of total natural gas

flow" even without quantifying the leakage contribution from "gas extraction/processing" that

would support the Cumberland Gas Plant.[43] In addition, the Environmental Protection Agency

("EPA") offered to assist the Commission with an analysis of upstream greenhouse gas emissions

from the Project but the Commission "dismissed the EPA's offer."[44] Despite this, EPA estimated

upstream emissions of carbon dioxide, methane, and nitrous oxide from the Project and informed

the Commission that "upstream emissions would roughly be the following, in tons, per year:

| CO2 | CH4 | N2O |
|------|------|------|
| 462,427.60 | 10923.58 | 1.05 |

"[45]

---

[42] *See* Comments of Environmental Protection Agency ("EPA") on *Consideration of Greenhouse Gas Emissions in Natural Gas Infrastructure Project Reviews* at Encl. 3, FERC Dkt. No. PL21-3 (Apr. 25, 2022), Accession No. 20220426-5037 ("In EPA's view, both upstream and downstream GHG emissions are clearly reasonably foreseeable and are indirect impacts of NGA section 7 projects."); CEQ Climate Guidance, 88 Fed. Reg. at 1,204 n.86 ("[N]atural gas pipeline infrastructure creates the economic conditions for additional natural gas production . . . , which produce[s] indirect (both upstream and downstream) GHG emissions that contribute to climate change."). EPA's comments on the Interim GHG Policy also appear in the Project record as Attachment 28 to DEIS Comments of Conservation Groups at Accession No. 20230327-5150.

[43] Cumberland Plant FEIS at App. I-2 (first quote); Cumberland Plant FEIS at 261 n.15 (second quote). TVA's estimate of 1.6 percent is indefensibly low but nonetheless underscores that upstream emissions are foreseeable.

[44] Comments of EPA on Final Environmental Impact Statement for the Cumberland Project at Encl. 2, FERC Dkt. No. CP22-493 (Aug. 7, 2023), Accession No. 20230807-5153.

[45] *Id.*

In sum, the record refutes the Commission's claim that upstream emissions are not reasonably foreseeable here. This is not a case where information is lacking. *Cf. Birckhead v. FERC*, 925 F.3d 510, 517–18 (D.C. Cir. 2019).

The Commission had at least two additional methods available to quantify upstream emissions by itself. First, the Commission could have calculated upstream emissions according to the *Lifecycle Analysis of Natural Gas Extraction and Power Generation*, published by the Department of Energy ("DOE") and National Energy Technology Laboratory ("NETL"), which estimates the emissions associated with extracting, processing, and transporting a given quantity of gas.[46] The Commission has repeatedly used the DOE/NETL methodology for this purpose. *See, e.g.*, *Atl. Coast Pipeline*, 161 FERC ¶ 61,042 P293 & n.418 (Oct. 13, 2017); *Nat'l Fuel Gas Supply Corp.*, 158 FERC ¶ 61,145 PP185, 189 & n.264 (Feb. 3, 2017). Second, the Commission could have followed a recommendation from EPA to, "at a minimum, apply average emission rates per unit of natural gas produced from recent years of emissions data in the National Greenhouse Gas Inventory to project throughput."[47]

Uncertainty about the location of the supply source does not absolve the Commission of its duty to consider upstream emissions. True, it may be difficult to predict certain *local* impacts from gas extraction, processing, and transportation without knowing where those activities will occur. But greenhouse gas emissions and climate impacts are *global*.[48] To the extent supply source location affects upstream methane emissions because of regional variability in methane

---

[46] *See generally* DOE & NETL, DOE/NETL-2014/1646, Lifecycle Analysis of Natural Gas Extraction and Power Generation (May 29, 2014), https://perma.cc/G4VE-N3FS.

[47] EPA Comments on *Interim GHG Policy*, *supra* n. 42, at Encl. 3.

[48] Cumberland Project FEIS at 4-126.

leakage, for example, the Commission was required to provide a range of values, as EPA explained and the Commission has done in the past.[49] NEPA does not demand forecasting that is not meaningfully possible, but the Commission must consider indirect effects to the fullest extent it can. *Food & Water Watch v. FERC*, 28 F.4th 277, 285 (D.C. Cir. 2022). Here, the Commission "could have expressed the forecasts as ranges, and it could have explained the uncertainties underlying the forecasts, but it was not entitled to simply throw up its hands and ascribe any effort at quantification to 'a crystal ball inquiry.'" *WildEarth Guardians v. Zinke*, 368 F. Supp. 3d 41, 70 (D.D.C. 2019) (quoting *Scientists' Inst. for Pub. Info. v. Atomic Energy Comm'n*, 481 F.2d 1079, 1092 (D.C. Cir. 1973)).

Finally, insofar as the Commission believes information that would allow it to quantify a value or range of values for the upstream emissions associated with the Project is incomplete or unavailable, the Commission is still required under NEPA to comply with 40 C.F.R. § 1502.21, including by evaluating upstream emissions "based upon theoretical approaches or research methods generally accepted in the scientific community." 40 C.F.R. § 1502.21(c)(4); *Vecinos*, 6 F.4th at 1328–30. At a minimum, the DOE/NETL and EPA methodologies described above must be used in this way.

Just like with downstream emissions, the Commission made errors and omissions that dramatically obscured the magnitude of the upstream greenhouse gas emissions from the Project. These emissions are a significant factor in determining the climate impact of the Project. Table 2

---

[49] *See* Comments of EPA on Draft Environmental Impact Statement for the Cumberland Project at Enc. 1, FERC Dkt. No. CP22-493 (Mar. 27, 2023), Accession No. 20230327-5227 ("Where FERC may not know the specific origin of the natural gas, as reported in the [draft EIS], a range of values may be provided."); *Nat'l Fuel Gas Supply Corp.*, 158 FERC ¶ 61145 at PP189–90.

Document Accession #: 20240220-5230     Filed Date: 02/20/2024

and Table 3 below calculate annual upstream emissions of $CO_2e$ using EPA's estimates of upstream greenhouse gas emissions from the Project.

**Table 2: Annual Upstream Emissions from the Project Using GWP-20**

| Greenhouse Gas | Upstream Emissions from EPA (short tons) | GWP-20 Conversion Factor[50] | CO$_2$e Equivalent (short tons) |
|---|---|---|---|
| Carbon dioxide (CO$_2$) | 462,427.60 | 1 | 462,427.60 |
| Methane (CH$_4$) | 10,923.58 | 84 | 917,580.72 |
| Nitrous oxide (N$_2$O) | 1.05 | 273 | 286.65 |
| **Total** | /// | /// | 1,380,294.97 |

**Table 3: Annual Upstream Emissions from the Project Using GWP-100**

| Greenhouse Gas | Upstream Emissions from EPA (short tons) | GWP-100 Conversion Factor[51] | CO$_2$e Equivalent (short tons) |
|---|---|---|---|
| Carbon dioxide (CO$_2$) | 462,427.60 | 1 | 462,427.60 |
| Methane (CH$_4$) | 10,923.58 | 32 | 349,554.56 |
| Nitrous oxide (N$_2$O) | 1.05 | 273 | 286.65 |
| **Total** | /// | /// | 812,268.81 |

In sum, the upstream emissions that EPA estimated from the Project would result in roughly 812,000–1,380,000 short tons or 737,000–1,250,000 metric tons of additional $CO_2e$ emissions each year. Over the thirty-year expected life of the Cumberland Gas Plant, these upstream emissions total between approximately 22 million and 37.5 million metric tons of $CO_2e$. The

---

[50] GWP-20 for methane is based on the CEQ Climate Guidance, 88 Fed. Reg. at 1,199. GWP-20 for nitrous oxide is based on *Climate Change 2021: The Physical Science Basis*, *supra* n. 27, at 1017.

[51] GWP-100 for methane assumes the middle of the 28–36 range in the CEQ Climate Guidance, 88 Fed. Reg. at 1,199. GWP-100 for nitrous oxide is based on *Climate Change 2021: The Physical Science Basis*, *supra* n. 27, at 1017.

Commission is not necessarily required to use EPA's estimates, but the Commission cannot leave upstream emissions off the ledger just because estimating them involves uncertainty. Willful blindness to a factor of this importance violates NEPA and infects the Commission's ultimate decision under the NGA. *Vecinos*, 6 F.4th at 1331.

### C.  The Commission's Assertion That Project-Related Greenhouse Gas Emissions "Cannot Have a Significant Adverse Impact" is Baseless and Wrong.

The Commission is required to determine whether direct and indirect greenhouse gas emissions from the Project would be significant under NEPA and weigh their significance in its analysis under the NGA. *See Sabal Trail*, 867 F.3d at 1373–74. In this case, the Commission concluded that greenhouse gas emissions from the Project would not be significant because "the record indicates a net reduction in GHG emissions" and "[a] net reduction in the emissions of a pollutant logically cannot cause a significant adverse impact under NEPA."[52] This reasoning in the Certificate Order is the only support for the Commission's no-significance conclusion. The FEIS expressly declined to "characterize[e] the Project's GHG emissions as significant or insignificant."[53]

The Commission's no-significance conclusion rests on unsound logic and a false premise. To start, even a small volume of greenhouse gases may be significant because climate change is a problem of accumulation. This is why agencies must consider lifetime emissions, not just annual rates. *See supra* pp. 12–15. More importantly for this proceeding, the record refutes the underlying assumption: far from "indicat[ing] a net reduction in GHG emissions,"[54] the record

---

[52] Certificate Order P49.

[53] Cumberland Project FEIS at 4-128; *see also id.* at Abstract ("Climate change impacts are not characterized in the EIS as significant or insignificant.").

[54] Certificate Order P49.

Document Accession #: 20240220-5230    Filed Date: 02/20/2024

establishes that the Project will add over 28 million metric tons of $CO_2e$ from downstream emissions alone during the expected life of the Project. *See supra* pp. 3–16. Upstream emissions will increase that figure by at least another 22 million metric tons of $CO_2e$ over the life of the Project. *See supra* pp. 16–22.

On rehearing, the Commission must determine whether greenhouse gas emissions from the Project would be significant—and how significant they would be—after first quantifying those emissions correctly. This is not optional. The Commission must consider greenhouse gas emissions when deciding whether to approve a pipeline, *Sabal Trail*, 867 F.3d at 1373–74, and NEPA requires the Commission to take a hard look at both "[t]he environmental impacts of the proposed action . . . and the significance of those impacts." 40 C.F.R. § 1502.16(a)(1); *see also Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 352 (1989) ("action-forcing function of NEPA" should enable agency and public to "evaluate the severity of the adverse effects"); 18 C.F.R. § 380.7(a), (d) (1987) (an EIS prepared by Commission staff must summarize "[t]he significant environmental impacts of the proposed action" and "[a]ny significant environmental impacts of the proposed action that cannot be mitigated").

The proxy analysis framework used in the Certificate Order and FEIS, comparing Project emissions to national- and state-level emissions, is not capable of doing this work. *See, e.g.*, *Diné Citizens Against Ruining Our Env't v. Haaland*, 59 F.4th 1016, 1043–44 (10th Cir. 2023) ("Simply stating what percentage the emissions will make up of regional, national, and global emissions does not meaningfully inform the public or decisionmakers about the impact of the emissions."); CEQ Climate Guidance, 88 Fed. Reg. at 1,201 ("[S]uch comparisons and fractions also are not an appropriate method for characterizing the extent of a proposed action's . . . contributions to climate change because this approach does not reveal anything

beyond the nature of the climate change challenge itself."). The Commissions says it used these comparisons only to "contextualize the project emissions" and did not claim these comparisons revealed anything about significance.[55] For good reason. Even if national- and state-level comparisons offered decisionmakers useful context, *but see Diné Citizens*, 59 F.4th at 1043, these comparisons are not equivalent to a statement about the significance of the Project's emissions, which is what NEPA demands.

On rehearing, the Commission cannot lawfully refuse to answer whether greenhouse gas emissions from the Project would be significant—and how significant they would be—by claiming it lacks the tools. Paragraph 55 of the Certificate Order asserts that the Commission cannot use the social cost of greenhouse gases because the Commission has "no criteria to identify what monetized values are significant for NEPA purposes."[56] Paragraph 55 also claims the Commissions is not "aware of any other currently scientifically accepted method that would enable the Commission to determine the significance of reasonably foreseeable GHG emissions."[57] These rationales do not excuse the Commission from its obligations under NEPA and the NGA.

As an initial matter, Paragraph 55 rehashes the so-called *Driftwood* compromise from *Driftwood Pipeline LLC*, 183 FERC ¶ 61,049 (Apr. 21, 2023), and violates the APA. The Commission claims to lack the necessary tools to determine significance, but it has never explained why it thinks the methods proposed in connection with its now-draft *Interim GHG Policy* in Docket No. PL21-3 are not up to the task. This unexplained rejection amounts to a

---

[55] Certificate Order P52; *see also id.* PP52–54.

[56] Certificate Order P55.

[57] Certificate Order P55.

demand that the public trust the Commission without any ability to understand how, or even whether, the Commission considered significant points and weighed the relevant factors. *See, e.g.*, *Home Box Off., Inc. v. F.C.C.*, 567 F.2d 9, 35–36 (D.C. Cir. 1977). The APA embodies the principle that "the Government should turn square corners in dealing with the people." *Dep't of Homeland Sec. v. Regents of the Univ. of Cal.*, 140 S. Ct. 1891, 1909 (2020) (internal quotation omitted). But the Commission's decision to silently ignore proposed methods in the name of compromise is anathema to this rule. The Commission's claimed inability to determine the significance of a project's greenhouse gas emissions also represents an unexplained shift from Commission precedent. The Commission has previously evaluated the significance of greenhouse gas emissions in certificate orders, *see, e.g.*, *N. Nat. Gas Co.*, 174 FERC ¶ 61,189 PP29, 34–36 (Mar. 22, 2021), and it cannot simply depart from its prior rulings "without providing a reasoned analysis indicating that prior policies and standards are being deliberately changed, not casually ignored," *W. Deptford Energy, LLC v. FERC*, 766 F.3d 10, 17 (D.C. Cir. 2014) (internal quotation omitted).

In all events, the Commission had at least two methods it could have readily used here. First, the Commission could have simply applied the rebuttable presumption it announced in the now-draft *Interim GHG Policy* establishing a significance threshold of 100,000 metric tons or more per year of $CO_2e$.[58] "For a single natural gas project with a lifespan of 30 years, this threshold represents a total of three million metric tons of GHG emissions."[59] For the Project, downstream emissions alone are roughly ten times that threshold. *See supra* pp. 3–16. This is not an edge case.

---

[58] *Interim GHG Policy* P79.

[59] *Interim GHG Policy* P88.

25

Second, the Commission could have used the social cost of greenhouse gases to determine significance. The Certificate Order resists using the social cost of greenhouse gases for this purpose because "there are no criteria to identify what monetized values are significant for NEPA purposes" and the Commission is "currently unable to identify any such appropriate criteria."[60] The Certificate Order also claims that "the D.C. Circuit has repeatedly upheld the Commission's decisions not to use the social cost of carbon, including to assess significance."[61] Neither assertion excuses the Commission from using the social cost of greenhouse gases here. Whether greenhouse gas emissions from a pipeline will be significant is not a binary choice under NEPA, and especially not when the Commission evaluates the public convenience and necessity under Section 7 of the NGA. The social cost of greenhouse gases from the Project is staggering. For illustrative purposes, Table 4 below calculates the social cost of carbon for the downstream emissions shown in Table 1 for the years 2026–2050 based on the Interagency Working Group's ("IWG") *Technical Support Document: Social Cost of Carbon, Methane, and Nitrous Oxide Interim Estimates Under Executive Order 13990* (Feb. 2021), using the central discount rate (3%) in the Certificate Order. As shown below, the social cost of downstream emissions from the Project, based on these inputs, exceeds $495 million through 2050. Applying the same IWG social cost estimate and 3% discount rate to the lowest annual figure for upstream emissions based on Table 3 above—737,000 metric tons of $CO_2e$ per year—reveals another $862 million in social costs from the Project through 2050, as shown in Table 5 below.

---

[60] Certificate Order P55.

[61] Certificate Order P55.

26

**Table 4: Social Cost of Downstream Emissions – IWG Estimate and 3% Discount Rate**

| Year | 2026 | 2027 | 2028 | 2029 | 2030 | 2031 | 2032 | 2033 | 2034 | 2035 |
|---|---|---|---|---|---|---|---|---|---|---|
| Net Change (MMT/yr) | -2.26 | -2.26 | -2.26 | -2.26 | -2.26 | -2.26 | -2.26 | -2.26 | -2.26 | -2.26 |
| Social Cost ($) | -122,471,166 | -121,114,972 | -119,731,875 | -118,326,600 | -116,901,613 | -115,598,911 | -114,272,923 | -112,926,110 | -111,560,810 | -110,179,243 |

| Year (cont'd) | 2036 | 2037 | 2038 | 2039 | 2040 | 2041 | 2042 | 2043 | 2044 | 2045 |
|---|---|---|---|---|---|---|---|---|---|---|
| Net Change (MMT/yr) | 2.53 | 2.53 | 2.53 | 2.53 | 2.53 | 2.53 | 2.53 | 2.53 | 2.53 | 2.53 |
| Social Cost ($) | 121,779,775 | 120,203,682 | 118,616,091 | 117,019,007 | 115,414,331 | 113,806,921 | 112,195,237 | 110,580,890 | 108,965,404 | 107,348,854 |

| Year (cont'd) | 2046 | 2047 | 2048 | 2049 | 2050 | | TOTAL |
|---|---|---|---|---|---|---|---|
| Net Change (MMT/yr) | 2.53 | 2.53 | 2.53 | 2.53 | 2.53 | | /// |
| Social Cost ($) | 105,735,353 | 104,124,774 | 102,518,317 | 100,915,898 | 99,321,027 | | 495,461,338 |

27

**Table 5: Social Cost of Low-End Upstream Emissions – IWG Estimate and 3% Discount Rate**

| Year | 2026 | 2027 | 2028 | 2029 | 2030 | 2031 | 2032 | 2033 | 2034 | *2035 |
|---|---|---|---|---|---|---|---|---|---|---|
| Emissions (MT/yr) | 737,000 | 737,000 | 737,000 | 737,000 | 737,000 | 737,000 | 737,000 | 737,000 | 737,000 | 737,000 |
| Social Cost ($) | 39,938,606 | 39,496,343 | 39,045,306 | 38,587,037 | 38,122,340 | 37,697,521 | 37,265,108 | 36,825,904 | 36,380,671 | 35,930,134 |

| Year (cont'd) | 2036 | 2037 | 2038 | 2039 | 2040 | 2041 | 2042 | 2043 | 2044 | 2045 |
|---|---|---|---|---|---|---|---|---|---|---|
| Emissions (MMT/yr) | 737,000 | 737,000 | 737,000 | 737,000 | 737,000 | 737,000 | 737,000 | 737,000 | 737,000 | 737,000 |
| Social Cost ($) | 35,474,978 | 35,015,855 | 34,553,383 | 34,088,146 | 33,620,696 | 33,152,451 | 32,682,960 | 32,212,694 | 31,742,096 | 31,271,188 |

| Year (cont'd) | 2046 | 2047 | 2048 | 2049 | 2050 | | TOTAL |
|---|---|---|---|---|---|---|---|
| Emissions (MMT/yr) | 737,000 | 737,000 | 737,000 | 737,000 | 737,000 | | /// |
| Social Cost ($) | 30,801,168 | 30,331,999 | 29,864,031 | 29,397,240 | 28,932,647 | | 862,430,502 |

28

Taken together, these greenhouse gas emissions inflict more than $1.35 billion in social costs through 2050. In the face of those costs, the Commission cannot shrug its shoulders because it lacks a bright-line rule. NEPA "involves an almost endless series of judgment calls." *Duncan's Point Lot Owners Ass'n Inc. v. FERC*, 522 F.3d 371, 376 (D.C. Cir. 2008) (internal quotation marks omitted). And as the Commission is fond of saying, its ultimate duty under the NGA "entails not merely economic and mathematical analysis but value judgement." *E.g.*, Br. for Resp't Fed. Energy Regul. Comm'n at 42, *Env't Def. Fund v. FERC*, 2 F.4th 953 (D.C. Cir. 2021) (No. 20-1016), Doc. No. 1871074.

The D.C. Circuit decisions the Commission invokes in the Certificate Order do not provide an escape hatch. In those cases, the Commission gave multiple reasons why it refused to determine significance using the social cost of carbon—not solely because it lacked a consensus monetary threshold. *See Ctr. for Biological Diversity v. FERC*, 67 F.4th 1176, 1183–84 (D.C. Cir. 2023); *Del. Riverkeeper Network v. FERC*, 45 F.4th 104, 111 (D.C. Cir. 2022); *EarthReports, Inc. v. FERC*, 828 F.3d 949, 956 (D.C. Cir. 2016).[62] Here, the Commission claimed only that "there are no criteria to identify what monetized values are significant."[63] We are aware of no decision from any court upholding this single justification as sufficient to excuse the Commission from using the social cost of greenhouse gases to determine significance. In this case, where the social cost of greenhouse gases from the Project exceeds $1.35 billion, any lack of a consensus monetary benchmark is immaterial. The Commission cannot elide costs of that magnitude without explaining its reasoning.

---

[62] The issue was deemed waived in *Appalachian Voices v. FERC*, No. 17-1271, 2019 WL 847199, at *2 (D.C. Cir. Feb. 19, 2019), so that decision provides no support for the substance of the Commission's position.

[63] Certificate Order P55.

Finally, even if the Commission believes that necessary information about significance is missing, the Commission must do the best with the tools it has. This obligation is a central part of NEPA. *See, e.g.*, *Zinke*, 368 F. Supp. 3d at 70. At a minimum, the Commission must comply with 40 C.F.R. § 1502.21(c) and use the social cost of greenhouse gases as a "theoretical approach[] or research method[] generally accepted in the scientific community." 40 C.F.R. § 1502.21(c)(4); *see also Vecinos*, 6 F.4th at 1329. The Commission has never disputed that the social cost of greenhouse gases is generally accepted in the scientific community, *Tenn. Gas Pipeline Co., L.L.C.*, 180 FERC ¶ 61,205 P75 (Sept. 29, 2022), and has no basis for refusing to apply it here to evaluate significance under 40 C.F.R. § 1502.21(c)(4).

If the Commission fails to determine the significance of the Project's greenhouse gas emissions on rehearing, it will trigger other follow-on NEPA violations. Determining significance sets the stage for how an EIS discusses alternatives to the proposed action and mitigation strategies. *See, e.g.*, 40 C.F.R. § 1502.1 (EIS must "provide full and fair discussion of significant environmental impacts and . . . inform decision makers and the public of reasonable alternatives that would avoid or minimize adverse impacts"); *id.* § 1502.14(e) (EIS must "include appropriate mitigation measures"); 18 C.F.R. § 380.7(d) (EIS must summarize "[a]ny significant environmental impacts of the proposed action that cannot be mitigated"); *see also Robertson*, 490 U.S. at 351 (EIS must include "a detailed discussion of possible mitigation measures" to address adverse environmental impacts from proposed action). Determining significance is also essential to the public-disclosure function of NEPA, since one purpose of an EIS is to ensure that "the agency [and] other interested groups and individuals can properly evaluate the severity of the adverse effects" from the proposed action and whether they can be ameliorated. *Id.* at 352.

Document Accession #: 20240220-5230          Filed Date: 02/20/2024

**D.  The Commission is Required to Analyze the Cumberland Project and the Cumberland Gas Plant Together Because They are Connected Actions and are Functionally Interdependent.**

NEPA forbids agencies from segmenting their environmental analyses and "thereby fail[ing] to address the true scope and impact of the activities that should be under consideration." *Del. Riverkeeper Network v. FERC*, 753 F.3d 1304, 1313 (D.C. Cir. 2014). Agencies preparing environmental impact statements must consider "connected actions," which are actions that are "closely related and therefore should be discussed in the same impact statement." 40 C.F.R. § 1501.9(e)(1); *see also id.* § 1501.3(b) ("In considering whether the effects of the proposed action are significant, . . . [a]gencies should consider connected actions consistent with § 1501.9(e)(1)."). The point of this rule is to ensure agencies consider the full environmental impact of connected actions before they are undertaken so the true cost of an integrated project can be assessed while agencies are "best situated to evaluate 'different courses of action' and mitigate anticipated effects." *City of Bos. Delegation v. FERC*, 897 F.3d 241, 251–52 (D.C. Cir. 2018) (quoting *Del. Riverkeeper Network*, 753 F.3d at 1313–14). Actions are "connected actions" under NEPA if they (1) "trigger other actions," (2) "cannot or will not proceed" without previous or simultaneous actions, or (3) are "interdependent parts of a larger action and depend on the larger action for their justification." 40 C.F.R. § 1501.9(e)(1)(i)–(iii).

The Cumberland Project and the Cumberland Gas Plant are connected actions under any rubric and should have been analyzed in a single EIS. The Project is functionally "interdependent" with the gas plant, "cannot or will not proceed" alone, and depends on the Cumberland Gas Plant for its justification. *Id.* There is no reasonable dispute about the operative facts. The sole *raison d'être* of the Cumberland Project is that it "will provide additional firm transportation service for TVA to support a new natural gas-fired power plant in Stewart County,

31

Tennessee."[64] TVA is the only shipper on the Project and the site of the Cumberland Gas Plant is the only delivery point.[65] Meanwhile, the Cumberland Gas Plant cannot operate without the Project.[66] The two have no independent utility and the Project lacks a logical terminus without the gas plant. *See Del. Riverkeeper Network*, 753 F.3d at 1315. They are functionally, temporally, and geographically linked. Even TVA agrees that the Cumberland Project and the Cumberland Gas Plant are connected actions.[67]

The Commission takes the categorical position that "NEPA does not require the Commission to evaluate major federal actions outside of its control, such as TVA's system and its projects."[68] This is not correct. As an initial matter, the Commission never even acknowledges the connected actions regulation, but its "determination of the proper scope of its environmental review must train on the governing regulations," which here means 40 C.F.R. § 1501.9(e)(1). *Del. Riverkeeper Network*, 753 F.3d at 1315 (applying this rule to an earlier version of the "connected actions" regulation previously codified at 40 C.F.R. § 1508.25(a) (1978)). NEPA requires the Commission to consider connected actions even though another federal agency is involved. There is no one-agency limitation in 40 C.F.R. § 1501.9(e)(1), and courts have

---

[64] Certificate Order P3.

[65] Certificate Order PP3–5.

[66] Cumberland Plant FEIS at 33 ("The operation of a new [combined cycle] plant on the CUF Reservation would require construction of approximately 32 miles of a new single, 30-inch-diameter natural gas pipeline lateral and associated gas system infrastructure, together formally known as the Cumberland Pipeline Project, in Dickson, Houston, and Stewart counties in Tennessee.")

[67] *See* Cumberland Plant FEIS at iii ("This EIS also evaluates connected actions associated with the gas supply and transmission components of the respective alternatives.").

[68] Cumberland Project FEIS at App. I-82.

assumed that the rule against segmentation to applies to, and connected actions can involve, decisions by multiple agencies. *See, e.g.*, *Sierra Club v. U.S. Army Corps of Eng'rs*, 803 F.3d 31, 34, 51 (D.C. Cir. 2015) (describing contention that "the federal actions in [a] case" involving "several federal agencies' approvals relating to [a] pipeline" were connected "and so should have been analyzed together" as an "accurate statement of the connected actions doctrine" but finding the claim had not been preserved). The fact that TVA also has decisions to make does not absolve the Commission of its duty to undertake a NEPA process that is coextensive with its regulatory authority. *Sabal Trail*, 867 F.3d at 1373.

In any event, the Commission conjures a false choice between segmentation and intrusion into TVA's sphere. The NEPA regulations supply a clear solution and underscore why the Cumberland Project and the Cumberland Gas Plant should have been considered in a single EIS. Under 40 C.F.R. § 1501.7(a), a designated lead agency "shall supervise the preparation of an environmental impact statement or a complex environmental assessment if more than one Federal agency . . . [i]s involved in a group of actions directly related to each other because of their functional interdependence or geographical proximity." 40 C.F.R. § 1501.7(a)(2). This command is significant for two reasons. First, it demonstrates that actions that are directly related "because of their functional interdependence or geographical proximity" belong in the same EIS even when they involve "more than one Federal agency." *Id.* Whether this is a gloss on the "connected actions" criterion in 40 C.F.R. § 1501.9(e)(1)(iii) or a different test altogether, the Cumberland Project and the Cumberland Gas meet this standard because of their "functional interdependence" and "geographical proximity." *Id.* § 1501.7(a)(2). Accordingly, this "group of actions directly related to each other" should have been considered in a single EIS. *Id.* Second, this regulation and its corollary for cooperating agencies, *id.* § 1501.8, ameliorate any concern

33

about overreach. The Commission was not required to supplant TVA; it was required to initiate a NEPA process in which TVA could choose to collaborate.

The Commission's failure to consider the Cumberland Project and the Cumberland Gas Plant in the same EIS prejudiced its analysis. As described above, the Commission repeatedly miscalculated the Project's emissions by adopting data from TVA that TVA later updated without the Commission knowing. *See, e.g.*, *supra* p. 6. Similarly, the Commission claimed it would be "speculative" to imagine alternatives to the Project that could meet TVA's needs.[69] But if the Commission had analyzed these connected actions in a single EIS with a unified scope, its environmental analysis would have been informed by the action alternatives before TVA—all of which involved retirement of the Cumberland Fossil Plant.[70]

### E. The Record Does Not Contain Sufficient Evidence that the Project is Needed or That it Would Be in the Public Interest.

The Commission cannot approve a proposed pipeline without finding that the pipeline is needed and will serve the public interest. *See Certification of New Interstate Nat. Gas Pipeline Facilities*, 88 FERC ¶ 61,227, *corrected*, 89 FERC ¶ 61,040 (1999), *clarified*, 90 FERC ¶ 61,128, *further clarified*, 92 FERC ¶ 61,094 (2000). Section 7 of the NGA charges the Commission with determining whether a proposed pipeline "is or will be required by the present or future public convenience and necessity" before issuing a certificate. 15 U.S.C. § 717f(e). This is a capacious standard that requires the Commission to "evaluate *all* factors bearing on the public interest." *Spire*, 2 F.4th at 961 (quoting *Atl. Refin. Co. v. Pub. Serv. Comm'n of N.Y.*, 360 U.S. 378, 391 (1959)). Otherwise, the certificate "application shall be denied." 15 U.S.C. § 717f(e).

---

[69] Cumberland Project FEIS at 3-2.

[70] *See, e.g.*, Cumberland Plant FEIS at iii.

34

This record cannot support a determination that the Project is or will be truly "required by the present or future public convenience and necessity[.]" *Id.* To be clear, the issue in this proceeding is not whether TVA has a market need for *new power generation*, but whether the record assembled by Tennessee offers an adequate basis for the Commission to find a market need for *gas delivered by the Project* to generate that power and whether *the Project* would be in the public interest. The answer is "no" for three reasons.

First, the precedent agreement between Tennessee and TVA is not probative of market need for the Project under the circumstances of this proceeding. TVA is an unregulated monopoly provider of electric power within its territory. Indeed, several Commissioners in recent years have recognized the detriment to consumers from TVA's unchecked power.[71] This unchecked power sets TVA apart from other power companies and vitiates any probative value of the precedent agreement between Tennessee and TVA. By definition, normal market forces do not apply to TVA and its approval of the Cumberland Gas Plant over other available generation resources, nor to TVA's decision to enter a precedent agreement with Tennessee for a pipeline to fuel the gas plant.

The market distortion created by monopolies is well known to the Commission, since the "primary aim" of the NGA is to temper the monopolistic characteristics of the gas transportation

---

[71] *See Athens Utils. Bd.*, 177 FERC ¶ 61,021, 61,087–88 (Oct. 21, 2021) (Glick, Chairman, concurring) ("[T]he [Tennessee Valley] region, and particularly its ratepayers, would be far better served by having access to alternative power supplies on a competitive and non-discriminatory basis. The benefits of competition and consumer choice far outweigh whatever benefits the region once derived from the current model."); *id.* at 61,090 (Clements, Comm'r, dissenting) ("[Requiring TVA to wheel outside power to its customers] would provide the customers of the relevant not-for-profit cooperative and municipal utilities access to lower cost power than TVA currently provides them with, supplying a modicum of competition and its associated benefits to the region."); *id.* at 61,091 (Christie, Comm'r, concurring) ("Competitive procurements hold the promise of reducing power supply costs to *all* customers, large and small, while avoiding the threat of potential cost-shifting to small customers.").

industry in order to protect consumers. *Process Gas Consumers Grp. v. FERC*, 177 F.3d 995, 1002 (D.C. Cir. 1999) (cleaned up). Even before *Spire*, which upended the Commission's practice of near-total reliance on precedent agreements to establish need, the Commission was aware that "evidence of anti-competitive or other inappropriate behavior" could nullify the link between certain types of precedent agreements and market need. *NEXUS Gas Transmission, LLC*, 160 FERC ¶ 61,022 P47 (Aug. 25, 2017). The Commission has repeatedly justified its reliance on precedent agreements when they arise "in a competitive environment." *Greenbrier Pipeline Co., LLC*, 103 FERC ¶ 61,024 P17 (Apr. 9, 2003); *see also Millennium Pipeline Co., L.P.*, 100 FERC ¶ 61,277 P57 (Sept. 19, 2002). But because TVA is a monopoly, the precedent agreement here did not arise from a competitive environment. It arose from a distorted market devoid of competition.[72]

Second, the only thing behind the precedent agreement is TVA's own selection of the Cumberland Gas Plant. In some circumstances, a utility decision like this might be relevant to the market study required by the Certificate Policy Statement that informs the Commission's evaluation of the public convenience and necessity. *See Certification of New Interstate Nat. Gas Pipeline Facilities*, 88 FERC ¶ 61,227 at 61,748 ("[T]he evidence necessary to establish the need for [a] project will usually include a market study."). But those circumstances are not present here. EPA has questioned the validity of TVA's conclusion that the Cumberland Gas Plant is the

---

[72] As Appalachian Voices and Sierra Club have explained, the precedent agreement between Tennessee and TVA is not probative of need for two additional reasons beyond TVA's status as an unregulated monopoly. TVA has (1) affirmatively wielded its monopoly power to further entrench its unchecked position in the market by locking most of its local power company customers into perpetual contracts and (2) improperly entered into the precedent agreement before informing itself and the public of alternatives to the gas plant and pipeline as required by NEPA. *See* Mot. to Intervene & Comments in Opp'n of Sierra Club & Appalachian Voices at 9–13, FERC Dkt. No. CP22-493-000 (Aug. 19, 2022), Accession No. 20220819-5146.

least-cost alternative for new generation and has raised other substantial concerns with its final EIS.[73] For example, after TVA published its final EIS, EPA critiqued it because the utility's "alternatives analysis continues to rely on inaccurate underlying economic information" and "does not reflect a balanced economic assessment of the alternatives."[74] EPA faulted TVA for ignoring the "economic effects and opportunities of the Inflation Reduction Act," using misleading data concerning "economic competitiveness among generation options," and not accounting for the cost of "likely future GHG mitigation policies."[75] TVA dismissed these concerns in its Record of Decision as duplicative of similar concerns EPA raised about the utility's draft EIS,[76] but the logical conclusion the Commission should draw from EPA's repetition is that the agency did not find TVA's explanations convincing and the serious questions about the accuracy of TVA's economic analysis remain unanswered.[77] The Commission does not

---

[73] *See* Comments of EPA on the Final EIS for the Cumberland Fossil Plant Retirement at Encl. 1–4, FERC Dkt. No. CP22-493 (Jan. 6, 2023), Accession No. 20231002-5351 (in File List as Attachment 1).

[74] *Id.* at Encl. 1.

[75] *Id.* at 1–3.

[76] Cumberland Plant ROD, 88 Fed. Reg. at 3,770.

[77] Other evidence in the record supports EPA's substantial concerns about TVA's cost analysis in its final EIS. In comments on TVA's draft EIS, utilities industry expert Michael Goggin concluded that a solar-and-storage combination could reliably provide the needed energy and capacity while saving ratepayers about $1.79 billion over twenty years. *See* Michael Goggin, Grid Strategies, LLC, *Critique of TVA's Alternatives Analysis in the Utility's "Cumberland Fossil Plant Retirement, Draft Environmental Impact Statement"* 13–19, 41, FERC Dkt. No. CP22-493 (June 13, 2022), Accession No. 20231002-5351 (in File List as Attachment 2). And in comments on TVA's final EIS, Goggin reported that the Inflation Reduction Act—passed after the draft EIS but before the final EIS—would substantially increase those savings. Michael Goggin, Grid Strategies, LLC, *Analysis of TVA's "Cumberland Fossil Plant Retirement, Final Environmental Impact Statement"* 8–10, FERC Dkt. No. CP22-493 (Jan. 6, 2023), Accession No. 20231002-5351 (in File List as Attachment 3). A report from the Applied Economics Clinic demonstrated that, following the Inflation Reduction Act's passage, TVA's 2019 Integrated Resource Plan was

have the necessary expertise in the Inflation Reduction Act, the costs of generation options including solar and battery storage, and the cost of emissions mitigation technology for power plants to independently adjudicate this issue. On this record, the Commission cannot simply accept TVA's representations. *Cf. Sierra Club v. U.S. Army Corps of Eng'rs*, 701 F.2d 1011, 1030 (2d Cir. 1983) ("[T]he court may properly be skeptical as to whether an EIS's conclusions have a substantial basis in fact if the responsible agency has apparently ignored the conflicting views of other agencies having pertinent expertise." (citation omitted)).

Third, the flaws in TVA's economic analysis go to the heart of the Commission's public-interest balancing itself, fatally undermining any assertion that the Project serves a genuine market need or provides public benefits sufficient to outweigh the project's many adverse effects. The Certificate Policy Statement is clear that "[v]ague assertions of public benefits will not be sufficient," and that, for example, if one of the benefits claimed would be to lower electric rates, "the applicant's market study would need to explain the basis for that projection." *Certification of New Interstate Nat. Gas Pipeline Facilities*, 88 FERC ¶ 61,227 at 61,748. But TVA's project approval documents do not adequately explain or justify TVA's refusal to incorporate the pointed criticism of the EPA and others about the flaws in the data and analytic models TVA relied upon to determine that a gas plant is needed to replace the retiring coal plant. Since TVA's choice of gas generation was made at least in part on the basis of inaccurate or incomplete economic considerations in its project approval documents, it would be unlawful for the Commission to rely on those documents as evidence of market need or public benefits. *See, e.g.*, *Nat. Res. Def.*

---

badly out of date and did not allow TVA to conclude that the Cumberland Gas Plant was consistent with TVA's least-cost-planning mandate. Liz Stanton et al., Applied Econ. Clinic, *TVA Resource Planning Assessment Phase I* 8–9, FERC Dkt. No. CP22-493 (Jan. 6, 2023), Accession No. 20231002-5351 (in File List as Attachment 4).

*Council v. U.S. Forest Serv.*, 421 F.3d 797, 813 (9th Cir. 2005) (rejecting EIS where alternatives

analysis was based on inaccurate market demand forecast); *Johnston v. Davis*, 698 F.2d 1088,

1094–95 (10th Cir. 1983) (rejecting EIS based on "artificially low discount rate" that

exaggerated the project's benefits and resulted in an "unreasonable comparison of alternatives").

Rather than engage with these serious deficiencies in the record, the Certificate Order

bends over backwards to avoid confronting them. The Certificate Order proclaims that "[i]ssues

related to TVA's plan to replace coal-fired units from the Cumberland Fossil Plant with a natural

gas-fired plant, including issues regarding the need for the new natural gas-fired plant, are

outside the scope of this proceeding" because "the TVA Board has the exclusive authority to

evaluate the need for generation facilities within TVA's service territory."[78] This statement does

not answer the charge.

The Commission's purview under the NGA is not as constrained as the Commission

claims in the Certificate Order. To start, the Commission invokes provisions of the TVA Act

requiring TVA to undertake a least-cost planning program, 16 U.S.C. § 831m-1, and granting the

TVA Board statutory authority to acquire or construct power plants and other infrastructure, *id.*

§ 831c(j), but neither contains any reference to the exclusivity on which the Commission relies.

More importantly, the scope of TVA's authority does not displace the Commission's authority

and obligation under the NGA to consider all factors bearing on the public interest, including the

end use of the gas to be transported. *See, e.g.*, *Interim GHG Policy* P82 ("The Commission has

recognized from its earliest decisions that it may consider the end use of gas as a factor in

assessing the public interest[.]"). The Commission's authority under Section 7 and concomitant

obligation to consider the end use of the gas exists even where, as here, the Commission does not

---

[78] Certificate Order P15.

have direct regulatory authority over the end use. The Commission is empowered to "exercise a veto power over proposed transportation" for an "inferior" downstream use "when a balance of all the circumstances weighs against certification," even where direct regulation of downstream uses lies with another authority. *Fed. Power Comm'n v. Transcon. Gas Pipe Line Corp.*, 365 U.S. 1, 16–17 (1961).

In the face of serious questions about the need for and supposed benefit of the gas the Project would transport, the Commission cannot discharge its obligations under the NGA by simply acquiescing to TVA. Deferring to the precedent agreement without addressing the record evidence demonstrating that the Project and Cumberland Gas Plant are not needed and would not be in the public interest would repeat the mistakes of *Spire*. Although the red flags in *Spire* were different, the end result is the same. The Commission's refusal "to seriously engage with nonfrivolous arguments challenging the probative weight" of a precedent agreement with an unregulated monopoly does "not evince reasoned and principled decisionmaking." *Spire*, 2 F.4th at 960.

This is an unusual case because TVA is an unusual utility. The Commission historically has relied on state commission oversight to find a market need and public benefit for a project when a monopoly utility is a shipper under a precedent agreement. *See, e.g.*, *NEXUS Gas Transmission, LLC*, 164 FERC ¶ 61,054 P39 (July 25, 2018) (relying on "the important role played by the [state utility commission]" to protect captive ratepayers and concluding that a state commission's supervision of an electric-power utility made it "reasonable for the Commission to have confidence that the contracts . . . are good evidence of need and good evidence that the project is in the public interest"); *Granite State Gas Transmission, Inc.*, 83 FERC ¶ 61,194, 61,820 (May 27, 1998) (declining to take a "harder look" beyond the precedent agreement

40

because "that harder look was taken by the respective public service commissions charged with protecting the interests of the distribution company and the customers in the state"). But where, as here, there are no other checks and balances, it falls to the Commission to confront the relevant questions directly in keeping with its broad authority under the NGA.

The Commission may approve a pipeline only when the applicant has "create[d] a record that will enable the Commission to find that the benefits to be achieved by the project will outweigh the potential adverse effects." *Certification of New Interstate Nat. Gas Pipeline Facilities*, 88 FERC ¶ 61,227 at 61,748. Tennessee has not done so here. As described above, the precedent agreement cannot be relied upon as sufficient evidence of market need given TVA's unique lack of competitive market discipline or utility commission oversight.[79] And the Commission has been presented with EPA's analysis and other evidence in the record demonstrating flaws in TVA's economic and cost analysis that have not been resolved. The Commission must rely on the record created by the parties that have appeared in this proceeding, and the record here does not allow the Commission to conclude that the Project "is or will be required by the present or future public convenience and necessity." 15 U.S.C. § 717f(e).

---

[79] Of course, the adverse effects side of the ledger is also fatally flawed as a result of the Commission's multiple failures concerning the greenhouse gas emissions from the Project.

# CONCLUSION

For the reasons stated above, Appalachian Voices and Sierra Club respectfully request that the Commission grant this request for rehearing and abrogate the Certificate Order as authorized by 15 U.S.C. § 717r(a).

Dated: February 20, 2024

Respectfully submitted,

*/s Trey Bussey*
Trey Bussey
Amanda Garcia
SOUTHERN ENVIRONMENTAL LAW CENTER
1033 Demonbreun Street
Suite 205
Nashville, TN 37203
(615) 921-9470
tbussey@selctn.org
agarcia@selctn.org

*/s Spencer Gall*
Spencer Gall
Gregory Buppert
SOUTHERN ENVIRONMENTAL LAW CENTER
120 Garrett Street
Suite 400
Charlottesville, VA 22902
(434) 977-4090
sgall@selcva.org
gbuppert@selcva.org

*Counsel for Appalachian Voices and Sierra Club*

UNITED STATES OF AMERICA
DEPARTMENT OF ENERGY
FEDERAL ENERGY REGULATORY COMMISSION

IN THE MATTER OF                    )
                                    )
Tennessee Gas Pipeline Company, L.L.C.    )                    Docket No. CP22-493

**CERTIFICATE OF SERVICE**

I hereby certify that I have this day caused the foregoing document to be served upon

each person designated on the official service list compiled by the Acting Secretary in this

proceeding.

Dated at Charlottesville, Virginia this 20th Day of February, 2024.

*/s Spencer Gall*
Spencer Gall
SOUTHERN ENVIRONMENTAL LAW CENTER