**ORAL ARGUMENT NOT YET SCHEDULED**

**UNITED STATES COURT OF APPEALS**
**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

**No. 24-1099**
**(consolidated with No. 24-1198)**

**SIERRA CLUB AND**
**APPALACHIAN VOICES,**

*Petitioners*,

v.

**FEDERAL ENERGY REGULATORY COMMISSION,**

*Respondent.*

———————————————————

**TENNESSEE GAS PIPELINE COMPANY, L.L.C.,**
**TENNESSEE VALLEY AUTHORITY, AND**
**TENNESSEE VALLEY PUBLIC POWER ASSOCIATION, INC.**
*Respondent-Intervenors*

———————————————

**On Petitions for Review of Orders of**
**the Federal Energy Regulatory Commission**

———————————————

**BRIEF OF RESPONDENT-INTERVENORS**

———————————————

Dated:  November 19, 2024

*Counsel Listed on Inside Cover*

Bill Wolf
  Vice President & Deputy General Counsel
Jacquelyne Rocan
  Assistant General Counsel
Meghan Coffman
  Assistant General Counsel
TENNESSEE GAS PIPELINE COMPANY, L.L.C.
1001 Louisiana Street
Suite 1000
Houston, TX 77002
Tel.:   (713) 420-6680
Email: bill_wolf@kindermorgan.com
       jacquelyne_rocan@kindermorgan.com
       meghan_coffman@kindermorgan.com

Brian D. O'Neill
Michael R. Pincus
Travis Malesky
VAN NESS FELDMAN, LLP
2000 Pennsylvania Ave., NW,
Suite 6000
Washington, D.C. 20006
Tel.:   (202) 298-1800
Fax:   (202) 338-2416
Email:  bdo@vnf.com
        mmd@vnf.com
        tmalesky@vnf.com

David A. Super
Kevin A. Ewing
Ann D. Navaro
BRACEWELL LLP
2001 M Street, NW, Suite 900
Washington, D.C. 20036
Tel: (202) 828-5836
Facsimile: (800) 404-3970
Email: david.super@bracewell.com
Email: kevin.ewing@bracewell.com
Email: ann.navaro@bracewell.com

*Attorneys for Tennessee Gas Pipeline Company, L.L.C.*

David D. Ayliffe
Associate General Counsel
Office of the General Counsel
TENNESSEE VALLEY AUTHORITY
400 West Summit Hill Drive
Knoxville, Tennessee 37902-1401
Tel.: 865.632.8964
Email: ddayliffe@tva.gov

John P. Coyle
DUNCAN & ALLEN LLP
1730 Rhode Island Ave., N.W.
Suite 700
Washington, DC 20036
Tel.: (202) 289-8400
Email: jpc@duncanallen.com

*Attorney for Tennessee Valley Authority*

*Counsel for the Tennessee Valley Public Power Association, Inc.*

## CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES

### A.    Parties and *Amici*

All parties and intervenors appearing before this Court are as stated in the

Petitioners' opening brief.

### B.    Rulings Under Review

The following Federal Energy Regulatory Commission decisions are under

review:

- *Tennessee Gas Pipeline Co., L.L.C.*, FERC Docket No. CP22-493-000, Order Issuing Certificate, 186 FERC ¶ 61,046 (Jan. 18, 2024) ("Certificate Order") (R.169; J.A.___-___).

- *Tennessee Gas Pipeline Co., L.L.C.*, FERC Docket No. CP22-493-001, Notice of Denial of Rehearing by Operation of Law and Providing for Further Consideration, 186 FERC ¶ 62,143 (Mar. 22, 2024) (R.__; J.A.___-___).

- *Tennessee Gas Pipeline Co., L.L.C.*, FERC Docket No. CP22-493-001, Order on Rehearing, 187 FERC ¶ 61,136 (June 7, 2024) ("Rehearing Order") (R.190; J.A.___-___).

### C.    Related Cases

FERC's brief (at i-ii) sets forth the related cases.

## RULE 26.1 CORPORATE DISCLOSURE STATEMENT

Pursuant to Federal Rule of Appellate Procedure 26.1 and D.C. Circuit Rule 26.1, Tennessee Gas Pipeline Company, L.L.C. ("Tennessee"), Tennessee Valley Authority ("TVA"), and Tennessee Valley Public Power Association ("Tennessee Association") make the following disclosures:

### Tennessee Gas Pipeline Company, L.L.C.

The immediate parent of Tennessee is Kinder Morgan Operating LLC "A", which owns all of the outstanding membership interests of Tennessee.

Kinder Morgan Operating LLC "A" is a Delaware limited liability company which is owned by Kinder Morgan Energy Partners, L.P.

Kinder Morgan Energy Partners, L.P. is a Delaware limited partnership, of which a 97.5842% limited partner interest is owned by Kinder Morgan, Inc., a 1.4158% limited partner interest is owned by Kinder Morgan GP LLC, and the 1% general partner interest is owned by Kinder Morgan GP LLC.

Kinder Morgan GP LLC, a Delaware limited liability company, is owned by Kinder Morgan, Inc.

Kinder Morgan Inc., a Delaware corporation, is a publicly traded company whose stock trades on the New York Stock Exchange under the symbol "KMI."

**Tennessee Valley Authority**

TVA is an executive branch corporate agency and instrumentality of the United States created by and existing pursuant to the Tennessee Valley Authority Act of 1933, 16 U.S.C. §§ 831–831ee ("TVA Act"). TVA is wholly owned by the United States; that ownership is evidenced by the TVA Act; and TVA has neither a parent corporation nor stock certificates.

**Tennessee Valley Public Power Association**

The Tennessee Association is a non-profit mutual benefit corporation organized under the laws of the State of Tennessee, whose membership consists of the 153 municipal and rural electric cooperative electric utilities who are parties to requirements power sales agreements with TVA under Section 10 of the Tennessee Valley Authority Act (16 U.S.C. §§ 831-831ee, § 831i). The Tennessee Association has no outstanding shares of stock and is governed by a nineteen-member Board of Directors elected by its member utilities. The Association is a "trade association" within the meaning of Circuit Rule 26.1(b).

## TABLE OF CONTENTS

CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES ............. i

RULE 26.1 CORPORATE DISCLOSURE STATEMENT.................................... ii

TABLE OF CONTENTS..................................................................................... iv

TABLE OF AUTHORITIES .............................................................................. vi

GLOSSARY.........................................................................................................x

INTRODUCTION ................................................................................................1

STATEMENT OF THE ISSUES..........................................................................2

STATEMENT OF THE CASE.............................................................................3

    I.   Cumberland Project ...................................................................................3

    II.  FERC's Comprehensive Review..............................................................4

    III. FERC Orders ...........................................................................................4

STATUTES AND REGULATIONS.....................................................................9

JURISDICTIONAL STATEMENT .....................................................................9

STANDARD OF REVIEW ..................................................................................9

SUMMARY OF ARGUMENT ............................................................................9

ARGUMENT ......................................................................................................12

    I.   FERC Properly Identified and Analyzed the No-Action Alternative. ..........12

        A.   FERC Defined the Right "No Action" Alternative..................................14

        B.   This Court's Precedent Supports FERC...................................................16

        C.   FERC Properly Avoided the Perverse Result Following From Petitioners' Argument. .......................................................................................17

    II.  FERC Reasonably Considered Downstream Greenhouse Gas Emissions and Reductions As Indirect Effects of the Project. .............................................18

        A.   FERC Did Not Err in Attributing a Reduction in Coal Plant Emissions to Its Decision to Approve the Project. ......................................................18

        B.   FERC's Method of Analyzing Projected Greenhouse Gas Emissions Did Not Violate NEPA. ...................................................................................23

    III. FERC Properly Concluded That the Gas Plant Is Not a Connected Action. 25

IV. FERC Reasonably Relied Upon the Precedent Agreement in Compliance With the NGA. ................................................................................31

V. If the Court Finds FERC's Analysis Is Deficient, It Should Remand the Orders Without Vacatur. ................................................................35

CONCLUSION ................................................................................39

STATUTORY ADDENDUM ........................................................... SA-1

CERTIFICATE OF COMPLIANCE

CERTIFICATE OF SERVICE

## TABLE OF AUTHORITIES

<u>**FEDERAL CASES**</u>

*Alabama Municipal Distributors Group v. FERC*,
   100 F.4th 207 (D.C. Cir. 2024)................................................................1

*Allied-Signal, Inc. v. NRC*,
   988 F.2d 146 (D.C. Cir. 1993)......................................................35, 36

*American Great Lakes Ports Ass'n v. Schultz*,
   962 F.3d 510 (D.C. Cir. 2020)................................................................35

*Appalachian Voices v. FERC*,
   No. 17-1271, 2019 WL 847199 (D.C. Cir. Feb. 19, 2019) ...........................1, 32

*Canonsburg General Hospital v. Burwell*,
   807 F.3d 295 (D.C. Cir. 2015)................................................................19

*Center for Biological Diversity v. FERC*,
   67 F.4th 1176 (D.C. Cir. 2023) ("*Alaska LNG*").............................1, 16, 17, 30

*Citizens Against Burlington, Inc. v. Busey*,
   938 F.2d 190 (D.C. Cir. 1991)................................................................16

*City of Boston Delegation v. FERC*,
   897 F.3d 241 (D.C. Cir. 2018)................................................................31

*City of Oberlin, Ohio v. FERC*,
   39 F.4th 719 (D.C. Cir. 2022)............................................................ 31-32

*City of Oberlin, Ohio v. FERC*,
   937 F.3d 599 (D.C. Cir. 2019)................................................................31

*City of Port Isabel v. FERC*,
   111 F.4th 1198 (D.C. Cir. 2024)........................................... 30-31, 36

*Communities Against Runway Expansion, Inc. v. FAA*,
   355 F.3d 678 (D.C. Cir. 2004)................................................................24

*Delaware Riverkeeper Network v. FERC*,
   45 F.4th 104 (D.C. Cir. 2022).............................................22, 31, 32

*Delaware Riverkeeper v. FERC*,
    753 F.3d 1304 (D.C. Cir. 2014) ...........................................................30

*DOT v. Public Citizen*,
    541 U.S. 752 (2004) ....................................................18, 19, 29, 30

*Environmental Defense Fund v. FERC*,
    2 F.4th 953 (D.C. Cir. 2021) .................................................................32

*Food & Water Watch v. FERC*,
    104 F.4th 336 (D.C. Cir. 2024) ...................................................31, 32

*Food & Water Watch v. FERC*,
    28 F.4th 277 (D.C. Cir. 2022) ...............................................................31

*Kleppe v. Sierra Club*,
    427 U.S. 390 (1976) ..............................................................................19

*Marin Audubon Society v. FAA*,
    ___ F.4th ___, No. 23-1067, 2024 WL 4745044 (D.C. Cir. Nov. 12, 2024).....25

*Mayo v. Reynolds*,
    875 F.3d 11 (D.C. Cir. 2017) ................................................................22

*Minisink Residents for Environmental Preservation & Safety v. FERC*,
    762 F.3d 97 (D.C. Cir. 2014) .............................................................6, 32

*Motor Vehicle Mfrs. Ass'n v. State Farm Mutual Automobile Insurance Co.*,
    463 U.S. 29 (1983) .................................................................................22

*Myersville Citizens for a Rural Community., Inc. v. FERC*,
    783 F.3d 1301 (D.C. Cir. 2015) ....................................................31, 32

*NAACP v. FPC*,
    425 U.S. 662 (1976) ..............................................................................39

*New Jersey Conservation Foundation v. FERC*,
    111 F.4th 42 (D.C. Cir. 2024) ..............................................................33

*NRDC v. Hodel*,
    865 F.2d 288 (D.C. Cir. 1988) .............................................................17

*Robertson v. Methow Valley Citizens Council*,
490 U.S. 332 (1989)..................................................................19

*SEC v. Chenery Corp.*,
318 U.S. 80 (1943)....................................................................19

*Sierra Club v. U.S. Army Corps of Engineers*,
803 F.3d 31 (D.C. Cir. 2015).......................................................9

*Sierra Club v. FERC*,
38 F.4th 220 (D.C. Cir. 2024).....................................................22

*Sierra Club v. FERC*,
827 F.3d 36 (D.C. Cir. 2016)..............................................1, 18, 19

*Sierra Club v. FERC*,
827 F.3d 59 (D.C. Cir. 2016)........................................................1

*Sierra Club v. FERC*,
867 F.3d 1357 (D.C. Cir. 2017) ("*Sabal Trail*") .....................1, 8, 16, 21, 22, 32

*Standing Rock Sioux Tribe v. U.S. Army Corps of Engineers*,
471 F. Supp. 3d 71 (D.D.C. 2020), *affirmed in part and reversed in part*,
985 F.3d 1032 (D.C. Cir. 2021), *cert denied sub nom.*,
*Dakota Access, LLC v. Standing Rock Sioux Tribe*,
142 S. Ct. 1187 (2022).............................................................35

*Vecinos para el Bienestar de la Comunidad Costera v. FERC*,
6 F.4th 1321 (D.C. Cir. 2021), *vacated and remanded sub nom. on other grounds*,
*City of Port Isabel v. FERC*, 111 F.4th 1198 (D.C. Cir. 2024).............. 30-31, 36

*Williston Basin Interstate Pipeline Co. v. FERC*,
519 F.3d 497 (D.C. Cir. 2008).....................................................35

## **ADMINISTRATIVE CASES**

*Tennessee Gas Pipeline Co.*,
186 FERC ¶ 61,046 ("Certificate Order"), *notice of denial of rehearing by operation of law*,
186 FERC ¶ 62,143, *order on rehearing*,
187 FERC ¶ 61,136 (2024) ("Rehearing Order")........... 3, 4, 5, 6, 7, 8, 9, 12, 15, 19, 21, 22, 23, 24, 25, 26, 28, 29, 31, 32, 33

*Tex. E. Transmission, LP*,
185 FERC ¶ 61,038 (2023) ........................................................... 15-16

**STATUTES**

Natural Gas Act

15 U.S.C. § 717(b) ...............................................................................28
15 U.S.C. § 717f(c) ................................................................................3
15 U.S.C. § 717r(d)(5) .........................................................................37

Federal Power Act

16 U.S.C. § 824(b)(1) ..........................................................................28

Tennessee Valley Authority Act

16 U.S.C. §§ 831, *et seq.* ....................................................................33
16 U.S.C. § 831a(b)(5) .........................................................................34
16 U.S.C. § 831c(j) ...............................................................................29
16 U.S.C. § 831m-1 ..............................................................................29
16 U.S.C. § 831m-1(b)(1) .....................................................................34
16 U.S.C. § 831m-1(b)(2) .....................................................................34

National Environmental Policy Act

42 U.S.C. §§ 4321-4370h ......................................................................4
42 U.S.C. § 4332(2)(C) .........................................................................27
42 U.S.C. § 4332(C)(iii) .......................................................................14

**REGULATIONS**

40 C.F.R. § 1501.9(e)............................................................................27
40 C.F.R. § 1502.14 (2023) .............................................................14, 16
40 C.F.R. § 1502.16 (2023) .................................................................16
40 C.F.R. § 1508.1(g) (2022) ...............................................................19

**OTHER AUTHORITIES**

TVA, Cumberland Fossil Plant Retirement Environmental Impact Statement,
88 Fed. Reg. 3767 (Jan. 20, 2023) ("Record of Decision") .............5, 15, 17, 20, 24, 25, 39

TVA, Integrated Resource Plan,
84 Fed. Reg. 48,987 (Sept. 17, 2019) ........................................20, 24

## GLOSSARY

| | |
|---|---|
| *Alaska LNG* | *Center for Biological Diversity v. FERC*, 67 F.4th 1176 (D.C. Cir. 2023). |
| Application | Tennessee Gas Pipeline Company, L.L.C., Application for a Certificate of Public Convenience and Necessity for the Cumberland Project, Docket No. CP22-493-000 (July 22, 2022) (R.1; J.A.___-___). |
| Certificate Order | *Tenn. Gas Pipeline Co.*, 186 FERC ¶ 61,046 (2024) (R.169 J.A.___-___). |
| EIS | Environmental Impact Statement |
| FEIS | Tennessee Gas Pipeline Company, LLC, Cumberland Project, Final Environmental Impact Statement, Docket No. CP22-493-000 (June 30, 2023) (R.129; J.A.___-___). |
| FERC or Commission | Respondent Federal Energy Regulatory Commission |
| FERC Brief | Brief for Respondent Federal Energy Regulatory Commission, No. 24-1099, 24-1198 (D.C. Cir. Nov. 5, 2024). |
| Fossil Plant | TVA's aging, coal-fired plant in Stewart County, Tennessee. |
| Gas Plant | A new natural gas-fired power plant being built by TVA in Stewart County, Tennessee, which will replace the Fossil Plant. |
| GW | Gigawatts |
| Integrated Resource Plan | TVA, 2019 Integrated Resource Plan (2019) (J.A.___-___), 2019 Integrated Resource Plan Volume I - Final Resource Plan; TVA, Integrated Resource Plan 84 Fed. Reg 48,987 (Sept. 17, 2019). |
| J.A. | Citations to the Joint Appendix. |

| | |
|---|---|
| NEPA | National Environmental Policy Act, 42 U.S.C. § 4331, *et seq.* |
| NGA | Natural Gas Act |
| P or p. | Citations to paragraphs or pages, respectively, in orders of the Federal Energy Regulatory Commission. |
| Petitioners | Sierra Club and Appalachian Voices, collectively. |
| Petitioners' Brief | Brief for Petitioners Sierra Club and Appalachian Voices, No. 24-1099, 24-1198 (D.C. Cir. Sept. 6, 2024). |
| Project | Tennessee's Cumberland Project, a proposed 32-mile pipeline lateral to serve TVA's planned new Gas Plant. |
| R. | Citations to the Certified Index to the Record |
| Record of Decision | TVA, Cumberland Fossil Plant Retirement Environmental Impact Statement, 88 Fed. Reg. 3767 (Jan. 20, 2023) (J.A.___-___). |
| Rehearing Order | *Tenn. Gas Pipeline Co.*, 187 FERC ¶ 61,136 (2024) (R.190; J.A.___-___). |
| Respondent-Intervenors | Collectively, Tennessee Gas Pipeline Company, L.L.C., Tennessee Valley Authority, and Tennessee Valley Public Power Association, Inc. |
| Retire and Replace | TVA's retirement of its Fossil Plant and replacement with the Gas Plant. |
| *Sabal Trail* | *Sierra Club v. FERC*, 867 F.3d 1357 (D.C. Cir. 2017). |
| Tennessee | Respondent-Intervenor Tennessee Gas Pipeline Company, L.L.C. |
| Tennessee Association | Respondent-Intervenor Tennessee Valley Public Power Association, Inc. |
| TVA | Respondent-Intervenor Tennessee Valley Authority |

TVA FEIS            TVA, Cumberland Fossil Plant Retirement, Final
                    Environmental Impact Statement (Dec. 2022) (J.A.___-
                    ___),                    tva-azr-eastus-cdn-ep-tvawcm-
                    prd.azureedge.net/cdn-tvawcma/docs/default-
                    source/environment/cumberland-fossil-plant-retirement-
                    final-eis4eeac6f0-b6bf-4843-9881-
                    75d19ccf8ede.pdf?sfvrsn=d61f6b6f_7

## INTRODUCTION

The Cumberland Project ("Project") at issue here is one that *should* be supported by all stakeholders. The proposed 32-mile pipeline will serve a new natural gas-fired power plant ("Gas Plant") being built by the Tennessee Valley Authority ("TVA") in Stewart County, Tennessee, which will replace one of two units at an aging, coal-fired plant ("Fossil Plant") at the same location. The timely completion of the Project is critical to facilitating the transition from coal while responsibly serving power to local communities. In authorizing the Project, the Federal Energy Regulatory Commission ("FERC" or "Commission") extensively analyzed downstream greenhouse gas emissions—a result that should align with Sierra Club's and Appalachian Voices' ("Petitioners") stated interests. After all, Petitioners have routinely alleged that FERC failed to adequately consider greenhouse gas emissions relating to approvals of pipeline and liquified natural gas projects.[1]

But now that FERC has approved a Project that will result in a *substantial and sustained reduction* in greenhouse gas emissions, and that is squarely in the public

---

[1] *See, e.g.*, *Ala. Mun. Distributors Grp. v. FERC*, 100 F.4th 207, 213 (D.C. Cir. 2024); *Ctr. for Biological Diversity v. FERC*, 67 F.4th 1176 (D.C. Cir. 2023) ("*Alaska LNG*"); *Appalachian Voices v. FERC*, No. 17-1271, 2019 WL 847199 (D.C. Cir. Feb. 19, 2019) (unpublished); *Sierra Club v. FERC*, 867 F.3d 1357 (D.C. Cir. 2017) ("*Sabal Trail*"); *Sierra Club v. FERC*, 827 F.3d 59, 68 (D.C. Cir. 2016); *Sierra Club v. FERC*, 827 F.3d 36, 49 (D.C. Cir. 2016).

interest, Petitioners' real intent becomes clear:  to prevent construction of *any* new natural gas infrastructure, regardless of its benefits.[2]  To that end, Petitioners have fashioned rhetorical arguments that fall far short of the legal standard and should be rejected.

In the Orders at issue, FERC carefully and properly fulfilled its legal responsibilities under the Natural Gas Act ("NGA") and the National Environmental Policy Act ("NEPA").  In contrast, Petitioners' arguments disregard the well-established scope of FERC's jurisdiction, amount to a back-door challenge to TVA's decisions, and flout fundamental concepts underlying the NGA, NEPA, and this Court's well-established precedent.  This Court should deny the petitions for review and uphold FERC's Orders authorizing the Project.

## STATEMENT OF THE ISSUES

Tennessee Gas Pipeline Company, L.L.C. ("Tennessee"), TVA, and Tennessee Valley Public Power Association ("Tennessee Association") adopt the Statement of the Issues set forth in FERC's Brief at 2-3.

---

[2] Petitioners' efforts to impede the Project include other lawsuits:  one challenging the water quality certification issued by the Tennessee Department of Environment and Conservation under the Clean Water Act Section 401, *Sierra Club v. Tennessee Dep't of Environment & Conservation*, No. 23-3682 (6th Cir.); a second challenging the permit issued by the U.S. Army Corps of Engineers under the Clean Water Act Section 404, *Appalachian Voices v. U.S. Army Corps of Engineers*, No. 24-3831 (6th Cir.); and a third challenging TVA's decision to build the new Gas Plant, *Appalachian Voices v. TVA*, No. 3:23-CV-00604 (M.D. Tenn.).

## STATEMENT OF THE CASE

### I.    Cumberland Project

In response to a *bona fide* need for firm natural gas transportation service, Tennessee filed an application on July 22, 2022, pursuant to Section 7(c) of the NGA, 15 U.S.C. § 717f(c), requesting FERC issue a certificate of public convenience and necessity to construct and operate a pipeline lateral, the Project, to serve TVA's planned new combined-cycle natural gas-fired electric power plant. Application at 1 (R.1; J.A.___).  The Project consists of a roughly 32-mile-long, 30-inch-diameter pipeline lateral extending from Tennessee's existing mainline to a delivery point located at the terminus of the pipeline at TVA's new power plant.  *Id.* at 1-2 (J.A.___-___).  In designing the Project, Tennessee has taken care to minimize the environmental and landowner impacts of the Project, routing the Project generally parallel and adjacent to an existing electric transmission line and utility easements.

The Project will enable Tennessee to provide up to 245,040 dekatherms per day of firm transportation service to TVA, which will use the gas transported through the Project to fuel the Gas Plant, helping meet the demand for electric power in the Tennessee Valley region.  *Tenn. Gas Pipeline Co.*, 186 FERC ¶ 61,046, at P 13 (2024) ("Certificate Order") (R.169; J.A.___-___), *order on reh'g*, 187 FERC ¶ 61,136 (2024) ("Rehearing Order") (R.190; J.A.___-___).

## II.    FERC's Comprehensive Review.

FERC conducted a comprehensive review of the Project.  Consistent with its responsibilities under NEPA, 42 U.S.C. §§ 4321-4370h, FERC staff prepared in-depth Draft and Final Environmental Impact Statements ("FEIS") for the Project. (R.129; J.A.___-___).  The FEIS addressed a wide range of environmental impacts, including geology, soils, groundwater, surface water, wetlands, fisheries, wildlife, vegetation, species of special concern, socioeconomics, environmental justice, land use, recreation, visual impacts, cultural resources, air quality, noise, reliability and safety, and cumulative impacts.  The FEIS quantified greenhouse gas emissions associated with construction and operation of the Project, as well as the downstream emissions associated with the combustion of the gas utilized to fuel the Gas Plant. *Id.* at 4-130 (J.A.___).  Because the Project will transport natural gas to fuel the Gas Plant, which is replacing one of the two units of a coal-fired power plant, the FEIS explained that the Project would have a beneficial effect on air quality during operation and would result in a substantial net reduction in greenhouse gas emissions.  *Id.* at 4-101–4-103 (J.A.___–___).

## III.    FERC Orders

On January 18, 2024, FERC issued the Certificate Order, finding "that the public convenience and necessity requires approval of [the Project]."  Certificate Order at P 77 (J.A.___-___).  FERC found that Tennessee demonstrated the requisite

need for the Project based on a 20-year precedent agreement between Tennessee and TVA for 100 percent of the Project's capacity to fuel the Gas Plant. *Id.* at PP 5, 19 (J.A.___, ___). FERC explained that TVA issued a Record of Decision "adopting the demolition of its two-unit, coal-fired Cumberland Fossil Plant and construction of a new natural gas-fueled combined cycle plant to replace the generation capacity of one of two retired units." *Id.* at P 19 (J.A.___-___) (citing TVA, Cumberland Fossil Plant Retirement Environmental Impact Statement, 88 Fed. Reg. 3767 (Jan. 20, 2023) ("Record of Decision") (J.A.___-___)). TVA's decision was consistent with TVA's 2019 Integrated Resource Plan, which identified resources necessary to meet the Tennessee Valley's energy needs over the next 20-year period. *Id.* FERC explained that the precedent agreement is significant evidence of need because it is a binding, long-term agreement with an unaffiliated entity for the Project's full capacity, and there was no evidence of self-dealing. *Id.* at P 15 (J.A.___). Considering these factors, FERC concluded that the Project would not have adverse economic impacts on existing shippers or other pipelines and their existing customers, and the Project's benefits will outweigh any adverse economic effects on landowners and surrounding communities. *Id.* at P 19 (J.A.___-___).

The Certificate Order also adopted the FEIS's evaluation of the direct greenhouse gas emissions associated with construction and operation of the Project, and the emissions associated with the downstream combustion of gas fueling the Gas

5

Plant. *Id.* at P 48 (J.A.___-___). The Certificate Order concluded that the Project would result in an overall net reduction in downstream greenhouse gas emissions because the Project will provide fuel to the Gas Plant that is replacing a higher-emitting coal-fired plant. *Id.* FERC quantified the potential downstream emissions by subtracting the three-year average emissions of the existing coal-fired power plant from the estimated emissions from the new Gas Plant and compared those emissions to national and state levels of emissions. *Id.* at P 48, 53-54 (J.A.___-___, ___-___); Rehearing Order at PP 42, 55 (J.A.___-___, ___). The Certificate Order found that the greenhouse gas emissions cannot have a significant impact for NEPA purposes, because "[a] net *reduction* in the emissions of a pollutant logically cannot cause a significant adverse impact . . . ." Certificate Order at P 49 (J.A.___) (emphasis added).

Petitioners sought rehearing of the Certificate Order. Request for Rehearing (Feb. 20, 2024) (R.173; J.A.___-___). On rehearing, FERC responded to Petitioners' arguments that FERC has an "obligation" to look beyond precedent agreements by explaining that the FERC's Certificate Policy Statement "allows but does not require the Commission to assess a project's benefits by looking beyond the market need reflected by the applicant's precedent agreements with shippers." Rehearing Order at P 10 (J.A.___-___) (citing *Minisink Residents for Envtl. Preservation & Safety v. FERC*, 762 F.3d 97, 110, n.10 (D.C. Cir. 2014)). FERC

explained that a precedent agreement is a useful indicator of need because it reflects a shipper's independent business decision that such a need exists. *Id.* FERC found that it did not need to look beyond the precedent agreement between Tennessee and TVA because it did not arise from an anticompetitive process and there was no evidence of self-dealing or anticompetitive behavior that would undermine the precedent agreement's otherwise clear showing of market need. *Id.* at P 9 (J.A.___-___).

The Rehearing Order also addressed Petitioners' arguments that FERC must consider evidence regarding the need for, alternatives to, and economic consequences of the Gas Plant. In the Rehearing Order, FERC explained that it does not have jurisdiction over business decisions made by entities such as TVA, and thus, does not engage in resource planning for end users. *Id.* at PP 13-14 (J.A.___-___). Likewise, FERC explained that issues related to the economic considerations underlying the Gas Plant are outside FERC's jurisdiction and dedicated exclusively to TVA's Board. *Id.* at P 15 (J.A.___).

In the Rehearing Order, FERC affirmed that the Project would cause reductions in downstream greenhouse gas emissions. *Id.* at P 40 (J.A.___-___). FERC rejected the notion that it could not credit greenhouse gas reductions attributable to switching from coal to natural gas. *Id.* FERC explained that not considering the downstream greenhouse gas emissions reductions attributable to

switching from the existing Fossil Plant to the new Gas Plant would run counter to the requirement that FERC consider "both beneficial and detrimental effects, even if on balance the agency believes that the effect will be beneficial." *Id.* (quoting *Sabal Trail*, 867 F.3d at 1375).

The Rehearing Order rejected arguments that the Certificate Order improperly relied on the annual rate of downstream greenhouse gas emissions reductions rather than attempting to estimate the greenhouse gas emissions based on future events that may (or may not) occur. The Rehearing Order explained that NEPA analysis necessarily involves reasonable forecasting "about an uncertain future." *Id.* at P 54 (quoting *Sabal Trail*, 867 F.3d at 1374) (J.A.___-___). The Rehearing Order found that annualizing the net reduction in emissions over the 20-year term of the precedent agreement was a reasonable forecast and consistent with FERC's precedent. *Id.* at PP 54-55 (J.A.___-___).

The Rehearing Order also addressed Petitioners' argument that the Project and the Gas Plant should have been analyzed in a single EIS. FERC explained that NEPA does not require it to evaluate actions taken by other federal agencies that are outside of FERC's jurisdiction and control as "connected actions." *Id.* at P 60 (J.A.___-___). FERC further explained that the purpose of the connected actions requirement is to prevent an agency from "segmenting its own federal actions into separate projects and thereby failing to address the true scope and impact of the

8

activities that should be under consideration." *Id.* (quoting *Sierra Club v. U.S. Army Corps of Eng'rs*, 803 F.3d 31, 49 (D.C. Cir. 2015)) (internal quotations omitted). Here, *TVA's* decision to retire the existing coal-fired power plant and replace it with the Gas Plant was not before FERC, and is not subject to FERC's jurisdiction. *Id.* Nevertheless, FERC considered the impacts of the Gas Plant as part of its cumulative impacts analysis. *Id.* at P 64 (J.A.___-___).

## STATUTES AND REGULATIONS

Applicable statutes and regulations are contained in the Addendum to Petitioners' Brief and the Addendum to Respondent's Brief, with the exception of those contained in the Addendum to this Brief.

## JURISDICTIONAL STATEMENT

Jurisdiction is correctly described in Petitioners' opening brief.

## STANDARD OF REVIEW

FERC's brief (at 27-28) correctly sets forth the applicable standard of review.

## SUMMARY OF ARGUMENT

Petitioners' arguments violate fundamental concepts underlying NEPA and the NGA and disregard this Court's long-standing precedent. Their arguments should be rejected.

First, contrary to Petitioners' argument, FERC properly identified and analyzed the No-Action alternative. FERC described the No-Action alternative as denying the Proposed Action—approval of the Project—and went on to explain that,

without the Project, Tennessee would not be able to fulfill TVA's requirement for natural gas in order to allow TVA to retire its Fossil Plant and replace it with the Gas Plant ("retire and replace"). FERC properly concluded it could not assume that TVA would change the decision it had already made to retire the Fossil Plant and operate the Gas Plant.

Contrary to Petitioners' claims, FERC's articulation of the No-Action alternative is consistent with its analysis of downstream greenhouse gas emissions. In analyzing FERC's Proposed Action to authorize the Project, FERC reasonably considered downstream greenhouse gas emissions from the end user of the gas, TVA, as indirect impacts of FERC's decision. This analysis considered the *entirety* of those emissions—the reduction from the retirement of the Fossil Plant combined with the emissions from the Gas Plant. In the No-Action alternative, FERC reasonably assumed that TVA's decision would go forward with some solution for gas supply, while in the Proposed Action FERC reasonably assumes that the Project provides the gas supply.

Second, FERC reasonably considered downstream greenhouse gas emissions and reductions (assuming FERC was even required to consider such effects), considering TVA's independent decision to approve the "retire and replace" action. FERC properly included both the projected new greenhouse gas emissions and the reduction in greenhouse gas emissions effectuated by the "retire and replace"

10

decision because they are both part of one TVA decision supported by the Project. Not considering the entirety of the relevant downstream emissions would ignore an important aspect of the proposal.

FERC rationally discussed emissions on an annual basis and reasonably used the term of the precedent agreement to bound its analysis. TVA's decision inextricably intertwined the retirement and the replacement because TVA must ensure that gas supply is available as the Fossil Plant is decommissioned and replaced, in part, with the Gas Plant. The duration of the contract supporting implementation of this TVA plan properly forms the basis of FERC's analysis of emissions.

Third, the Gas Plant and the Project are not "connected actions" under NEPA requiring FERC to analyze both before making its decision. FERC had only one decision before it—whether to approve the Project. FERC could not make a decision for TVA regarding, nor compel TVA to participate in, a single EIS to support separate decisions by these separate entities—especially where one entity (TVA) had already reached its decision based on its own fulsome NEPA analysis. This Court's precedent affirms that FERC is correct when it recognizes its jurisdictional limits and prepares an EIS for its own action. Moreover, FERC considered the environmental impacts of the TVA action where appropriate in its comprehensive

cumulative impacts analysis. In sum, FERC carefully and properly fulfilled its legal responsibilities under NEPA.

The same is true for FERC's obligations under the NGA. In the Certificate Order, FERC found that Tennessee and TVA entered into a binding 20-year precedent agreement for 100 percent of the Project's transmission capacity. Certificate Order at P 5 (J.A.___). Based on that binding precedent agreement, FERC found that "Tennessee has demonstrated a need for the project." *Id.* at P 19 (J.A.___-___). That finding of public need is supported by the overwhelming precedent of this Court holding that FERC may properly rely on precedent agreements as sufficient evidence of market need under Section 7 of the NGA. FERC did its job under the NGA.

For all these reasons, Petitioners' arguments should be rejected and the petitions dismissed. However, if the Court determines that there is some deficiency in FERC's analysis, then the proper remedy is to remand the matter to FERC without vacatur, allowing FERC to address any such deficiencies, and the avoiding the massive disruption that a vacatur would cause.

## ARGUMENT

## I.   FERC Properly Identified and Analyzed the No-Action Alternative.

Petitioners' argument that FERC erred in implementing one of the most straightforward of NEPA's requirements—the identification and treatment of the

"no-action" alternative—does not withstand scrutiny and invites a perverse conclusion that FERC sensibly rejected. *See* Pet'rs' Br. 20. FERC plainly identified the "No Action" alternative in the Draft EIS and properly incorporated it in the FEIS and subsequent decisions. *See* FERC Br. 59-62. Petitioners argue that FERC arbitrarily contradicted itself (i) when, for purposes of the No-Action alternative, FERC assumed that retirement of the coal unit and replacement with the Gas Plant would go forward regardless of FERC's approval of the Project, (ii) while, for purposes of the Proposed Action, FERC assumed that its approval of the Project would cause the downstream effects of the retirement and replacement. *See* Pet'rs' Br. 20-22. But these assumptions by FERC were reasonable, not arbitrary, for several reasons.

Stated simply, Petitioners' argument improperly conflates FERC's responsibility to consider *actions* and *impacts*, and the result is fatal to its argument. In the No-Action alternative, FERC rationally assumes that it denies the Project. In contrast, for the Proposed Action, FERC assumes that it approves the Project. These are inherently inconsistent assumptions—but are entirely appropriate—because they distinguish the alternative actions, as NEPA requires. From this, Petitioners attempt to infer a contradiction relating to the causation of impacts, arguing that FERC cannot be the cause of impacts in the Proposed Action alternative if these impacts would occur under the No-Action alternative.

The fatal flaw in Petitioners' argument is that, in the No-Action alternative, FERC reasonably assumes the "retire-and-replace" decision will go forward with some other solution for gas supply, while in the Proposed Action alternative FERC reasonably assumes that the Project is the specific solution for the gas supply. Ironically, Petitioners' argument would lead to the conclusion that FERC should not have considered itself the cause of either the avoided emissions from the Fossil Plant retirement or the new emissions from the new Gas Plant. FERC more prudently, and reasonably, analyzed all these potential effects.

## A. FERC Defined the Right "No Action" Alternative.

NEPA requires consideration of a reasonable range of alternatives, including a "no-action" alternative. *See* 42 U.S.C. § 4332(C)(iii); 40 C.F.R. § 1502.14 (2023).[3] The FEIS explains the "two possible outcomes from the Commission's review of [the] applications under Section 7 of the NGA, 1) grant the Certificate with or without conditions, or 2) deny the requested action (i.e., adopt the no-action alternative)." FEIS at 3-2 (J.A.___). If FERC denies the requested certificate, the FEIS explains that Tennessee "would not be able to fulfill TVA's requirement" but that "it is speculative to determine what other actions may be proposed to serve

---

[3] Consistent with FERC's brief, Respondent-Intervenors cite the NEPA regulations in effect at the time FERC prepared its EIS and issued its Orders. FERC Br. 37 n.6.

TVA's need for additional firm transportation capacity, or to otherwise increase reliability of service in the market." *Id.*

In response to comments questioning its No-Action alternative, FERC stated that, under this alternative, a "different project would have to be designed to meet the natural gas needs of the new TVA natural gas-fueled combined cycle plant," which TVA had decided to construct in its 2023 Record of Decision. *Id.*, App. I-83 (J.A.___). TVA's Record of Decision, referred to by FERC, explains that it adopted as its "Preferred Alternative" an action with two components—"the retirement and demolition of TVA's two-unit, coal-fired Cumberland Fossil Plant (CUF) *and* the construction and operation of a natural gas-fueled combined cycle (CC) plant on the CUF reservation to replace generation capacity of one of the two retired units." Record of Decision, 88 Fed. Reg. at 3767 (J.A.___) (emphasis added); *see also* Certificate Order at P 19 (J.A.___-___).

Thus, TVA's decision—a two-part "retire and replace" decision as articulated in the TVA Record of Decision—is assumed to occur. FERC's decision not to approve the Project does not change TVA's own "retire and replace" decision, and FERC has no basis to speculate that TVA would re-visit its decision. As FERC explained, "an agency's consideration of alternatives under NEPA is 'shaped by the application at issue and by the function that the agency plays in the decisional process.'" Rehearing Order at P 18 (J.A.___) (quoting *Tex. E. Transmission, LP,*

185 FERC ¶ 61,038, at P 37 (2023) (citing *Citizens Against Burlington, Inc. v. Busey*, 938 F.2d 190, 199 (D.C. Cir. 1991)).

The fact that FERC analyzed the greenhouse gas-related implications of TVA's "retire and replace" decision as indirect effects of FERC's own Proposed Action (i.e., approving the Project) is not an inconsistency that renders FERC's consideration of alternatives arbitrary. Fundamentally, the scope of indirect or downstream impacts of action alternatives is a separate legal and factual inquiry from the proper delineation of alternatives. *Compare* 40 C.F.R. § 1502.16(a)(1) (2023) (impacts) *with* 40 C.F.R. § 1502.14 (2023) (alternatives). Petitioners cite no support for their implication that the impacts of various alternatives cannot overlap. In fact, FERC's articulation of the No-Action alternative analysis and scope of effects consideration is a recognition that *any* pipeline supplying the new Gas Plant would "cause" the same emissions reductions, within the meaning of this Court's precedent. *See Sabal Trail*, 867 F.3d at 1373. In this case, that pipeline is the Project.

### B.    This Court's Precedent Supports FERC.

FERC's approach is consistent with this Court's precedent. In *Alaska LNG*, the petitioner challenged a Commission decision to authorize the construction and operation of "a system of natural gas facilities" on the North Slope of Alaska. 67 F.4th at 1179. In its EIS in that case, FERC considered an unlikely "no-action"

16

alternative where no project would ever be built and a "likely no-action" alternative which assumed a similar construction project would occur even if the project at issue were not approved because of the "substantial incentives" to build "something like the Project." *Id*. at 1182. The petitioner faulted the analysis for allegedly disguising the proposed action's true significance because the "likely no-action alternative" had similar impacts to the proposed action. *Id*. This Court upheld that approach, finding that FERC was reasonable to consider the reality of the circumstances in formulating the "no-action" alternative. *Id*. FERC took a similar approach here, consistent with the applicable facts and law. *See NRDC v. Hodel*, 865 F.2d 288, 294 (D.C. Cir. 1988) (fully informed and well-considered agency decision is entitled to deference).

### C.    FERC Properly Avoided the Perverse Result Following From Petitioners' Argument.

Petitioners' argument logically leads to the conclusion that FERC should not have considered itself the cause of downstream impacts from the new gas-fired plant in the Proposed Action. TVA's retirement of the Fossil Plant and its replacement with the Gas Plant is a single decision, reflected as such in TVA's Record of Decision. *See* 88 Fed. Reg. at 3768 (J.A.___) (describing TVA's "preferred alternative"). If TVA's "retire and replace" decision is assumed to go forward in the No-Action alternative and (as Petitioners' argument necessarily demands) this means FERC has no causative connection to its impacts, then the *entirety* of that decision—*including the Gas Plant*—lies outside FERC's scope of causation and

need not be analyzed, even under the Proposed Action alternative. Here, however, FERC acted prudently by electing to assess the *downstream emissions* as an indirect effect of FERC's decision to approve the Project.

## II.    FERC Reasonably Considered Downstream Greenhouse Gas Emissions and Reductions As Indirect Effects of the Project.

### A.    FERC Did Not Err in Attributing a Reduction in Coal Plant Emissions to Its Decision to Approve the Project.

Petitioners' insistence that FERC could not consider avoided emissions from the retirement of the Fossil Plant would require FERC to artificially segment its analysis of the downstream impacts of the Project because those impacts are part of one TVA decision—i.e., to retire the Fossil Plant and replace it with the new Gas Plant. Petitioners' strained reading of the record and of this Court's precedent should be rejected.

As a threshold matter, Petitioners' argument can be rejected because FERC was not required to consider indirect effects that "could only occur after intervening action by [another agency] or Congress and that only those actors—and not the Commission—had the authority to prevent." *Sierra Club*, 827 F.3d at 49 (citing *DOT v. Pub. Citizen*, 541 U.S. 752, 767 (2004). Here, it was TVA's decision to approve—or not—the retirement of the Fossil Plant and its replacement with the Gas Plant. The indirect effects resulting from that TVA decision are not effects that

*FERC* has the authority to prevent. *See Public Citizen*, 541 U.S. at 767.[4] That point, alone, defeats Petitioners' argument.

Nonetheless, having decided to consider those downstream emissions as indirect effects, FERC properly assessed them. NEPA "require[s] that agencies take a '"hard look" at environmental consequences,' . . . and . . . provide for broad dissemination of relevant environmental information." *Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 350 (1989) (quoting *Kleppe v. Sierra Club*, 427 U.S. 390, 410 n.21 (1976)). Pursuant to NEPA, FERC is required to consider effects or impacts including effects that "occur at the same time and place" and those that "are later in time or farther removed in distance, but are still reasonably foreseeable." Certificate Order at P 47 (J.A.___) (quoting 40 C.F.R. § 1508.1(g) (2022)). FERC reasonably considered the scope of indirect effects, in this case downstream emissions, based on TVA's decision and TVA's own approach to impact analysis. *See* FERC Br. 49-50.

Petitioners attempt to paint TVA's decision to retire the Fossil Plant as something separate from TVA's decision to construct the Gas Plant and somehow

---

[4] Although FERC did not rely on this rationale, this Court may consider it in upholding FERC's Orders. *See Sierra Club*, 827 F.3d at 49. The *Chenery* doctrine, under which a reviewing court can only affirm an agency decision on the same grounds an agency invoked, "applies only to 'determinations specifically entrusted to an agency's expertise,' not "legal principles' of the sort 'that a court usually makes.'" *Canonsburg Gen. Hosp. v. Burwell*, 807 F.3d 295, 304 (D.C. Cir. 2015) (citing *SEC v. Chenery Corp.*, 318 U.S. 80, 94 (1943)).

not relevant for FERC's analysis of downstream impacts. *See* Pet'rs' Br. 29.

Petitioners are wrong. Petitioners refer to various planning documents—pre-dating

TVA's 2023 Record of Decision—in which TVA considered retirement of its coal-

fired units. *Id.* These included the 2019 TVA Integrated Resource Plan which made

*recommendations* to the TVA Board for "a 20-year plan that will result in the

addition of up to 14 gigawatts ("GW") of solar generation, five GWs of battery

energy storage, between 2-17 GWs of natural gas additions, and the evaluation of

further coal-fired unit retirements." FEIS at 1-2 (J.A.___).

After the TVA Board's approval of this long-term energy resource strategy,

TVA moved forward with option-specific/site-specific environmental reviews

consistent with the strategic direction set by TVA's 2019 Integrated Resource Plan,

including preparation of the TVA EIS for the retirement of the Fossil Plant's coal-

fired units *and* the provision of replacement generation with the Gas Plant. *Id.* at 1-

2–1-3 (J.A.___-___); *see also* TVA, Integrated Resource Plan, 84 Fed. Reg. 48,987,

48,989 (Sept. 17, 2019) (J.A.___). TVA's 2023 Record of Decision reflects TVA's

final decision relating to *both*: retire the Fossil Plant *and* replace the capacity of one

unit with the Gas Plant. *See* 88 Fed. Reg. 3767 (J.A.___-___). *See also* TVA,

Cumberland Fossil Plant Retirement, Final Environmental Impact Statement, at i-ii,

40-41 (Dec. 2022) ("TVA FEIS") (J.A.___, ___-___) (explaining purpose and need

of proposed action and alternative). This is basic power system planning—

20

generating assets that are needed to meet demand are not retired until replacement generation is available and online.  Petitioners pretending that TVA made two separate decisions is not only belied by the Record of Decision, but is also absurd.  Thus, FERC had no basis (or authority) to separate the two conjoined elements of TVA's decision when conducting its own analyses.

Properly taking the full scope of TVA's decision as its basis, FERC found that approving the construction and operation of the Project "would result in a 'net overall reduction in [greenhouse gas] emissions' due to the retirement of existing facilities."  Certificate Order at P 48 (J.A.___-___) (quoting FEIS at 4-128 (J.A.___)); Rehearing Order at P 42 (J.A.___-___).  FERC found that "construction emissions, operational emissions, and the downstream combustion emissions associated with the transportation capacity subscribed by shipper TVA are reasonably foreseeable effects of the project," and calculated an overall "net reduction of approximately -2.26 million metric tons of $CO_2e$ per year, based upon TVA's estimated utilization rate for the Cumberland Fossil Plant."  Rehearing Order at P 42 (J.A.___-___).

FERC's analysis of the downstream greenhouse gas emissions reductions caused by the construction and operation of the Project is consistent with this Court's precedent in *Sabal Trail*, 867 F.3d at 1372-74.  There, this Court faulted FERC for providing no estimate of downstream greenhouse gas emissions and held that, "at a

minimum, FERC should have estimated the amount of power-plant carbon emissions that the pipelines will make possible." *Id.* at 1371. FERC did that here, providing an estimate of downstream emissions as offset by the reduction in emissions from the retirement of the Fossil Plant. Rehearing Order at P 42 (J.A.___-___). *See also Del. Riverkeeper Network v. FERC*, 45 F.4th 104, 109 (D.C. Cir. 2022) (requiring consideration of downstream greenhouse gas emissions when a particular downstream project is known).

To the extent *Sabal Trail* teaches that FERC must assess the effects of downstream combustion when specifically and exclusively devoted to a particular power generation facility, it cannot be arbitrary for FERC to assess the downstream impacts in full, not in part. FERC did so here. To have assessed only one aspect of the downstream conditions but not its necessary, correlative other piece would have omitted an important part of the analysis since (i) they are linked by the same TVA decision and share a common purpose, (ii) the Gas Plant is predicated on the retirement of the Fossil Plant, and (iii) the Fossil Plant's retirement is predicated on the replacement gas-fired capacity. *See Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983) (agency action is arbitrary if it "entirely failed to consider an important aspect of the problem"). *See also Sierra Club v. FERC*, 38 F.4th 220, 231 (D.C. Cir. 2024); *Mayo v. Reynolds*, 875 F.3d 11, 20 (D.C. Cir. 2017) (same). FERC succinctly explained that "the [Project] will serve TVA's

need for firm natural gas transportation capacity to replace one of the Cumberland Fossil Plant units at the new Cumberland Gas Plant," and reasonably "conclude[d] that the Commission appropriately credited the project for offsets associated with the retirement of the first coal-fired unit at the Cumberland Fossil Plant." Rehearing Order at P 40 (J.A.___-___) (internal citations omitted).

## B. FERC's Method of Analyzing Projected Greenhouse Gas Emissions Did Not Violate NEPA.

Petitioners argue that FERC calculated greenhouse gas emissions reductions incorrectly in two different ways because FERC: (1) looked at an annual emissions reduction rate rather than tallying up the total emissions over the course of the Project into one number, and (2) calculated emissions reductions beyond the assumed retirement date of the Fossil Plant in 2035. Pet'rs' Br. 30-37. Again, Petitioners ignore reality to make their argument—the shutdown of the Fossil Plant is premised on the availability of gas supply for the Gas Plant. Thus, FERC reasonably evaluated downstream impacts based on the 20-year duration of the Precedent Agreement for the Project that will supply that gas.

First, Petitioners' criticism of the way FERC discussed emissions, on an annual basis, is fully addressed by FERC's brief and amounts to mere disagreement over how FERC explained information. FERC Br. 55. As FERC explained, an "agency's choice among reasonable analytical methodologies is entitled to

deference." Rehearing Order at P 56 (J.A.___-___) (citing *Cmtys. Against Runway Expansion, Inc. v. FAA*, 355 F.3d 678, 689 (D.C. Cir. 2004)).

As to Petitioners' second argument, FERC rationally used the length of the precedent agreement to calculate both the avoided emissions from retiring the coal-fired unit and the new emissions from the new gas-fired replacement unit. The reason is straightforward: the retirement and the replacement are tied to the same TVA decision and to the same schedule, as TVA must ensure replacement power is available as coal-fired generation is taken offline. *See* Section II.A, *supra*.

Moreover, contrary to Petitioners' argument, TVA's own planning documents do not irretrievably commit to retiring the Fossil Plant by 2035 no matter what. TVA stated that the 2019 Integrated Resource Plan establishes planning "*ranges of resource additions and retirements*" but that the recommended ranges were based on TVA's then-current projections which could shift based on future developments and other variables. 84 Fed. Reg. at 48,988 (J.A.___) (emphasis added). In fact, the 2019 Integrated Resource Plan notes that the Fossil Plant units would "continue to operate." TVA, 2019 Integrated Resource Plan at 5-4 (2019) (J.A.___). In addition, TVA discusses its No-Action alternative, under which TVA would not retire the two Fossil Plant units but would continue to operate them as part of the TVA generation portfolio. Record of Decision, 88 Fed. Reg. at 3768 (J.A.___). TVA's Alternative A, which TVA adopted as its "preferred alternative," provides for

construction and operation of the Gas Plant by 2026 to replace the generation for one of the retired coal units. *Id.* However, at no point does TVA say the coal-plant units would be retired by 2035 under all circumstances, and retirement is dependent on the gas supply under the alternative chosen by TVA. Therefore, FERC reasonably applied the emissions reductions over the 20-year term of the precedent agreement between Tennessee and TVA. Rehearing Order at PP 54-56 (J.A.___-___).

### III. FERC Properly Concluded That the Gas Plant Is Not a Connected Action.

In *Marin Audubon Society v. FAA*, ___ F.4th ___, No. 23-1067, 2024 WL 4745044 (D.C. Cir. Nov. 12, 2024), this Court held that the Council on Environmental Quality's NEPA regulations lack a statutory basis and, thus, are *ultra vires*.[5] As a threshold matter, because Petitioners' connected actions arguments rely entirely on those invalidated regulations, Petitioners' arguments should be rejected.

Petitioners' arguments are wrong in any event. Petitioners contend that the Gas Plant and the Project are "inextricably intertwined federal actions and *FERC* should have considered them together." Pet'rs' Br. 37-38 (emphasis added). Petitioners are fundamentally incorrect. Their argument disregards the legal and practical reality of the two projects as well as the legal predicate for preparing an

---

[5] Respondent-Intervenors note that as of the date of this brief, the mandate has not yet issued in this case.

EIS to support analysis of connected actions. The purpose of an EIS is to form a basis for a decision on a proposed federal action. In a situation involving connected federal actions, an EIS serves that purpose for more than one proposed federal action where the agency has multiple actions before it that can only proceed if each one is approved. Here, FERC had only one decision before it—whether to authorize the Project.

First, the predicate for Petitioners' argument is that FERC failed to adequately assess the effects of TVA's decision. That is incorrect. FERC considered the effects of TVA's decision in its cumulative impacts analysis. FEIS at 4-115–4-132 (J.A.___-___). *See* FERC Br. 43-45; Rehearing Order at 45-46 (J.A.___-___). Petitioners have not challenged the sufficiency of that analysis. Where Petitioners err is in arguing that FERC had to go *even further* to assess TVA's decision as if it were FERC's decision—a connected action.

Here, there is only one action before FERC: its own decision to authorize the Project. FERC did not, and legally could not, decide for TVA regarding the proposed Gas Plant because FERC has no jurisdiction over that Proposed Action. Moreover, TVA had already reached that decision on its own in its 2023 Record of Decision. For the same reason, FERC could not compel TVA to participate in a single EIS addressing both the Gas Plant and the Project as conjoined decisions.

Rather, TVA—the agency with exclusive jurisdiction over the Gas Plant—prepared its own EIS, conducted its own analysis, and made its own decision.

The notion of requiring a single EIS to address both the Gas Plant and the Project runs counter to NEPA's purpose, would be ineffectual, and is flatly inconsistent with this Court's controlling precedent recognizing and enforcing FERC's jurisdictional boundaries.  It is not surprising that Petitioners point to no authority supporting its audacious demand here—that FERC should have strongarmed TVA into subordinating its own decision to FERC's environmental analysis.  Petitioners' argument must be rejected.

Petitioners disregard both the purpose of an EIS and the circumstances of this matter.  NEPA requires an EIS for "proposals" on "major Federal actions significantly affecting the quality of the human environment."  42 U.S.C. § 4332(2)(C).  An EIS must include, among other things, analysis of reasonably foreseeable environmental effects and "a reasonable range of alternatives to the proposed agency action."  *Id*.  As Petitioners explain, in certain circumstances, proposed federal actions may be "connected actions" if they are "closely related and therefore should be discussed in the same impact statement."  Pet'rs' Br. 38 (citing 40 C.F.R. § 1501.9(e)).  This ensures that the agency considers the full reach of reasonably foreseeable impacts arising from its linked decisions—as well as their alternatives.

But here, FERC's authority is limited to its own jurisdiction, which is limited to the Project.  FERC's authority does not extend to *TVA's* decision regarding the Gas Plant; nor is *TVA's* decision before the Court.  This Court's precedent is clear on this point:  where FERC's decision relied on the limits of its authority under the NGA and on the Court's precedent, this Court has, repeatedly, affirmed FERC's finding that the non-jurisdictional action is not connected.  *See* FERC Br. 38-40 (citing cases).

FERC properly recognized its jurisdictional limits and squarely rejected Petitioners' assertion that FERC must evaluate the Project and TVA's approval of the Gas Plant in a single EIS as connected actions.  Rehearing Order at PP 60-64 (J.A.___-___).[6]  FERC's jurisdiction under the NGA extends to the "transportation of natural gas in interstate commerce" and "the sale in interstate commerce of natural gas," but does not include the "facilities used for such [local] distribution."  15 U.S.C. § 717(b).  Congress has spoken directly on FERC's jurisdiction over power generation facilities and specifically excluded them from FERC's jurisdiction under Federal Power Act.  *See* 16 U.S.C. § 824(b)(1) ("The Commission . . . shall not have

---

[6] By the same token, TVA's EIS considers the natural gas pipeline (describing it variously as "related" or "connected," TVA FEIS at 9, 33 (J.A.___, ___)), since, in TVA's case, it was deciding whether to (1) choose the alternative that required construction of the pipeline and (2) enter into a "future firm gas transportation agreement" with Tennessee to provide the natural gas to the Gas Plant.  *Id.* at 19 (J.A.___).

jurisdiction . . . over facilities used for the generation of electric energy . . . .").
Accordingly, FERC has no authority over the permitting, funding, construction, or
operation of the Gas Plant.

Instead, Congress delegated these powers to TVA under the TVA Act.
Rehearing Order at P 60 (J.A.___-___) (citing 16 U.S.C. §§ 831m-1, 831c(j)). By
specifically excluding power plants from FERC's jurisdiction and delegating the
authority to plan and site new energy resources in the Tennessee Valley region to
TVA, Congress could not have been clearer about who has jurisdiction over the Gas
Plant. Accordingly, FERC, relying on its limited jurisdiction under the NGA and
this Court's precedent, properly found that it did not have jurisdiction over TVA's
Gas Plant and, therefore, was not required to consider the power plant as a connected
action. Forcing FERC and TVA to prepare a single EIS for the Project and TVA's
actions is particularly inappropriate in this case where TVA is the Project customer
and has a direct stake in the outcome of FERC's assessment of the Project.

In this context, a single EIS covering both FERC's approval of the Project and
TVA's approval of the Gas Plant would not serve NEPA's purposes. A single EIS
would not inform the public or the decisionmaker—FERC—about the impacts of its
decision, as FERC cannot make a decision on the Gas Plant. *See Pub. Citizen*, 541
U.S. at 768 (describing goals of informing agency decisions and informing public).
Neither FERC nor this Court can compel TVA to participate in a connected-actions

29

EIS. NEPA regulations "do not, and cannot, expand FERC's jurisdiction." *Alaska LNG*, 67 F.4th at 1185. Requiring FERC to consider actions and alternatives that are neither part of the proposed action before it nor within its power to perform would fundamentally violate NEPA's "rule of reason." *Pub. Citizen*, 541 U.S. at 769.

Disregarding this precedent, the purpose of an EIS, and FERC's narrowly circumscribed role, Petitioners argue that NEPA regulations sweep in multiple federal agencies' proposed actions regardless of jurisdiction or timing. Pet'rs' Br. 41-42. FERC addresses this argument in its brief and Tennessee will not repeat it here. *See* FERC Br. 41-43. In short, the regulations Petitioners cite do not dictate the result it proposes, and Petitioners' interpretation would upend this Court's precedent.

Finally, Petitioners' effort to characterize these projects as "connected actions" is utterly devoid of supporting precedent. The two cases Petitioners rely upon undercut their argument, because both involve multiple proposed actions *within FERC's jurisdiction* and *FERC's own consideration* of those proposed actions. *See Del. Riverkeeper v. FERC*, 753 F.3d 1304, 1307 (D.C. Cir. 2014) (multiple proposed projects under FERC's jurisdiction and before FERC for review, involving upgrades on "almost 200 miles of continuous pipeline," had to be analyzed together for NEPA purposes); *City of Port Isabel v. FERC*, 111 F.4th 1198, 1213

(D.C. Cir. 2024) (second action was submitted to FERC for FERC's review, was subject to FERC's jurisdiction, and was "connected" to the first proposed action under review).[7]

## IV.  FERC Reasonably Relied Upon the Precedent Agreement in Compliance With the NGA.

In the Certificate Order, FERC explained that Tennessee and TVA entered into a binding 20-year precedent agreement for the full capacity of the Project. Certificate Order at P 5 (J.A.___).  Based on that binding precedent agreement, FERC found that "Tennessee has demonstrated a need for the project." *Id.* at P 19 (J.A.___-___).  FERC's finding of public need was correct and is supported by the overwhelming precedent of this Court holding that FERC may properly rely on precedent agreements as sufficient evidence of market need under Section 7 of the NGA.

This Court has "repeatedly . . . held that such contracts—especially between unaffiliated entities—are 'good evidence' of such demand." *Food & Water Watch v. FERC*, 104 F.4th 336, 347 (D.C. Cir. 2024).  *E.g.*, *Del. Riverkeeper*, 45 F.4th at 114; *City of Oberlin, Ohio v. FERC*, 937 F.3d 599, 605 (D.C. Cir. 2019); *City of*

---

[7] The other cases Petitioners cite involving connected actions analysis also pertained to separate proposals pending before *FERC*, none of which are relevant here.  *See* Pet's' Br. 41 (citing *Food & Water Watch v. FERC*, 28 F.4th 277, 291-92 (D.C. Cir. 2022); *City of Boston Delegation v. FERC*, 897 F.3d 241, 251 (D.C. Cir. 2018); *Myersville Citizens for Rural Cmty., Inc. v. FERC*, 783 F.3d 1301, 1308 (D.C. Cir. 2015)).

*Oberlin, Ohio v. FERC*, 39 F.4th 719, 729 (D.C. Cir. 2022); *Appalachian Voices*, 2019 WL 847199 at *1; *Sabal Trail*, 867 F.3d at 1379; *Myersville Citizens*, 783 F.3d at 1311; *Minisink Residents*, 762 F.3d at 111 n.10. Nothing here is distinguishable from this long-standing case law.

Petitioners argue that FERC should not rely on the precedent agreement, but instead should "look behind" the agreement to question whether there is real market need for the Project. Pet'rs' Br. 50. Petitioners are wrong. This Court has not required FERC to look beyond a precedent agreement to prove that it reflects market need, other than in a single case where there was "plausible evidence of self-dealing" between corporate affiliates. *Envtl. Def. Fund v. FERC*, 2 F.4th 953, 975 (D.C. Cir. 2021); *see also Food & Water Watch*, 104 F.4th at 347 (distinguishing *Environmental Defense Fund* as "involv[ing] an agreement between corporate affiliates"); *Del. Riverkeeper*, 45 F.4th at 114 (distinguishing *Environmental Defense* where "petitioners had identified plausible evidence of self-dealing"). Here, Tennessee entered into a long-term precedent agreement with an unaffiliated entity (TVA) for the full capacity of the Project and there is no evidence (or even an allegation) of self-dealing. Moreover, customers of TVA have expressed support for the Project. Certificate Order at n.15 (J.A.___) (noting the Tennessee Association's support for the Project). Thus, under this Court's precedent, FERC

32

properly relied on the precedent agreement with TVA as sufficient evidence of market need.

Petitioners' reliance on *New Jersey Conservation Foundation v. FERC*, 111 F.4th 42 (D.C. Cir. 2024), is equally unavailing.  There, the Court found that FERC "arbitrarily discredited" market studies that were before FERC.  *Id*. at 59.  Here, FERC fully considered Petitioners' arguments challenging the precedent agreement between Tennessee and TVA.  FERC simply disagreed with those arguments and explained why.  Rehearing Order at PP 8-16 (J.A.___-___).

First, Petitioners argue that the precedent agreement should not be considered evidence of market need because, according to Petitioners, "TVA does not face normal competitive dynamics" in its territory and its investment decisions are not subject to oversight.  Pet'rs' Br. 50.  That is incorrect—there are multiple "checks and balances" regarding TVA's decisions.  Most significantly, TVA is subject to direct oversight by Congress to ensure that it is "carrying out the purposes of the TVA Act, including one of its primary objectives to keep rates as low as are feasible."  Motion to Answer and Answer of TVA, Docket No. CP22-493-000, at 3 (Oct. 24, 2023) (R.151; J.A.___) (citing 16 U.S.C. § 831a(g)(1)); Rehearing Order at P 11 (J.A.___).  Moreover, as required by the TVA Act, 16 U.S.C. §§ 831-831ee, TVA Board members must affirm support for the objectives and mission of TVA,

including being a "national leader in technological innovation, low-cost power, and environmental stewardship." *Id*. § 831a(b)(5).

Congress also created safeguards for TVA ratepayers by mandating that TVA engage in "least-cost planning" that accounts for "the full range of existing and incremental resources." *Id.* § 831m-1(b)(1). In conducting that planning, TVA must "take into account the ability to verify energy savings achieved through energy conservation and efficiency" and "treat demand and supply resources on a consistent and integrated basis." *Id.* § 831m-1(b)(2)(B) & (C). Moreover, TVA's decisions are subject to challenge in, and oversight by, the courts. Indeed, in an action filed in June 2023 in federal district court, Petitioners *are challenging* TVA's decision to retire its coal-fired plant and replace it with the Gas Plant. *See* footnote 2, *supra*.

Second, Petitioners argue that the record before FERC contained "independent warnings" that the Project would harm ratepayers in TVA's service area. Pet'rs' Br. 50. But the so-called "warnings" cited by Petitioners concern *TVA's decision to construct the Gas Plant*, not TVA's decision to enter into the precedent agreement. *Id.* at 50-52. Thus, Petitioners' argument is entirely immaterial to whether the *precedent agreement* demonstrates market need. FERC correctly found that it does.

At bottom, Petitioners are asking this Court to direct FERC to ignore and second-guess the decisions of TVA to retire the Fossil Plant and replace a portion of

its generating capacity with the Gas Plant.  Plainly, FERC lacks jurisdiction to address that issue.

## V.   If the Court Finds FERC's Analysis Is Deficient, It Should Remand the Orders Without Vacatur.

For the reasons discussed above, this Court should deny the petitions for review and uphold FERC's Orders.  However, if this Court determines that FERC's analysis in the Orders was deficient in some respect, then the Court should not vacate the Orders but should remand them to FERC for further consideration and analysis. Under the *Allied-Signal* standard, the Court considers, first, the "seriousness of the [order's] deficiencies," and, second, the likely "disruptive consequences" of vacatur. *Am. Great Lakes Ports Ass'n v. Schultz*, 962 F.3d 510, 518-19 (D.C. Cir. 2020) (quoting *Allied-Signal, Inc. v. NRC*, 988 F.2d 146, 150-51 (D.C. Cir. 1993)) (citations omitted) (internal quotation marks omitted).

Under the <u>first prong</u>, the Court determines "whether there is 'a significant possibility that the [agency] may find an adequate explanation for its actions' on remand."  *Standing Rock Sioux Tribe v. U.S. Army Corps of Eng'rs*, 471 F. Supp. 3d 71, 80 (D.D.C. 2020) (quoting *Williston Basin Interstate Pipeline Co. v. FERC*, 519 F.3d 497, 504 (D.C. Cir. 2008)), *affirmed in part and reversed in part*, 985 F.3d 1032 (D.C. Cir. 2021), *cert denied sub nom.*, *Dakota Access, LLC v. Standing Rock Sioux Tribe*, 142 S. Ct. 1187 (2022).  A cure on remand need not be certain; rather, the Court need only identify "a serious possibility that" the agency "will be able to

substantiate its decision." *Allied-Signal*, 988 F.2d at 151.  Should the Court find a

deficiency in this case, each of Petitioners' alleged defects are readily curable on

remand.  *See Vecinos para el Bienestar de la Comunidad Costera v. FERC*, 6 F.4th

1321, 1332 (D.C. Cir. 2021) (finding "reasonably likely" FERC could "redress its

failure of explanation . . . while reaching the same result"), *vacated and remanded*

*sub nom. on other grounds*, *City of Port Isabel*, 111 F.4th 1198.

For example, on the NEPA side, FERC could revise its EIS analysis of the

emissions calculation to omit the avoided emissions from the retirement of one

Fossil Plant unit.  Likewise, on the issue of market need, FERC could readily review

the reliability of market data and analysis in the record and, if FERC deemed it

necessary, easily supplement the analysis in its decision on remand.  In short, FERC

could readily perform these analyses and offer further explanation in its decision

document.[8]

As to the <u>second prong</u> of *Allied-Signal*—the extent to which vacatur would

be disruptive—vacating FERC's Orders would have potentially calamitous

consequences on the Project, TVA, and the customers who rely on TVA's power.

Vacating the Orders would force FERC to redo its entire analysis when only discrete

---

[8] For reasons explained above, *see* Section III, *supra*, FERC lacks the authority to unilaterally conduct a connected-actions analysis under NEPA that includes TVA's decision to retire-and-replace certain power generation units.  But this fundamental impracticability does not change the *Allied-Signal* analysis as to the Commission's ready ability to cure any defect *within its authority*.

points are allegedly deficient.  Although it is unclear how much time such a "do-over" would require, it took roughly 18 months for FERC to issue the Certificate Order.

The Project is not "in its earliest post-authorization stages," as alleged by Petitioners.  Pet'rs' Br. 56.  The Project's timing is critical because of Tennessee's tight schedule for meeting its legal obligation in support of the public's need for power from TVA, which requires Tennessee to place the Project in-service by September 1, 2025.  To meet that required date, the Project has a carefully calibrated construction schedule, which was set to commence in October 2024.  *See* Implementation Plan, Att. A (Apr. 12, 2024) (R.185; J.A.___-___).  While construction of the Gas Plant continues, construction of the Project is currently stayed pending resolution of two petitions brought by Petitioners in the U.S. Court of Appeals for the Sixth Circuit challenging the Project under aspects of the Clean Water Act.[9]  The merits of those actions have been expedited with oral argument set for December 10, 2024, consistent with the statutory directive in the NGA. 15 U.S.C. § 717r(d)(5).  Here, if the Court finds deficiencies in FERC's Orders, then

---

[9] *Sierra Club v. Tennessee Dep't of Environment & Conservation*, No. 23-3682 (6th Cir.) (challenging certification issued under Section 401 of the Clean Water Act); *Appalachian Voices v. U.S. Army Corps of Engineers*, No. 24-3831 (6th Cir.) (challenging Permit issued under Section 404 of the Clean Water Act).

remand without vacatur would allow Tennessee to complete construction without severe disruption to the Project.

The harm caused by vacatur would also be inflicted on the public because it would have disruptive consequences to the TVA power system and to the millions of people who rely on it every day for safe, reliable, and affordable electric power. The timing of the Project is critical to TVA and, by extension, the public served by TVA. TVA's plan to retire one of the Fossil Plant coal units and replace it with the Gas Plant depends on the timely completion of the Project to supply natural gas. TVA's construction of the new Gas Plant is nearing fifty percent complete and on schedule to enable the retirement of the first Cumberland Fossil Plant unit by the end of 2026. Maintaining that schedule is critical to TVA's ability to make the system performance improvements necessary to continue delivering reliable electric power and to reduce overall TVA power system carbon emissions by replacing the coal plant with the lower-emitting gas plant that, unlike the coal plant, also possesses the flexibility to enable TVA to integrate more renewable generation across its power system.

However, vacatur threatens serious consequences for the TVA power system because delay in TVA's scheduled retirement of one of the coal units at the Fossil Plant will lead to "additional construction, repairs, and maintenance . . . to maintain reliability and comply with applicable regulatory requirements." *See* Record of

Decision, 88 Fed. Reg. at 3768 (J.A.___).  Vacatur would further harm the public by delaying the benefits that would be derived from TVA's replacement of an aging, inefficient Fossil Plant with the new, efficient Gas Plant.

The public interest supports honoring Congress's mandate in the NGA that the Nation continue to benefit from "the orderly development of plentiful supplies of . . . natural gas at reasonable prices."  *NAACP v. FPC*, 425 U.S. 662, 669-70 (1976).  Petitioners have offered no reason why the deficiencies they have alleged should trump the significant public interests served by the Project.  In sum, because vacating FERC's Orders would be highly disruptive, the second *Allied-Signal* factor supports remand without vacatur if the Court finds deficiencies in FERC's Orders.

## CONCLUSION

For the foregoing reasons, this Court should deny the petitions for review.  If remand is ordered, the Court should remand without vacatur.

Respectfully submitted,

Bill Wolf
  Vice President & Deputy General Counsel
Jacquelyne Rocan
   Assistant General Counsel
Meghan Coffman
  Assistant General Counsel
TENNESSEE GAS PIPELINE COMPANY, L.L.C.
1001 Louisiana Street
Suite 1000
Houston, TX 77002
Tel.:   (713) 420-6680
Email:  bill_wolf@kindermorgan.com

*/s/ Brian D. O'Neill*
Brian D. O'Neill
Michael R. Pincus
Travis Malesky
VAN NESS FELDMAN, LLP
2000 Pennsylvania Ave., NW,
Suite 6000
Washington, D.C. 20006
Tel.:   (202) 298-1800
Fax:   (202) 338-2416
Email:  bdo@vnf.com
       mmd@vnf.com
       tmalesky@vnf.com

jacquelyne_rocan@kindermorgan.com
meghan_coffman@kindermorgan.com

David A. Super
Kevin A. Ewing
Ann D. Navaro
BRACEWELL LLP
2001 M Street, NW, Suite 900
Washington, D.C. 20036
Tel.: (202) 828-5836
Fax: (800) 404-3970
Email: david.super@bracewell.com
Email: kevin.ewing@bracewell.com
Email: ann.navaro@bracewell.com

*Attorneys for Respondent-Intervenor Tennessee Gas Pipeline Company, L.L.C.*

David D. Ayliffe
Associate General Counsel
Office of the General Counsel
TENNESSEE VALLEY AUTHORITY
400 West Summit Hill Drive
Knoxville, Tennessee 37902-1401
Tel.: 865.632.8964
Email: ddayliffe@tva.gov

John P. Coyle
DUNCAN & ALLEN LLP
1730 Rhode Island Ave., N.W.
Suite 700
Washington, DC 20036
Tel.: (202) 289-8400
Email: jpc@duncanallen.com

*Attorney for Respondent-Intervenor Tennessee Valley Authority*

*Attorney for Respondent-Intervenor Tennessee Valley Public Power Association, Inc.*

Dated: November 19, 2024

40

**STATUTORY ADDENDUM**

## Table of Contents to Statutory Addendum

Tennessee Valley Authority Act
   16 U.S.C. § 831c(j) ............................................................... SA-1

40 C.F.R. § 1502.14 (2023) .................................................. SA-4
40 C.F.R. § 1502.16 (2023) .................................................. SA-4

United States Code Annotated
  Title 16. Conservation
    Chapter 12A. Tennessee Valley Authority (Refs & Annos)

16 U.S.C. § 831c

§ 831c. Corporate powers generally; eminent domain; construction of dams, transmission lines, etc.

Except as otherwise specifically provided in this chapter, the Corporation--

**(a)** Shall have succession in its corporate name.

**(b)** May sue and be sued in its corporate name.

**(c)** May adopt and use a corporate seal, which shall be judicially noticed.

**(d)** May make contracts, as herein authorized.

**(e)** May adopt, amend, and repeal bylaws.

**(f)** May purchase or lease and hold such real and personal property as it deems necessary or convenient in the transaction of its business, and may dispose of any such personal property held by it.

The Board shall select a treasurer and as many assistant treasurers as it deems proper: *Provided,* That any member of said Board may be removed from office at any time by a concurrent resolution of the Senate and the House of Representatives.

**(g)** Shall have such powers as may be necessary or appropriate for the exercise of the powers herein specifically conferred upon the Corporation.

**(h)** Shall have power in the name of the United States of America to exercise the right of eminent domain, and in the purchase of any real estate or the acquisition of real estate by condemnation proceedings, the title to such real estate shall be taken in the name of the United States of America, and thereupon all such real estate shall be entrusted to the Corporation as the agent of the United States to accomplish the purposes of this chapter.

**(i)** Shall have power to acquire real estate for the construction of dams, reservoirs, transmission lines, power houses, and other structures, and navigation projects at any point along the Tennessee River, or any of its tributaries, and in the event that the owner or owners of such property shall fail and refuse to sell to the Corporation at a price deemed fair and reasonable by the Board, then the Corporation may proceed to exercise the right of eminent domain, and to condemn all property that it deems necessary for carrying out the purposes of this chapter, and all such condemnation proceedings shall be had pursuant to the provisions and requirements hereinafter specified, with reference to any and all condemnation proceedings: *Provided,* That nothing contained herein or elsewhere in this chapter shall be construed to deprive the Corporation of the rights conferred by sections 3114, 3115, and 3118 of Title 40.

**(j)** Shall have power to construct such dams, and reservoirs, in the Tennessee River and its tributaries, as in conjunction with Wilson Dam, and Norris, Wheeler, and Pickwick Landing Dams, now under construction, will provide a nine-foot channel in the said river and maintain a water supply for the same, from Knoxville to its mouth, and will best serve to promote navigation on the Tennessee River and its tributaries and control destructive flood waters in the Tennessee and Mississippi River drainage basins; and shall have power to acquire or construct power houses, power structures, transmission lines, navigation projects, and incidental works in the Tennessee River and its tributaries, and to unite the various power installations into one or more systems by transmission lines.

**(k)** Shall have power in the name of the United States--

**(a)** to convey by deed, lease, or otherwise, any real property in the possession of or under the control of the Corporation to any person or persons, for the purpose of recreation or use as a summer residence, or for the operation on such premises of pleasure resorts for boating, fishing, bathing, or any similar purpose;

**(b)** to convey by deed, lease, or otherwise, the possession and control of any such real property to any corporation, partnership, person, or persons for the purpose of erecting thereon docks and buildings for shipping purposes or the manufacture or storage thereon of products for the purpose of trading or shipping in transportation: *Provided,* That no transfer authorized herein in (b) shall be made without the approval of Congress: *And provided further,* That said corporation, without further action of Congress, shall have power to convey by deed, lease, or otherwise, to the Ingalls Shipbuilding Corporation, a tract or tracts of land at or near Decatur, Alabama, and to the Commercial Barge Lines, Inc., a tract or tracts of land at or near Guntersville, Alabama;

**(c)** to transfer any part of the possession and control of the real estate now in possession of and under the control of said Corporation to any other department, agency, or instrumentality of the United States: *Provided, however,* That no land shall be conveyed, leased, or transferred, upon which there is located any permanent dam, hydroelectric power plant, or munitions plant heretofore or hereafter built by or for the United States or for the Authority, except that this prohibition shall not apply to the transfer of Nitrate Plant Numbered 1, at Muscle Shoals, Alabama, or to Waco Quarry: *And provided further,* That no transfer authorized herein in (a) or (c) except leases for terms of less than twenty years, shall be made without the approval of the President of the United States, if the property to be conveyed exceeds $500 in value; and

**(d)** to convey by warranty deed, or otherwise, lands, easements, and rights-of-way to States, counties, municipalities, school districts, railroad companies, telephone, telegraph, water, and power companies, where any such conveyance is necessary in order to replace any such lands, easements, or rights-of-way to be flooded or destroyed as the result of the construction of any dam or reservoir now under construction by the Corporation, or subsequently authorized by Congress, and easements and rights-of-way upon which are located transmission or distribution lines. The Corporation shall also have power to convey or lease Nitrate Plant Numbered 1, at Muscle Shoals, Alabama, and Waco Quarry, with the approval of the Department of the Army and the President.

**(l)** Shall have power to advise and cooperate in the readjustment of the population displaced by the construction of dams, the acquisition of reservoir areas, the protection of watersheds, the acquisition of rights-of-way, and other necessary acquisitions of land, in order to effectuate the purposes of the chapter; and may cooperate with Federal, State, and local agencies to that end.

**Council on Environmental Quality**                                   **§ 1502.16**

costs incurred by cooperating and participating agencies, applicants, and contractors.

**§ 1502.12  Summary.**

Each environmental impact statement shall contain a summary that adequately and accurately summarizes the statement. The summary shall stress the major conclusions, areas of disputed issues raised by agencies and the public, and the issues to be resolved (including the choice among alternatives). The summary normally will not exceed 15 pages.

**§ 1502.13  Purpose and need.**

The statement shall briefly specify the underlying purpose and need to which the agency is responding in proposing the alternatives including the proposed action.

[87 FR 23469, Apr. 20, 2022]

**§ 1502.14  Alternatives including the proposed action.**

The alternatives section should present the environmental impacts of the proposed action and the alternatives in comparative form based on the information and analysis presented in the sections on the affected environment (§ 1502.15) and the environmental consequences (§ 1502.16). In this section, agencies shall:

(a) Evaluate reasonable alternatives to the proposed action, and, for alternatives that the agency eliminated from detailed study, briefly discuss the reasons for their elimination.

(b) Discuss each alternative considered in detail, including the proposed action, so that reviewers may evaluate their comparative merits.

(c) Include the no action alternative.

(d) Identify the agency's preferred alternative or alternatives, if one or more exists, in the draft statement and identify such alternative in the final statement unless another law prohibits the expression of such a preference.

(e) Include appropriate mitigation measures not already included in the proposed action or alternatives.

(f) Limit their consideration to a reasonable number of alternatives.

**§ 1502.15  Affected environment.**

The environmental impact statement shall succinctly describe the environment of the area(s) to be affected or created by the alternatives under consideration, including the reasonably foreseeable environmental trends and planned actions in the area(s). The environmental impact statement may combine the description with evaluation of the environmental consequences (§ 1502.16), and it shall be no longer than is necessary to understand the effects of the alternatives. Data and analyses in a statement shall be commensurate with the importance of the impact, with less important material summarized, consolidated, or simply referenced. Agencies shall avoid useless bulk in statements and shall concentrate effort and attention on important issues. Verbose descriptions of the affected environment are themselves no measure of the adequacy of an environmental impact statement.

**§ 1502.16  Environmental consequences.**

(a) The environmental consequences section forms the scientific and analytic basis for the comparisons under § 1502.14. It shall consolidate the discussions of those elements required by sections 102(2)(C)(i), (ii), (iv), and (v) of NEPA that are within the scope of the statement and as much of section 102(2)(C)(iii) of NEPA as is necessary to support the comparisons. This section should not duplicate discussions in § 1502.14. The discussion shall include:

(1) The environmental impacts of the proposed action and reasonable alternatives to the proposed action and the significance of those impacts. The comparison of the proposed action and reasonable alternatives shall be based on this discussion of the impacts.

(2) Any adverse environmental effects that cannot be avoided should the proposal be implemented.

(3) The relationship between short-term uses of man's environment and the maintenance and enhancement of long-term productivity.

(4) Any irreversible or irretrievable commitments of resources that would be involved in the proposal should it be implemented.

(5) Possible conflicts between the proposed action and the objectives of

659

Federal, regional, State, Tribal, and local land use plans, policies and controls for the area concerned. (§ 1506.2(d) of this chapter)

(6) Energy requirements and conservation potential of various alternatives and mitigation measures.

(7) Natural or depletable resource requirements and conservation potential of various alternatives and mitigation measures.

(8) Urban quality, historic and cultural resources, and the design of the built environment, including the reuse and conservation potential of various alternatives and mitigation measures.

(9) Means to mitigate adverse environmental impacts (if not fully covered under § 1502.14(e)).

(10) Where applicable, economic and technical considerations, including the economic benefits of the proposed action.

(b) Economic or social effects by themselves do not require preparation of an environmental impact statement. However, when the agency determines that economic or social and natural or physical environmental effects are interrelated, the environmental impact statement shall discuss and give appropriate consideration to these effects on the human environment.

### § 1502.17 Summary of submitted alternatives, information, and analyses.

(a) The draft environmental impact statement shall include a summary that identifies all alternatives, information, and analyses submitted by State, Tribal, and local governments and other public commenters during the scoping process for consideration by the lead and cooperating agencies in developing the environmental impact statement.

(1) The agency shall append to the draft environmental impact statement or otherwise publish all comments (or summaries thereof where the response has been exceptionally voluminous) received during the scoping process that identified alternatives, information, and analyses for the agency's consideration.

(2) Consistent with § 1503.1(a)(3) of this chapter, the lead agency shall invite comment on the summary identifying all submitted alternatives, information, and analyses in the draft environmental impact statement.

(b) The final environmental impact statement shall include a summary that identifies all alternatives, information, and analyses submitted by State, Tribal, and local governments and other public commenters for consideration by the lead and cooperating agencies in developing the final environmental impact statement.

### § 1502.18 List of preparers.

The environmental impact statement shall list the names, together with their qualifications (expertise, experience, professional disciplines), of the persons who were primarily responsible for preparing the environmental impact statement or significant background papers, including basic components of the statement. Where possible, the environmental impact statement shall identify the persons who are responsible for a particular analysis, including analyses in background papers. Normally the list will not exceed two pages.

### § 1502.19 Appendix.

If an agency prepares an appendix, the agency shall publish it with the environmental impact statement, and it shall consist of:

(a) Material prepared in connection with an environmental impact statement (as distinct from material that is not so prepared and is incorporated by reference (§ 1501.12 of this chapter)).

(b) Material substantiating any analysis fundamental to the impact statement.

(c) Material relevant to the decision to be made.

(d) For draft environmental impact statements, all comments (or summaries thereof where the response has been exceptionally voluminous) received during the scoping process that identified alternatives, information, and analyses for the agency's consideration.

(e) For final environmental impact statements, the comment summaries and responses consistent with § 1503.4 of this chapter.

## CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMIT

1.      This document complies with the type-volume limits of Circuit Rule 32(e)(2)(B) because, excluding the parts of the document exempted by Fed. R. App. P. 32(f), this document contains 9,041 words.

2.      This document complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because this document has been prepared in a proportionally spaced typeface using Microsoft Word 365 in 14-point Times New Roman.

Respectfully submitted,

*/s/ Brian D. O'Neill*
Brian D. O'Neill
Van Ness Feldman, LLP
2000 Pennsylvania Ave., NW,
Suite 6000
Washington, D.C. 20006
Telephone:  (202) 298-1800
Facsimile: (202) 338-2416
bdo@vnf.com

Dated:  November 19, 2024

## CERTIFICATE OF SERVICE

Pursuant to Rules 15(c)(2) and 25(d) of the Federal Rules of Appellate Procedure and Circuit Rule 15, I hereby certify that the foregoing document was electronically filed through this Court's CM/ECF system, which will send a notice of filing to the counsel registered to receive service through the Court's CM/ECF system via electronic filing.

Respectfully submitted,

*/s/ Brian D. O'Neill*
Brian D. O'Neill
Van Ness Feldman, LLP
2000 Pennsylvania Ave., NW,
Suite 6000
Washington, D.C. 20006
Telephone:  (202) 298-1800
Facsimile: (202) 338-2416
bdo@vnf.com

Dated:  November 19, 2024