No. 24-1099
(consolidated with No. 24-1198)

─────────────────────────────────────────

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE DISTRICT OF COLUMBIA CIRCUIT

─────────────────────────────────────────

SIERRA CLUB and APPALACHIAN VOICES,

*Petitioners*,

v.

FEDERAL ENERGY REGULATORY COMMISSION,

*Respondent*,

and

TENNESSEE GAS PIPELINE COMPANY, L.L.C., et al.,

*Intervenor-Respondents*.

─────────────────────────────────────────

On Petition for Review of Orders of the
Federal Energy Regulatory Commission

─────────────────────────────────────────

### PETITIONERS' FINAL OPENING BRIEF

─────────────────────────────────────────

Delaney King
Southern Environmental Law Center
1033 Demonbreun Street
Suite 205
Nashville, Tennessee 37203
Telephone: (615) 921-9470
Email: dking@selctn.org

Spencer Gall
Southern Environmental Law Center
120 Garrett Street
Suite 400
Charlottesville, Virginia 22902
Telephone: (434) 977-4090
Email: sgall@selcva.org

*Counsel for Sierra Club and
Appalachian Voices*

**CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES**

A.     **Parties and *Amici***

In these consolidated petitions for review, the parties in both No. 24-1099 and No. 24-1198 are:

Petitioners: Petitioners are Sierra Club and Appalachian Voices.

Respondent: Respondent is the Federal Energy Regulatory Commission.

Intervenor-Respondents: Intervenor-Respondents are Tennessee Gas Pipeline Company, L.L.C.; Tennessee Valley Public Power Association, Inc.; and Tennessee Valley Authority.

Amici Curiae: No individuals or entities have sought leave to participate as *amici curiae*.

B.     **Rulings Under Review**

Petitioners challenge the following orders of the Federal Energy Regulatory Commission:

1.  Order Issuing Certificate, *Tenn. Gas Pipeline Co., L.L.C.*, 186 FERC ¶ 61,046 (Jan. 18, 2024).

2.  Notice of Denial of Rehearing by Operation of Law and Providing for Further Consideration, *Tenn. Gas Pipeline Co., L.L.C.*, 186 FERC ¶ 62,143 (Mar. 22, 2024).

i

3. Order on Rehearing, *Tenn. Gas Pipeline Co. L.L.C.*, 187 FERC ¶ 61,136 (June 7, 2024).

**C.     Related Cases**

This case has not previously been before this Court or any other court.

Counsel for Petitioners are aware of the following case pending in this Court that may be related within the meaning of Circuit Rule 28(a)(1)(C):

1. *Citizens Action Coalition of Indiana, Inc. v. FERC*, No. 23-1046.

2. *Healthy Gulf, et al. v. FERC*, No. 23-1226.

*/s/ Spencer Gall*
Spencer Gall
Southern Environmental Law Center

## RULE 26.1 DISCLOSURE STATEMENTS

Sierra Club is a non-profit conservation and advocacy organization incorporated under the laws of California. Sierra Club has no parent corporation and does not issue stock. No publicly held company has a 10% or greater ownership interest in Sierra Club.

Appalachian Voices is a non-profit conservation and advocacy organization incorporated under the laws of North Carolina. Appalachian Voices has no parent corporation and does not issue stock. No publicly held company has a 10% or greater ownership interest in Appalachian Voices.

*/s/ Spencer Gall*
Spencer Gall
Southern Environmental Law Center

# TABLE OF CONTENTS

CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES ............... i

RULE 26.1 DISCLOSURE STATEMENTS ........................................... iii

TABLE OF CONTENTS ................................................................. iv

TABLE OF AUTHORITIES ............................................................. vi

GLOSSARY ................................................................................ xi

JURISDICTIONAL STATEMENT ......................................................1

STATUTES AND REGULATIONS ....................................................3

ISSUES FOR REVIEW ...................................................................3

STATEMENT OF THE CASE ...........................................................4

    A.   Legal Framework.............................................................4

    B.   Factual Background..........................................................6

SUMMARY OF ARGUMENT........................................................16

STANDING................................................................................18

ARGUMENT..............................................................................20

I.    Standard of Review .............................................................20

II.   FERC Violated NEPA and the Natural Gas Act Because It Took Arbitrary and Inconsistent Positions Regarding the No-Action Alternative. ........................20

III.  FERC Violated NEPA and the Natural Gas Act Because It Did Not Take a Hard Look at the Project's Downstream Greenhouse Gas Emissions. ............26

    A.   The coal plant retirement is not an effect of the Project. .........................27

    B.   FERC ignored total emissions because it fixated on the annual rate. ......30

IV.  FERC Violated NEPA Because It Refused to Consider the Project and the Cumberland Gas Plant as Connected Actions.................................................37

    A.   The Project and the Cumberland Gas Plant are major federal actions that are functionally interdependent. ...............................................38

    B.   The connected actions requirement applies even when multiple federal agencies are involved. ................................................................41

V.   FERC's Decision Under the Natural Gas Act Was Arbitrary and Capricious. 47

    A.   FERC did not confront material challenges to the precedent agreement.48

B.    FERC did not meaningfully balance harms and benefits.........................54

VI.  Vacatur Is the Appropriate Remedy.....................................................55

CONCLUSION .........................................................................................56

CERTIFICATE OF COMPLIANCE .........................................................58

CERTIFICATE OF SERVICE ...................................................................59

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Abhe & Svoboda, Inc. v. Chao,*
   508 F.3d 1052 (D.C. Cir. 2007)............................................................8

*Alabama Municipal Distributors Group v. FERC,*
   100 F.4th 207 (D.C. Cir. 2024)....................................................44, 45

*Allied-Signal, Inc. v. Nuclear Regul. Comm'n,*
   988 F.2d 146 (D.C. Cir. 1993)............................................................56

*ANR Storage Co. v. FERC,*
   904 F.3d 1020 (D.C. Cir. 2018)..........................................................21

*Atl. Refin. Co. v. Pub. Serv. Comm'n of N.Y.,*
   360 U.S. 378 (1959)....................................................................4, 53

*Cape Cod Hosp. v. Sebelius,*
   630 F.3d 203 (D.C. Cir. 2011)............................................................37

*Center for Biological Diversity v. FERC,*
   67 F.4th 1176 (D.C. Cir. 2023) ("*Alaska LNG*")........................................44, 45

*City of Bos. Delegation v. FERC,*
   897 F.3d 241 (D.C. Cir. 2018)............................................................41

*City of Oberlin v. FERC,*
   937 F.3d 599 (D.C. Cir. 2019)............................................................5

*City of Port Isabel v. FERC,*
   111 F.4th 1198, 2024 WL 3659344 (D.C. Cir. Aug. 6, 2024) ....................38, 41

*Constellation Mystic Power, LLC v. FERC,*
   45 F.4th 1028 (D.C. Cir. 2022)..........................................................25

*Del. Riverkeeper Network v. FERC,*
   753 F.3d 1304 (D.C. Cir. 2014)..............................................20, 38, 39, 43

*Dep't of Transp. v. Public Citizen,*
   541 U.S. 752 (2004)....................................................................28

*Dist. Hosp. Partners, L.P. v. Burwell*,
    786 F.3d 46 (D.C. Cir. 2015)...............................................................37

*Environmental Defense Fund v. FERC*,
    2 F.4th 953 (D.C. Cir. 2021)............................... 4, 20, 47, 48, 49, 52, 54, 55, 56

*Epic Sys. Corp. v. Lewis*,
    584 U.S. 497 (2018)...............................................................................54

*Fed. Power Comm'n v. Transcon. Gas Pipe Line Corp.*,
    365 U.S. 1 (1961)..............................................................................46, 53

*Food & Water Watch v. FERC*,
    28 F.4th 277 (D.C. Cir 2022).............................................................41

*Healthy Gulf v. FERC*,
    107 F.4th 1033 (D.C. Cir. 2024)..........................................................6

*Hunt v. Wash. State Apple Advert. Comm'n*,
    432 U.S. 333 (1977)..............................................................................18

*Minisink Residents for Env't Pres. & Safety v. FERC*,
    762 F.3d 97 (D.C. Cir. 2014).............................................................21

*Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins.
Co.*,
    463 U.S. 29 (1983)....................................................................20, 25, 36

*Myersville Citizens for a Rural Community v. FERC*,
    783 F.3d 1301 (D.C. Cir. 2015)..........................................................41

*N. Natural Gas Co. v. Fed. Power Comm'n*,
    399 F.2d 953 (D.C. Cir. 1968).............................................................22

*N.J. Conservation Found. v. FERC*,
    111 F.4th 42 (D.C. Cir. 2024)........................................................47, 48, 49, 55

*Off. of Consumers' Couns. v. FERC*,
    655 F.2d 1132 (D.C. Cir. 1980)....................................................45, 53

*Robertson v. Methow Valley Citizens Council*,
    490 U.S. 332 (1989)...............................................................................5

*Sierra Club v. FERC*,
867 F.3d 1357 (D.C. Cir. 2017) ("*Sabal Trail*") ........... 19, 26, 27, 29, 36, 43, 46

*Sierra Club v. U.S. Army Corps of Engineers*,
803 F.3d 31 (D.C. Cir. 2015)....................................................................42, 43

*South Fork Band Council of Western Shoshone of Nevada v. U.S.
Department of Interior*,
588 F.3d 718 (9th Cir. 2009) ...........................................................................32

*Theodore Roosevelt Conservation P'ship v. Salazar*,
744 F. Supp. 2d 151 (D.D.C. 2010).................................................................21

*Vecinos para el Bienestar de la Comunidad Costera v. FERC*,
6 F.4th 1321 (D.C. Cir. 2021)....................................20, 22, 26, 37, 54

*WildEarth Guardians v. Bernhardt*,
502 F. Supp. 3d 237 (D.D.C. 2020)....................................31, 32, 36

**Statutes**

5 U.S.C. § 706(2)(A)..........................................................................................20

15 U.S.C. § 717f..................................................................................................1

15 U.S.C. § 717f(c)..............................................................................................6

15 U.S.C. § 717f(c)(1)(A)....................................................................................4

15 U.S.C. § 717f(e)..........................................................................4, 21, 47, 49

15 U.S.C. § 717f(h)..............................................................................................4

15 U.S.C. § 717r(a)........................................................................................1, 14

15 U.S.C. § 717r(b)..............................................................................................1

16 U.S.C. § 831....................................................................................................7

16 U.S.C. § 831c................................................................................................54

16 U.S.C. § 831i.................................................................................................54

16 U.S.C. § 831m-1 ...........................................................................................54

42 U.S.C. § 4332(2)(C)..............................................................5

42 U.SC. § 4332(2)(C)(i)............................................................5

42 U.S.C. § 4332(2)(C)(iii).........................................................21

**Regulations**

40 C.F.R. § 1501.7(a)...........................................................42, 46

40 C.F.R. § 1501.7(a)(2).........................................................6, 44

40 C.F.R. § 1501.8..................................................................6

40 C.F.R. § 1501.9(e)..............................................................42

40 C.F.R. § 1501.9(e)(1)...........................................6, 38, 42, 44, 46

40 C.F.R. § 1501.9(e)(1)(iii)...................................................38, 44

40 C.F.R. § 1508.1(g)...............................................................6

40 C.F.R. § 1508.1(g)(1).......................................................28, 29

40 C.F.R. § 1508.1(g)(2).......................................................29, 31

40 C.F.R. § 1508.8 (1978).........................................................27

**FERC Orders**

*Kern River Gas Transmission Co.*,
179 FERC ¶ 61,121 (2022)........................................................29

*NEXUS Gas Transmission, LLC*,
164 FERC ¶ 61,054 (July 25, 2018)...............................................50

*Tennessee Gas Pipeline Co.*,
179 FERC ¶ 61,041 (2022)........................................................30

*Tennessee Gas Pipeline Co.*,
186 FERC ¶ 61,113 (2024)........................................................30

*Texas Gas Transmission, LLC*,
181 FERC ¶ 61,049 (2022)........................................................30

## Other Authorities

CEQ, Forty Most Asked Question Concerning CEQ's National
Environmental Policy Act Regulations, 46 Fed. Reg. 18,026 (Mar.
23, 1981) ...................................................................................21

CEQ, National Environmental Policy Act Implementing Regulations
Revisions Phase 2, 89 Fed. Reg. 35,442 (May 1, 2024)..........................6, 43, 44

FERC, Certification of New Interstate Natural Gas Pipeline Facilities,
88 FERC ¶ 61,227 (Sept. 15, 1999).........................................4, 51, 55

Fed. R. Evid. 201(b).........................................................................8

FERC, Delta Lateral Project: Final Environmental Impact Statement,
*Kern River Transmission Co.*, Docket No. CP21-197, Accession
No. 20220225-3007 (Feb. 25, 2022) ...................................................29

FERC, Notice of Intent to Prepare an Environmental Impact
Statement for the Proposed Cumberland Project, Request for
Comments on Environmental Issues, and Schedule for
Environmental Review, 87 Fed. Reg. 56,048 (Sept. 13, 2022).........................10

TVA, Notice of Intent: Environmental Impact Statement for
Cumberland Fossil Plant Retirement, 86 Fed. Reg. 25,933 (May
11, 2021) .................................................................................9

TVA, Record of Decision: Cumberland Fossil Plant Retirement
Environmental Impact Statement, 88 Fed. Reg. 3,767 (Jan. 20,
2023) ....................................................................................11

TVA, Record of Decision: Integrated Resource Plan, 84 Fed. Reg.
48,987 (Sept. 17, 2019).................................................................7

TVA, Aging Coal Fleet Evaluation (May 2021),
https://perma.cc/3YT2-R6EQ.........................................................8, 9, 34, 37

U.S. Global Climate Change Research Program, *Climate Science
Special Report: Fourth National Climate Assessment, Vol. 1*
(2017), https://perma.cc/8UBS-EFUC.................................................31, 32

# GLOSSARY

| | |
|---|---|
| Certificate Order | Order Issuing Certificate, *Tenn. Gas Pipeline Co., L.L.C.*, 186 FERC ¶ 61,046 (Jan. 18, 2024) |
| CEQ | Council on Environmental Quality |
| $CO_2e$ | Carbon dioxide equivalents |
| EIS | Environmental impact statement |
| EPA | Environmental Protection Agency |
| FERC or Commission | Federal Energy Regulatory Commission |
| Final EIS | Cumberland Project: Final Environmental Impact Statement, *Tenn. Gas Pipeline Co.*, Docket No. CP22-493, Accession No. 20230630-3003 (June 30, 2023) |
| NEPA | National Environmental Policy Act |
| Power Plant EIS | Cumberland Fossil Plant Retirement: Final Environmental Impact Statement (Dec. 2, 2022), filed as Exhibit 2 to Request for Rehearing of Appalachian Voices and Sierra Club, *Tenn. Gas Pipeline Co.*, Docket No. CP22-493, Accession No. 20240220-5230 (Feb. 20, 2024) |
| Project | Cumberland Project |
| Rehearing Order | Order on Rehearing, *Tenn. Gas Pipeline Co., L.L.C.*, 187 FERC ¶ 61,136 (June 7, 2024) |
| TVA | Tennessee Valley Authority |

## JURISDICTIONAL STATEMENT

The Court has jurisdiction over these consolidated petitions for review of final orders of the Federal Energy Regulatory Commission ("FERC" or "Commission") under 15 U.S.C. § 717r(b).

On January 18, 2024, FERC issued an order under Section 7 of the Natural Gas Act, 15 U.S.C. § 717f, that granted a certificate of public convenience and necessity authorizing Intervenor-Respondent Tennessee Gas Pipeline Company, L.L.C., to construct and operate a gas pipeline and related facilities called the Cumberland Project. *See* Order Issuing Certificate, *Tenn. Gas Pipeline Co., L.L.C.*, 186 FERC ¶ 61,046 (Jan. 18, 2024), JA001–049 ("Certificate Order"). Petitioners Sierra Club and Appalachian Voices ("Petitioners") were intervenors below and timely sought rehearing of the Certificate Order, which was denied by operation of law pursuant to 15 U.S.C. § 717r(a) on March 22, 2024. *See* Notice of Denial of Rehearing by Operation of Law and Providing for Further Consideration, *Tenn. Gas Pipeline Co., L.L.C.*, 186 FERC ¶ 62,143 (Mar. 22, 2024), JA050. On April 29, 2024, Petitioners filed a timely petition for review in No. 24-1099. *See* Doc. No. 2051958.

FERC later exercised its authority under 15 U.S.C. § 717r(a) to issue a subsequent order on rehearing that set aside the Certificate Order, in part, and modified the discussion therein as it relates to certain greenhouse gas emissions

figures, while sustaining the overall result. *See* Order on Rehearing, *Tenn. Gas Pipeline Co., L.L.C.*, 187 FERC ¶ 61,136 PP42, 45, 51 (June 7, 2024), JA080–082, JA083–084, JA086–087 ("Rehearing Order"). On June 13, 2024, Petitioners filed a timely petition for review naming all three orders in No. 24-1198. *See* Doc. No. 2059766. The Court consolidated the cases on its own motion. *See* Doc. No. 2059772.

## STATUTES AND REGULATIONS

Relevant statutes and regulations appear in an addendum.

## ISSUES FOR REVIEW

1.     Whether FERC violated the National Environmental Policy Act, Natural Gas Act, and Administrative Procedure Act by relying on an internally inconsistent no-action alternative and explicitly contradictory statements when evaluating the effects of the Cumberland Project.

2.     Whether FERC violated the National Environmental Policy Act, Natural Gas Act, and Administrative Procedure Act by concluding the Cumberland Project would cause a net reduction in greenhouse gas emissions, where FERC (A) credited the Project with downstream emissions reductions FERC found would happen anyway and (B) focused on the annual *rate* of emissions to the exclusion of *total* emissions.

3.     Whether FERC violated the National Environmental Policy Act, Natural Gas Act, and Administrative Procedure Act by refusing to evaluate the Cumberland Project and the downstream federal gas plant as connected actions.

4.     Whether FERC violated the Natural Gas Act and the Administrative Procedure Act by approving the Cumberland Project without (A) confronting material challenges to the precedent agreement or (B) meaningfully balancing the Cumberland Project's purported benefits against its harms.

## STATEMENT OF THE CASE

### A.     Legal Framework

*Natural Gas Act*. Section 7(c) of the Natural Gas Act provides that a company wishing to construct, extend, acquire, or operate an interstate natural gas pipeline must obtain approval from FERC through a "certificate of public convenience and necessity." 15 U.S.C. § 717f(c)(1)(A). Section 7(e) directs FERC to grant a certificate only when the project "is or will be required by the present or future public convenience and necessity." *Id.* § 717f(e). This standard requires the Commission to "evaluate *all* factors bearing on the public interest." *Env't Def. Fund v. FERC*, 2 F.4th 953, 961 (D.C. Cir. 2021) (emphasis in original) (quoting *Atl. Refin. Co. v. Pub. Serv. Comm'n of N.Y.*, 360 U.S. 378, 391 (1959)). The standard mandates thoroughness and caution because a certificate-holder "may exercise eminent domain against any holdouts in acquiring property rights necessary to complete the pipeline." *Id.* (citing 15 U.S.C. § 717f(h)).

The criteria FERC uses to evaluate certificate applications are set forth in its Certificate Policy Statement. *See* Certification of New Interstate Natural Gas Pipeline Facilities, 88 FERC ¶ 61,227 (Sept. 15, 1999), *clarified*, 90 FERC ¶ 61,128 (Feb. 9, 2000), *further clarified*, 92 FERC ¶ 61,094 (July 28, 2000). Ultimately, "the Commission will issue a certificate of public convenience and necessity only if a project's public benefits (such as meeting unserved market

demand) outweigh its adverse effects (such as deleterious environmental impact on the surrounding community)." *City of Oberlin v. FERC*, 937 F.3d 599, 602 (D.C. Cir. 2019).

   ***National Environmental Policy Act***. The National Environmental Policy Act ("NEPA") commands agencies to take a "hard look" at the environmental consequences of their proposed actions and disclose their analysis to the public before making decisions. *Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 350 (1989). The goal is to ensure that important environmental effects "will not be overlooked or underestimated only to be discovered after resources have been committed or the die otherwise cast." *Id.* at 349. NEPA's core procedural mandate requires agencies to prepare an environmental impact statement ("EIS") before all "major Federal actions significantly affecting the quality of the human environment." 42 U.S.C. § 4332(2)(C).

   NEPA tells agencies to look at the big picture. Among other things, an EIS must analyze the "reasonably foreseeable environmental effects of the proposed agency action," the alternatives to the proposed action, and the environmental consequences of the "no action" alternative. *Id.* § 4332(2)(C)(i), (iii). The Council on Environmental Quality ("CEQ") regulations implementing NEPA require agencies to consider the direct, indirect, and cumulative effects of their actions. *See*

40 C.F.R. § 1508.1(g) (2022).[1] The regulations also instruct that "agencies shall consider . . . connected actions," to ensure that "closely related" actions are evaluated in the same EIS. 40 C.F.R. § 1501.9(e)(1). In addition, "if more than one Federal agency . . . [i]s involved in a group of actions directly related to each other because of their functional interdependence or geographical proximity," the regulations mandate interagency cooperation between the "lead agency" and "[c]ooperating agencies" with special expertise. 40 C.F.R. § 1501.7(a)(2) (lead agencies); *id.* § 1501.8 (cooperating agencies).

## B.    Factual Background

***The Cumberland Project***. The Cumberland Project ("Project") is a proposed gas pipeline in Middle Tennessee. In July 2022, Tennessee Gas Pipeline Company, L.L.C., ("Tennessee Gas") applied to FERC for a certificate of public convenience and necessity for the Project under Section 7(c) of the Natural Gas Act, 15 U.S.C. § 717f(c). Certificate Order P1, JA001. The Project would include approximately thirty-two miles of new thirty-inch-diameter pipe, along with associated facilities such as a meter station and pressure regulation equipment, extending from an

---

[1] The Council on Environmental Quality regulations have been amended several times in recent years, including since FERC issued the Certificate Order and Rehearing Order. *See* CEQ, National Environmental Policy Act Implementing Regulations Revisions Phase 2, 89 Fed. Reg. 35,442 (May 1, 2024) (effective July 1, 2024). Except where otherwise indicated, Petitioners cite, apply, and provide in the addendum the regulations in effect at the time of the orders. *Healthy Gulf v. FERC*, 107 F.4th 1033, 1039 n.1 (D.C. Cir. 2024).

interconnection with two existing Tennessee Gas lines in Dickson County to a delivery point on property owned by the Tennessee Valley Authority ("TVA") in Cumberland City. *See* Certificate Order P4, JA002. The sole purpose of the Project is to supply TVA with up to 245,040 dekatherms per day of firm transportation service to support a new gas-fired power plant at the site. Certificate Order PP1, 3, JA001–002.

***TVA plans to retire its aging coal fleet***. TVA is a federal utility corporation established by the Tennessee Valley Authority Act ("TVA Act"), 16 U.S.C. § 831 *et seq.*, that generates and sells electricity. Since the early 1970s, TVA has operated a coal-fired power plant called the Cumberland Fossil Plant on its Cumberland City property. *See* TVA, Cumberland Fossil Plant Retirement: Final Environmental Impact Statement 1 (Dec. 2, 2022), filed as Exhibit 2 to Request for Rehearing of Appalachian Voices and Sierra Club, *Tenn. Gas Pipeline Co.*, Docket No. CP22-493, Accession No. 20240220-5230 (Feb. 20, 2024), JA358 ("Power Plant EIS"). The Cumberland Fossil Plant comprises two coal-fired generating units, and it is the largest plant in TVA's coal fleet, which is one of the nation's oldest. Power Plant EIS 1, JA358.

In 2019, TVA published an integrated resource plan describing its options to meet electricity demand over the coming decades. Power Plant EIS 4, JA361; *see also* TVA, Record of Decision: Integrated Resource Plan, 84 Fed. Reg. 48,987

(Sept. 17, 2019). Rather than make specific resource decisions, the plan prioritized flexibility and set broad guideline ranges for future additions to TVA's generating portfolio, principally split between gas and renewable options. Power Plant EIS 4, JA361. The plan also recommended that TVA evaluate its aging coal fleet and consider retiring its coal plants sooner than it otherwise might. Power Plant EIS 4–5, JA361–362.

Two years later, TVA produced a study outlining a phased plan to shut down its entire coal fleet by 2035. Power Plant EIS 4, JA361. The study recommended that TVA retire one of the coal-fired units at the Cumberland Fossil Plant by 2026 and the other by 2028. *See* Power Plant EIS 8, JA365. Even in the most conservative planning scenario, the study recommended that TVA fully retire the Cumberland Fossil Plant by 2031. *See* TVA, Aging Coal Fleet Evaluation 12 (May 2021), https://perma.cc/3YT2-R6EQ.[2] The study also noted that TVA would evaluate each individual coal plant retirement under NEPA and would consider

---

[2] FERC discussed the Aging Coal Fleet Evaluation on rehearing, *see* Rehearing Order P3 n.8, JA052, and the study is expressly incorporated by reference in the Power Plant EIS, *see* Power Plant EIS 9–10, JA366–367. Further, the Court may take judicial notice of the Aging Coal Fleet Evaluation because it is a government document in the public record. *See Abhe & Svoboda, Inc. v. Chao*, 508 F.3d 1052, 1059 (D.C. Cir. 2007) (government documents were subject to judicial notice as public records); *see also* Fed. R. Evid. 201(b).

"alternatives for replacement generation" including "solar, gas, and storage resource types." *Id.* at 17.

Within days of finalizing the study, TVA began preparing an EIS to evaluate options for replacing the Cumberland Fossil Plant. *See* TVA, Notice of Intent: Environmental Impact Statement for Cumberland Fossil Plant Retirement, 86 Fed. Reg. 25,933 (May 11, 2021). From the beginning, TVA proposed to retire both coal-fired units at the Cumberland Fossil Plant by no later than 2033 and build 1,450 megawatts of replacement generating capacity—roughly the size of one retiring coal-fired unit. *See id.* at 25,934. TVA also identified three replacement options: a new gas-fired combined cycle power plant called the Cumberland Gas Plant to be located on the same site as the Cumberland Fossil Plant, two smaller gas plants at alternate locations, and new solar-and-storage facilities. *Id.*; *see also* Power Plant EIS 21, JA378; Rehearing Order P3 & n.8, JA052.

**FERC and TVA conduct separate processes.** FERC and TVA reviewed the Project and the Cumberland Gas Plant, respectively, on parallel tracks. Neither FERC nor TVA participated as a cooperating agency during the other's process. *See* FERC, Cumberland Project: Final Environmental Impact Statement 1-4, *Tenn. Gas Pipeline Co.*, Docket No. CP22-493, Accession No. 20230630-3003 (June 30, 2023), JA175 ("Final EIS"); Power Plant EIS 15, JA372. FERC staff began evaluating the Project in November 2021 as part of the Commission's pre-filing

review process. Certificate Order P31, JA015. In April 2022, TVA issued a draft of the Power Plant EIS. *See* Power Plant EIS 14, JA371. A few months later, the Commission set an intervention deadline and then began preparing an EIS for the Project. *See* Notice of Application and Establishing Intervention Deadline, *Tenn. Gas Pipeline Co.*, Docket Nos. CP22-493, PF-22-2, Accession No. 20220729-3020 (July 29, 2022), JA107–112; FERC, Notice of Intent to Prepare an Environmental Impact Statement for the Proposed Cumberland Project, Request for Comments on Environmental Issues, and Schedule for Environmental Review, 87 Fed. Reg. 56,048 (Sept. 13, 2022). Petitioners timely intervened and urged FERC to recognize that the Project and the Cumberland Gas Plant are connected federal actions that must be evaluated together. Motion to Intervene and Comments in Opposition of Sierra Club and Appalachian Voices 1, 13–16, *Tenn. Gas Pipeline Co.*, Docket No. CP22-493, Accession No. 20220819-5146 (Aug. 19, 2022), JA120, JA132–135.

In December 2022, TVA issued the final Power Plant EIS. It evaluated the same three replacement options for the Cumberland Fossil Plant from the draft EIS and identified the Cumberland Gas Plant as TVA's preferred alternative. Power Plant EIS iii–iv, JA356–357. The Power Plant EIS described the Project as one of the "connected actions" for the alternatives under consideration. Power Plant EIS 9, JA366. The following month, TVA announced its decision to retire the

Cumberland Fossil Plant and build the Cumberland Gas Plant on the same site. TVA, Record of Decision: Cumberland Fossil Plant Retirement Environmental Impact Statement, 88 Fed. Reg. 3,767 (Jan. 20, 2023). In July 2023, TVA published an errata sheet for the Power Plant EIS disclosing corrections to its emissions calculations. *See* Errata Document: Tennessee Valley Authority Cumberland Fossil Plant Retirement Final Environmental Impact Statement (July 2023), filed as Exhibit 3 to Request for Rehearing of Appalachian Voices and Sierra Club, *Tenn. Gas Pipeline Co.*, Docket No. CP22-493, Accession No. 20240220-5230 (Feb. 20, 2024), JA418–426.

Meanwhile, the Commission issued a draft EIS for the Project on February 3, 2023. *See* Final EIS ii–iii, JA162–163. Petitioners raised concerns about the Project and the scope of FERC's review. *See* Conservation Groups' Comments on FERC's Draft Environmental Impact Statement for the Cumberland Project, Docket No. CP23-493, Accession No. 20230327-5150 (Mar. 27, 2023), JA138–159. Relevant here, Petitioners argued that FERC (1) failed to take a hard look at the Project's greenhouse gas emissions and improperly credited the Project with causing the closure of the Cumberland Fossil Plant, including by relying on an inconsistent no-action alternative, *id.* at 17–20, JA153–156; (2) failed to treat the Project and the Cumberland Gas Plant as connected actions, as required by NEPA, *id.* at 11–12, JA148–149; and (3) failed to consider evidence that the Project is

11

not needed and that its public benefits are illusory, *id.* at 4–10, JA141–147. The

Commission issued the Final EIS for the Project on June 30, 2023. Certificate

Order P37, JA017–018. The Final EIS did not correct the flaws Petitioners

identified above.

     ***FERC approves the Project, but its orders are inconsistent***. FERC issued

the Certificate Order approving the Project on January 18, 2024. *See generally*

Certificate Order, JA001–049. FERC concluded that a single precedent agreement

between Tennessee Gas and TVA for the full capacity of the Project was sufficient

evidence that the Project would meet a market need. Certificate Order P15, JA007.

However, FERC refused to address "[i]ssues related to TVA's plan to replace coal-

fired units from the Cumberland Fossil Plant with a natural gas-fired plant,

including issues regarding the need for the new natural gas-fired plant." Certificate

Order P15, JA007.

     FERC also concluded that downstream greenhouse gas emissions from the

Cumberland Gas Plant are a reasonably foreseeable effect of the Project.

Certificate Order P48, JA022–024. However, FERC credited the Project with "an

overall net reduction" in downstream greenhouse gas emissions by subtracting

projected annual emissions at the Cumberland Gas Plant from historical annual

emissions at the higher-emitting Cumberland Fossil Plant. Certificate Order P48,

JA023. After disclosing that the Final EIS had relied on outdated emissions data

and had not been "updated to reflect the changes to and data in TVA's final [Power Plant] EIS," the Commission produced an estimate of "approximately -7.06 million metric tons of $CO_2e$ per year."[3] Certificate Order P48 & n.110, JA023. Elsewhere in the order, FERC claimed that the net reduction would be roughly 4.5 million metric tons annually. Certificate Order P53, JA026. Without acknowledging the inconsistency, FERC relied on its claim of a net reduction to conclude that Project-related greenhouse gas emissions "cannot have a significant adverse impact for NEPA purposes." Certificate Order P49, JA024.

Petitioners filed a timely request for rehearing before the Commission. *See* Request for Rehearing of Appalachian Voices and Sierra Club, *Tenn. Gas Pipeline Co.*, Docket No. CP22-493, Accession No. 20240220-5230 (Feb. 20, 2024), JA305–347 ("Request for Rehearing"). Among other issues, Petitioners sought rehearing on the grounds that (1) FERC mischaracterized and miscalculated the Project's downstream greenhouse gas emissions, including by relying on an internally inconsistent no-action alternative, Request for Rehearing 3–16, JA307–320; (2) unlawfully refused to consider the Project and the Cumberland Gas Plant as connected actions, Request for Rehearing 31–34, JA335–338; and (3) failed to contend with evidence showing that the Project is not needed or to meaningfully

---

[3] $CO_2e$, or carbon dioxide equivalents, is a metric used to quantify greenhouse gases. *See* Final EIS 4-92, JA193.

13

balance its purported benefits against its harms, Request for Rehearing 34–41, JA338–345.

FERC did not act on the Request for Rehearing within the time prescribed by the Natural Gas Act, and it issued a notice stating that the Request for Rehearing was deemed denied under 15 U.S.C. § 717r(a) and that FERC would address it in a future order. *See* Notice of Denial of Rehearing by Operation of Law and Providing for Further Consideration, *Tenn. Gas Pipeline Co.*, *L.L.C.*, 186 FERC ¶ 62,143 (Mar. 22, 2024), JA050. Petitioners timely filed a petition for review. *See* Doc. No. 2051958.

On June 7, 2024, the Commission issued the Rehearing Order. FERC set aside the Certificate Order, in part, and modified its discussion of certain greenhouse gas emissions figures, while sustaining the overall result. Rehearing Order PP42, 45, 51, JA080–082, JA083–084, JA086–087. FERC conceded that the Certificate Order had provided internally inconsistent emissions figures and acknowledged that its original estimates did not account for updated data from TVA in the Power Plant EIS and subsequent errata. Rehearing Order PP42, 45 & nn.180, 185, JA080–082, JA083. FERC also conceded that it had overestimated the net reduction in downstream emissions it attributed to the Project by a factor of three, because "any emissions reductions should have been limited to the

retirement of one coal-fired unit" at the Cumberland Fossil Plant. Rehearing Order

P42, JA080. Ultimately, FERC settled on the following formula for the Project:

| *Cumberland Fossil Plant Emissions (one unit, historical)* | − | *Cumberland Gas Plant Emissions (projected)* | = | *Net Reduction in Downstream Emissions Credited to the Project* |
|---|---|---|---|---|

That formula resulted in the following calculation, in million metric tons of annual

greenhouse gas emissions:

$$4.79 - 2.53 = 2.26$$

*See* Rehearing Order P42, JA080–082.

FERC denied rehearing on all other issues. Yet even as FERC continued to

credit the Project with emissions reductions from the closure of one unit at the

Cumberland Fossil Plant, FERC also found that "TVA will retire the Cumberland

Fossil Plant and construct and operate the Cumberland Gas Plant . . . with or

without the Cumberland Project." Rehearing Order P63, JA094–095. Petitioners

timely filed a petition for review naming all three FERC orders. *See* Doc No.

2059766. The Court consolidated the petitions. *See* Doc. No. 2059772.

On August 29, 2024, after FERC filed the certified record index in this

Court, *see* Doc. No. 2065129, the Commission authorized Tennessee Gas to begin

construction. *See* FERC, Notice to Proceed with Construction and Approval of

Modifications, *Tenn. Gas Pipeline Co.*, Docket No. CP22-493, Accession No.

20240829-3030 (Aug. 29, 2024).

15

## SUMMARY OF ARGUMENT

The Commission's decision to approve the Cumberland Project was arbitrary, capricious, and unlawful for four reasons.

*First*, the Commission took inconsistent and sometimes explicitly contradictory positions regarding the no-action alternative. Under NEPA and the Natural Gas Act, the Commission was required to account for the Project's impacts and weigh them when deciding whether a certificate should issue. But because FERC failed to articulate and stick to a coherent baseline, FERC had no principled and record-based way of knowing what the Project's impacts would be—especially its greenhouse gas emissions. This was a straightforward instance of unreasoned decisionmaking.

*Second*, inconsistencies aside, the Commission failed to take a hard look at the Project's downstream greenhouse gas emissions under NEPA and erroneously concluded emissions would go down, when the record shows they will go up. The Project would cause approximately 2.53 million metric tons of greenhouse gas emissions each year from the Cumberland Gas Plant. But the Commission concluded that the Project would decrease greenhouse gas emissions overall because FERC treated the retirement of the higher-emitting Cumberland Fossil Plant as a beneficial effect of the Project. This approach flouted the relationship between cause and effect. The record before the Commission established—and

16

FERC explicitly found—that the coal plant will retire with or without the Project. Compounding the problem, FERC fixated on the annual *rate* of the Project's emissions instead of its *total* emissions. If FERC had taken a hard look at the latter, it would have realized the Project will increase emissions overall, even assuming the Project could be credited for some offsets from the coal plant retirement. Each of these errors caused FERC to mischaracterize a climate harm as a climate benefit, undermining the Commission's ultimate decision under the Natural Gas Act.

*Third*, the Commission refused to evaluate the Project and the Cumberland Gas Plant as connected actions under NEPA. Both are major federal actions and they lack substantial independent utility. The fact that another federal agency—TVA—is involved did not excuse the Commission from considering these actions together. If anything, it triggered an additional obligation to evaluate them holistically. FERC's refusal to treat the pipeline and the gas plant as connected actions is at least partially responsible for FERC's flawed understanding of the Project's greenhouse gas emissions.

*Finally*, the Commission shirked its obligations under the Natural Gas Act. The Commission declined to confront serious evidence undercutting the precedent agreement between Tennessee Gas and TVA and failed to meaningfully balance the Project's harms against its purported benefits.

## STANDING

Petitioners have associational standing to bring this case on behalf of their members who would be harmed by the Project and who would have standing to sue in their own right. *Hunt v. Wash. State Apple Advert. Comm'n*, 432 U.S. 333, 343 (1977). These members have concrete recreational, aesthetic, and property interests that have been, and will continue to be, injured by the approval, construction, and operation of the Project. Connor Decl. ¶¶ 3–19 (AD027–034); Crow Decl. ¶¶ 3–22 (AD036–043); Miller Decl. ¶¶ 3–15 (AD045–048); Shafer Decl. ¶¶ 3–17 (AD054–060).

One member owns a farm in the path of the Project and is concerned about adverse impacts from pipeline construction to the waters and wildlife on his property. Connor Decl. ¶¶ 4–14 (AD028–032). He is also facing eminent domain proceedings as Tennessee Gas seeks to condemn an easement across his farm. Connor Decl. ¶¶ 18–19 (AD034).

Another member is an adjacent landowner who worries that construction of the Project will contaminate the groundwater feeding springs and a pond on her property, and that tree clearing will drive away wildlife and denude the soil, impairing her ability to enjoy the natural beauty in and around her home. Miller Decl. ¶¶ 10–14 (AD047–048). Both these members also share well-founded fears about the risk of a pipeline rupture and the danger of an explosion if the Project

18

enters operation. Connor Decl. ¶¶ 15–17 (AD032–033); Miller Decl. ¶¶ 8–11 (AD046–047).

Other members live nearby and have recreational and aesthetic interests in creeks and streams that the Project would cross. Crow Decl. ¶¶ 8–13, 16–18 (AD038–042); Shafer Decl. ¶¶ 5–11 (AD055–058). For example, one member avers that he enjoys "visiting Peabody Branch and Gafford Branch with [his] grandchildren to swim, explore, and enjoy the beautiful scenery," but worries that he would be forced to stop if pipeline construction turns them "into muddy waterways impacted by sediment pollution." Shafer Decl. ¶ 8 (AD056–057).

At bottom, Petitioners' members face concrete injuries from the Project that will be immediate and persist through decades of operation. *See, e.g.*, Connor Decl. ¶¶ 16–17 (AD033); Crow Decl. ¶¶ 17–20 (AD041–043); Miller Decl. ¶ 8 (AD046–047). These injuries are caused by FERC's approval of the Project and would be redressed by a decision vacating FERC's orders. *Sierra Club v. FERC*, 867 F.3d 1357, 1365–66 (D.C. Cir. 2017) ("*Sabal Trail*").

Petitioners also meet the other requirements for associational standing. This lawsuit is germane to their conservation purposes. *See* Swinford Decl. ¶¶ 7–8 (AD063); Mummaw Decl. ¶¶ 6–7 (AD050–051). And nothing about the claims asserted or relief requested requires Petitioners' members to participate as individuals. *Sabal Trail*, 867 F.3d at 1366.

# ARGUMENT

## I.    Standard of Review

The Court reviews the Commission's decisions under the Natural Gas Act and its compliance with NEPA according to the Administrative Procedure Act. *Env't Def. Fund*, 2 F.4th at 967–68; *Del. Riverkeeper Network v. FERC*, 753 F.3d 1304, 1312–13 (D.C. Cir. 2014). The Court "shall . . . hold unlawful and set aside" any agency action that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). Under this standard, "agency action will be set aside . . . if it is not the product of 'reasoned decisionmaking.'" *Del. Riverkeeper*, 753 F.3d at 1313 (quoting *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 52 (1983)). "The overarching question . . . is whether the Commission's decisionmaking was reasoned, principled, and based upon the record." *Env't Def. Fund*, 2 F.4th at 967–68 (cleaned up). "Where the Commission rests a decision, at least in part, on an infirm ground, [the Court] will find the decision arbitrary and capricious." *Vecinos para el Bienestar de la Comunidad Costera v. FERC*, 6 F.4th 1321, 1331 (D.C. Cir. 2021).

## II.    FERC Violated NEPA and the Natural Gas Act Because It Took Arbitrary and Inconsistent Positions Regarding the No-Action Alternative.

The Commission's decision to approve the Project is arbitrary and capricious because it rests upon a stack of contradictions about the no-action alternative that grew worse throughout the proceeding. FERC never took a consistent position on

20

what would happen to the power plants if the Project were not approved. This was arbitrary and capricious, and it laid the groundwork for violations of NEPA and the Natural Gas Act, especially regarding the Project's downstream greenhouse gas emissions. *See ANR Storage Co. v. FERC*, 904 F.3d 1020, 1028 (D.C. Cir. 2018) ("Because FERC's decision is internally inconsistent, it is arbitrary and capricious.").

To satisfy its obligations under NEPA and the Natural Gas Act, the Commission needed to articulate a clear and consistent picture of what would happen in the no-action scenario. Under NEPA, agencies must analyze the "no action" alternative, 42 U.S.C. § 4332(2)(C)(iii), because it provides the "benchmark" or baseline for "decisionmakers to compare the magnitude of environmental effects of the action alternatives," Forty Most Asked Question Concerning CEQ's National Environmental Policy Act Regulations, 46 Fed. Reg. 18,026, 18,027 (Mar. 23, 1981); *see also Theodore Roosevelt Conservation P'ship v. Salazar*, 744 F. Supp. 2d 151, 160 (D.D.C. 2010), *aff'd*, 661 F.3d 66 (D.C. Cir. 2011) (same). Under the Natural Gas Act, the Commission cannot rationally determine whether a pipeline "is or will be required by the present or future public convenience and necessity," 15 U.S.C. § 717f(e), unless it understands the effects of the project and "give[s] proper consideration to logical alternatives which might serve the public interest better," *Minisink Residents for Env't Pres. & Safety v.*

21

*FERC*, 762 F.3d 97, 107 (D.C. Cir. 2014) (quoting *N. Natural Gas Co. v. Fed. Power Comm'n,* 399 F.2d 953, 973 (D.C. Cir. 1968)); *see also Vecinos*, 6 F.4th at 1331 (deficient climate analysis undermined decision under Natural Gas Act).

At every major stage of the proceeding below, the Commission contradicted itself about the no-action alternative. In the Final EIS, the Commission assumed TVA would build the Cumberland Gas Plant to replace the Cumberland Fossil Plant with or without the Project. The Final EIS stated that "the new natural gas plant will be constructed by TVA and will require natural gas to be delivered to the plant. Under the No-Action alternative, the proposed Cumberland Pipeline would not be constructed; rather, a different project would have to be designed to meet the natural gas needs of the new TVA natural gas-fueled combined cycle plant." Final EIS App. I-83, JA237; *see also* Final EIS 3-2, JA190 (describing no-action alternative to mean "the Cumberland Pipeline Project facilities would not be constructed, the potential impacts from the Proposed Action would not occur, and the Project's objectives would not be met"). But despite assuming no action would mean that TVA retires the Cumberland Fossil Plant and builds the Cumberland Gas Plant anyway, the Commission treated the net change in downstream emissions from TVA shuttering the coal plant and operating the gas plant as a beneficial effect caused by the Project. *See* Final EIS 4-101 to 4-102, JA202–203. If the Final EIS had stayed true to its no-action alternative, it could not have credited the

22

Project as being the cause of downstream emissions reductions, because the Final EIS assumed those reductions would happen regardless. Petitioners raised this incongruity before FERC in comments on the draft EIS, but FERC plowed ahead. *See, e.g.*, Conservation Groups' Comments on FERC's Draft Environmental Impact Statement for the Cumberland Project 34, *Tenn. Gas Pipeline Co.*, Docket No. CP23-493, Accession No. 20230327-5150 (Mar. 27, 2023), JA157 ("[C]omparisons to the emissions of the coal plant . . . are disingenuous, since that is not an accurate description of the no-action scenario—the coal plant is retiring, regardless of whether the pipeline is built.").

The Certificate Order perpetuated the inconsistency. There, FERC relied on the Final EIS to conclude that the Project would result in a net reduction in greenhouse gas emissions due to the Cumberland Fossil Plant retirement. Certificate Order P48, JA022–024. Although the Commission revised its calculations to credit the Project with even greater reductions than in the Final EIS, the Commission's basic approach—treating the difference between coal emissions and gas emissions as an effect of the Project—did not change. *See* Certificate Order P48 & n.110, JA022–024. Once again, Petitioners warned FERC that its analysis of downstream greenhouse gas emissions was inconsistent with its no-action alternative, explaining that "the Commission cannot lawfully credit the

Project for the retirement of the coal plant because the [Final EIS] assumes that will happen under either scenario." Request for Rehearing 8, JA312.

In the Rehearing Order, the Commission doubled down on contradictions. The Commission continued to credit the Project with "emissions reductions from retirement of the Cumberland Fossil Plant" as a beneficial effect of the Project. Rehearing Order P40, JA078–080. But just paragraphs later, the Commission found that "TVA will retire the Cumberland Fossil Plant and construct and operate the Cumberland Gas Plant . . . with or without the Cumberland Project." Rehearing Order P63, JA095. Compounding the inconsistencies, the Rehearing Order also made an explicitly contradictory assertion: "Commission staff found, and we agreed, that *if the Commission selects the no-action alternative*, the Cumberland Project facilities would not be constructed, the potential impacts from TVA's *construction and operation of the Cumberland Gas Plant would not occur*, and the project's objectives would not be met." Rehearing Order P19, JA062 (emphasis added). This was arbitrary and capricious on its face. One of the central issues in this case is whether it was lawful on this record for the Commission to treat the Project as the cause of the net emissions change between the Cumberland Fossil Plant and the Cumberland Gas Plant. "An order with apparent contradictions as to a dispositive issue is not reasoned decisionmaking" and, at a minimum, must be

24

remanded. *Constellation Mystic Power, LLC v. FERC*, 45 F.4th 1028, 1055 (D.C. Cir. 2022).

The Rehearing Order also reveals that FERC misunderstood its own record. FERC claimed "Commission staff found" in the Final EIS that the no-action alternative would mean "the potential impacts from TVA's construction and operation of the Cumberland Gas Plant would not occur," Rehearing Order P19, JA062, but FERC mischaracterized the cited language in the Final EIS, which actually states that "[i]f the Commission selects the no-action alternative, then . . . the potential impacts from the *Proposed Action* would not occur," Final EIS 3-2, JA190 (emphasis added). The Final EIS is clear that the "Proposed Action" means the Project, not the Cumberland Gas Plant. *See* Final EIS 2-1, JA181 ("Description of the Proposed Action"). In other words, FERC reimagined the Final EIS to make a finding it did not make. As a result, even without its internal contradictions, the Rehearing Order was arbitrary and capricious because it offered an explanation that runs counter to the evidence on which the Commission claimed to rely. *State Farm*, 463 U.S. at 43.

At bottom, the Commission flunked the test of reasoned decisionmaking. The Final EIS, Certificate Order, and Rehearing Order each suffered from a fundamental mismatch between FERC's articulation of the no-action alternative and its treatment of downstream greenhouse gas emissions. The Commission's

failure to articulate a clear and consistent baseline for evaluating the Project left FERC with no way of making informed decisions about how to weigh the Project's effects. In sum, FERC's decision to approve the Project was arbitrary, capricious, and contrary to NEPA and the Natural Gas Act. *See Vecinos*, 6 F.4th at 1331. These contradictions paved the way for the Commission to commit additional violations of NEPA and the Natural Gas Act discussed below. But the Court's inquiry could also end here. The Commission's internal inconsistencies and confusion about the record make its decision to approve the Project arbitrary and capricious. The Court should vacate and remand.

## III.    FERC Violated NEPA and the Natural Gas Act Because It Did Not Take a Hard Look at the Project's Downstream Greenhouse Gas Emissions.

In addition to being internally inconsistent, FERC violated its obligation under NEPA to take a hard look at the environmental impacts of the Project. FERC assumed the Project would reduce downstream greenhouse gas emissions when the record establishes that the opposite is true. First, the Commission misread this Court's decision in *Sabal Trail* to allow crediting the Project with greenhouse gas reductions that the record shows—and FERC found—would happen "with or without the Cumberland Project." Rehearing Order P63, JA094–095; *see also, e.g.*, Rehearing Order P40, JA078–080 (citing *Sabal Trail*, 867 F.3d at 1375). Second, the Commission did not take a hard look at how emissions would add up over time because it fixated on the annual *rate* of emissions instead of the Project's *total*

emissions, arbitrarily assuming the purported emissions reduction would persist "at a constant rate throughout the life of the 20-year [precedent agreement]." Rehearing Order P56, JA089–090. Individually and together, these errors caused FERC to mistake one of the Project's harms (increasing greenhouse gas emissions) for a benefit (reducing them).

### A.    The coal plant retirement is not an effect of the Project.

In *Sabal Trail*, this Court held that when the Commission reviews a proposed pipeline that would transport gas to a power plant, the greenhouse gas emissions from burning that gas in the power plant are a foreseeable effect of the pipeline under NEPA, and the Commission must quantify them (or explain why it cannot). *Sabal Trail*, 867 F.3d at 1373–74. If those emissions would be partially offset because the pipeline would cause reductions elsewhere, the Commission should consider that too, consistent with NEPA's instruction to consider "both beneficial and detrimental effects." *Id.* at 1374–75 (quoting 40 C.F.R. § 1508.8 (1978)). Ultimately, the Commission must determine "whether total emissions, on net, will be reduced or increased by this project, or what the degree of reduction or increase will be." *Sabal Trail*, 867 F.3d at 1375.

In this case, the Commission disregarded *Sabal Trail*'s instruction to focus on emissions caused "by this project." *Id.* To start, the Commission correctly recognized that the downstream emissions from burning Project-transported gas at

the Cumberland Gas Plant are a reasonably foreseeable effect of the Project. Certificate Order P48, JA022. Although the exact figure varied throughout the proceeding, FERC eventually concluded that operation of the Cumberland Gas Plant "is estimated to result in approximately 2.53 million metric tons of $CO_2$e per year." Rehearing Order P42, JA081. So far, so good.

But the Commission proceeded to net those emissions against historical emissions from the retiring Cumberland Fossil Plant. These figures varied too, but the Commission landed on the relevant coal plant emissions being "4.79 million metric tons of $CO_2$e per year." Rehearing Order P42, JA081. Comparing those estimates, the Commission ultimately credited the Project with "a net reduction of approximately -2.26 million metric tons of $CO_2$e per year." Rehearing Order P42, JA081.

On this record, it was unlawful for the Commission to offset downstream greenhouse gas emissions in this way. As an initial matter, FERC failed to articulate a consistent no-action alternative, which was straightforwardly arbitrary and doomed this exercise from the start. *See supra* pp. 20–26.

Offsetting emissions here also violated NEPA by flouting the relationship between cause and effect. Under NEPA, direct and indirect effects—whether beneficial or detrimental—must be "caused by the action." 40 C.F.R. § 1508.1(g)(1), (2); *see also Dep't of Transp. v. Public Citizen*, 541 U.S. 752, 767

28

(2004) ("NEPA requires a reasonably close causal relationship between the environmental effect and the alleged cause." (internal quotation marks omitted)). This is why the Commission must consider "whether total emissions, on net, will be reduced or increased *by this project*, or what the degree of reduction or increase will be." *Sabal Trail*, 867 F.3d at 1375 (emphasis added). The record establishes—and FERC expressly found—that "TVA will retire the Cumberland Fossil Plant . . . with or without the Cumberland Project." Rehearing Order P63, JA094–095; *see also, e.g.*, Power Plant EIS 8, JA365 (referencing "TVA's phased 2035 [coal] retirement plans"); Final EIS 1-2 to 1-3, JA173–174 (discussing TVA's plans to retire coal-fired units by 2026 and 2028); Certificate Order P3 n.4, JA002 (same). If something will happen anyway, it cannot be an effect "caused by the action." 40 C.F.R. § 1508.1(g)(1), (2) (defining direct and indirect effects).

On rehearing, the Commission defended its approach by invoking its practice in other cases. *See* Rehearing Order P40 & nn.164–65, JA078–080. But far from justifying what FERC did here, those comparisons reveal why this case demanded something different. In *Kern River Gas Transmission Co.*, 179 FERC ¶ 61,121 (2022), the record showed that a downstream power plant "would continue to operate as a coal-fired generation facility" absent a gas supply. Delta Lateral Project: Final Environmental Impact Statement 3-2, *Kern River Transmission Co.*, Docket No. CP21-197, Accession No. 20220225-3007 (Feb. 25,

2022). And in *Texas Gas Transmission, LLC*, 181 FERC ¶ 61,049 (2022), the project was part of a retire-and-replace plan that had been approved by the state utility commission in the utility's integrated resource plan. *Id.* at P48.[4] Unlike those cases, this case involves FERC's explicit finding that the coal plant will retire with or without the Project. It was arbitrary and capricious to offset emissions on this record.

### B.     FERC ignored total emissions because it fixated on the annual rate.

FERC also failed to take a hard look at the Project's downstream greenhouse gas emissions because it did not consider how those emissions would add up over time. Instead, the Commission overlooked the Project's *total* emissions because it focused exclusively on the annual *rate* of those emissions. This matters because even if FERC could lawfully credit the Project with some emissions reductions associated with the retirement of the Cumberland Fossil Plant, the record could not support emissions offsets beyond 2035 at the latest, and the Project's downstream greenhouse gas emissions would still cause a net increase—not a decrease as FERC claimed.

---

[4] The Commission also cited *Tennessee Gas Pipeline Co.*, 186 FERC ¶ 61,113 P17 (2024), and *Tennessee Gas Pipeline Co.*, 179 FERC ¶ 61,041 P53 (2022), which restated FERC's general approach to emissions offsets but did not apply them.

NEPA requires agencies to account for effects that will unfold over time. *See* 40 C.F.R. § 1508.1(g)(2) (indirect effects "are caused by the action and are later in time"). Although this rule applies across the board, it is especially important in the context of greenhouse gas emissions. As the Final EIS explains, "[c]limate change is driven by [the] accumulation of [greenhouse gases] in the atmosphere due to the increased consumption of fossil fuels," Final EIS 4-125, JA220, and the record before FERC included information from an authority FERC lauded as "the leading U.S. scientific body on climate change," Final EIS 4-126 & n.62, JA221, explaining that "the magnitude of human-induced climate change depends less on the year-to-year emissions than it does on the net amount of carbon, or cumulative carbon, emitted into the atmosphere," Request for Rehearing 12–13, JA316–317 (quoting U.S. Global Climate Change Research Program, *Climate Science Special Report: Fourth National Climate Assessment, Vol. 1* at 139 (2017), https://perma.cc/8UBS-EFUC). As a result, NEPA requires agencies to consider more than just the annual rate of a project's emissions—they must also consider a project's total emissions over its expected lifetime.

The reasoning of *WildEarth Guardians v. Bernhardt*, 502 F. Supp. 3d 237 (D.D.C. 2020), illustrates why total emissions require a hard look. In that case, the court remanded an environmental assessment studying the effects of oil and gas leasing on federal land because the agency failed to take a hard look at total direct

greenhouse gas emissions from drilling on the lease parcels. *Id.* at 252–53, 259. The agency grounded its analysis of greenhouse gas emissions in "comparisons of yearly rates," but the court explained that, for actions with emissions spanning decades, "disclosing the yearly rate by itself does not paint the whole picture." *Id.* at 252.

This is not a rule only for climate cases. In *South Fork Band Council of Western Shoshone of Nevada v. U.S. Department of Interior*, 588 F.3d 718 (9th Cir. 2009), the court vacated the environmental impact statement for a mine expansion project because, among other things, the agency ignored the air quality impacts that would result from transporting and processing the ore. The agency defended its approach by claiming there would be "no increase in the rate of toxic ore shipments," but the court held that the agency "did not take the requisite 'hard look' at the environmental impacts" because the agency overlooked that "the mine expansion [would] create ten additional years of such transportation" and "fail[ed] to consider the transport and processing of five million tons of refractory ore over a ten-year period." *Id.* at 725–26.

FERC made the same mistake here. Rather than taking a hard look at the Project's total emissions, FERC arbitrarily fixated on the annual rate. FERC never disclosed an estimate of the Project's total downstream greenhouse gas emissions over its expected life. Instead, FERC focused on how the Project would change the

32

rate of downstream greenhouse gas emissions in a single year, ultimately concluding the Project would cause a net reduction of 2.26 million metric tons per year. Rehearing Order P42, JA080–082. From there, FERC "assume[d] that the project's emissions would be at a constant rate throughout the life of the 20-year contract" between Tennessee Gas and TVA. Rehearing Order P56, JA089–090; *see also* Rehearing Order P55, JA089; Final EIS 4-130, JA225. The closest FERC came to mentioning total emissions was assigning a range of monetary values using the Social Cost of Greenhouse Gases metric, and even this exercise relied on "a constant [emissions] rate throughout the life of the 20-year contract." Rehearing Order P55, JA089. All told, the Commission claimed a net emissions reduction for one year and multiplied that across two decades, crediting the Project with causing -2.26 million metric tons of greenhouse gas emissions each year through 2045. *See* Rehearing Order PP42, 55, JA080–082, JA089; *see also* Final EIS 4-130, JA225 (assuming 2025 in-service date and twenty-year constant emissions rate).

This approach led FERC to drastically misunderstand the Project's greenhouse gas emissions. If FERC had taken a hard look at the Project's total emissions instead of just extrapolating from the rate in the first year, FERC would have located no support in the record for its assumption that the Project's emissions would remain constant through 2045. FERC found that "TVA will retire the

Cumberland Fossil Plant and construct and operate the Cumberland Gas Plant . . .
with or without the Cumberland Project," Rehearing Order P63, JA095, and the
record establishes conclusively that the Cumberland Fossil Plant will shut down by
2035 regardless of whether the Project is built. Power Plant EIS 8, JA365
(referencing "TVA's phased 2035 retirement plans"); Certificate Order P3 n.4,
JA002; Final EIS 1-2 to 1-3, JA173–174 (discussing 2026 and 2028 coal-unit
retirement); *see also* TVA, Aging Coal Fleet Evaluation 17 (May 2021),
https://perma.cc/3YT2-R6EQ (Cumberland Fossil Plant fully retired by 2031 even
in most conservative scenario). Crediting the Project with emissions offsets relies
on the premise that the Cumberland Fossil Plant would keep emitting absent the
Project, but there is no basis on which FERC could assume the Cumberland Fossil
Plant would operate beyond 2035 at the latest. The result is that, even in the most
conservative retirement scenario, FERC ignored at least ten years of emissions
from the Cumberland Gas Plant—from 2036 through 2045—that could not be
netted out.

      FERC's unreasonable approach led it to the wrong conclusion. As shown in
the table below, even crediting the Project with offsets from the Cumberland Fossil
Plant's retirement each year through 2035 would result in a net increase of
downstream greenhouse gas emissions over twenty years. For the first ten years,
the Project would yield a net reduction in greenhouse gas emissions of 2.26 million

metric tons per year, for a total reduction of 22.6 million metric tons during that decade. But for the next ten years, the Project would cause 2.53 million metric tons of new greenhouse gas emissions each year from the Cumberland Gas Plant, totaling 25.3 million metric tons in the second decade. As a result, by the end of the twenty-year period FERC analyzed, downstream greenhouse gas emissions from the Project would have totaled 2.7 million metric tons, even after crediting the Project with a decade of offsets. And since the Cumberland Gas Plant would likely operate for at least thirty years, *see* Power Plant EIS 275, JA407, emissions would only continue to add up.

**Table 1: Net Change in Downstream Greenhouse Gas Emissions, 2026–2055**
*(in million metric tons of $CO_2e$ per year)*

| Year | 2026 | 2027 | 2028 | 2029 | 2030 | 2031 | 2032 | 2033 | 2034 | 2035* |
|------|------|------|------|------|------|------|------|------|------|-------|
| **Net change** | -2.26 | -2.26 | -2.26 | -2.26 | -2.26 | -2.26 | -2.26 | -2.26 | -2.26 | -2.26 |

| Year | 2036 | 2037 | 2038 | 2039 | 2040 | 2041 | 2042 | 2043 | 2044 | 2045 |
|------|------|------|------|------|------|------|------|------|------|------|
| **Net change** | +2.53 | +2.53 | +2.53 | +2.53 | +2.53 | +2.53 | +2.53 | +2.53 | +2.53 | +2.53 |

| Year | 2046 | 2047 | 2048 | 2049 | 2050 | 2051 | 2052 | 2053 | 2054 | 2055 |
|------|------|------|------|------|------|------|------|------|------|------|
| **Net change** | +2.53 | +2.53 | +2.53 | +2.53 | +2.53 | +2.53 | +2.53 | +2.53 | +2.53 | +2.53 |

*\*Latest Date of Cumberland Fossil Plant Retirement in the Record*

*See* Request for Rehearing 15–16, JA319–320. In total, the Project would cause approximately 28 million metric tons of greenhouse gas emissions over the thirty-year expected life of the Cumberland Gas Plant. But whether evaluated over

twenty years or thirty years, the bottom line is the same: the Project would cause an increase in downstream greenhouse gas emissions—not an overall reduction. Like the agency in *WildEarth Guardians*, the Commission's focus on the annual rate did "not paint the whole picture." *WildEarth Guardians*, 502 F. Supp. 3d at 252. By disregarding the Project's downstream greenhouse gas emissions over time, FERC did not take a hard look at "whether *total emissions*, on net, will be reduced or increased." *Sabal Trail*, 867 F.3d at 1375 (emphasis added).

On rehearing, FERC claimed that its approach was reasonable because the future is uncertain. *See* Rehearing Order PP54, 56, JA088–090. There is no uncertainty about the relevant variables, and the Commission's failure cannot be ascribed to a difference in viewpoints or the product of FERC's expertise. *See State Farm*, 463 U.S. at 43. FERC posits uncertainty because emissions from the Cumberland Gas Plant will depend on "the frequency with which the natural gas turbines operate." Rehearing Order P56, JA089–090. But Petitioners are not challenging the Commission's use of certain operating parameters to assume the Cumberland Gas Plant will emit 2.53 million metric tons of greenhouse gases annually. Likewise, there is no uncertainty about whether the Cumberland Fossil Plant will shut down. Just the opposite: FERC expressly found that it would. Rehearing Order P63, JA094–095. The record is also clear that the retirement will happen by 2035 at the latest. *See* Power Plant EIS 8, JA365; Certificate Order P3

n.4, JA002; Final EIS 1-2 to 1-3, JA173–174; *see also* TVA, Aging Coal Fleet Evaluation 17 (May 2021), https://perma.cc/3YT2-R6EQ. On this record, there is simply no uncertainty that could justify netting coal emissions against gas emissions for twenty years.

Even in the face of complex judgments about methodology and data analysis, this Court will not defer when an agency "fails to apply its 'expertise in a reasoned manner.'" *Dist. Hosp. Partners, L.P. v. Burwell*, 786 F.3d 46, 60 (D.C. Cir. 2015) (quoting *Cape Cod Hosp. v. Sebelius*, 630 F.3d 203, 206 (D.C. Cir. 2011)). There is nothing particularly complex about this case, but what FERC did was certainly unreasoned. FERC did not take a hard look at downstream greenhouse gas emissions from the Project. Not only was this arbitrary, capricious, and contrary to NEPA, but it also led the Commission to put the Project's greenhouse gas emissions on the wrong side of the cost-benefit ledger, undermining its ultimate decision under the Natural Gas Act. *See Vecinos*, 6 F.4th at 1331.

## IV.    FERC Violated NEPA Because It Refused to Consider the Project and the Cumberland Gas Plant as Connected Actions.

The Commission also violated NEPA because it refused to evaluate the Project and the Cumberland Gas Plant as connected actions. This was arbitrary, capricious, and unlawful. First, the Project and the Cumberland Gas Plant are inextricably intertwined federal actions and FERC should have considered them

37

together. Second, FERC was not excused from evaluating these actions together just because another federal agency—TVA—is involved. If anything, the involvement of another federal agency only heightened FERC's obligation to look at these two actions holistically.

**A.**   **The Project and the Cumberland Gas Plant are major federal actions that are functionally interdependent.**

Because NEPA requires agencies to look at the big picture, an EIS "shall consider . . . connected actions" beyond the project immediately under review. 40 C.F.R. § 1501.9(e)(1). Connected actions are "closely related and therefore should be discussed in the same impact statement" when they "[a]re interdependent parts of a larger action and depend on the larger action for their justification." *Id.* § 1501.9(e)(1)(iii). In this Court, the inquiry focuses on whether the actions have "substantial independent utility" and their "temporal overlap." *Del. Riverkeeper*, 753 F.3d at 1316–1318; *see also, e.g.*, *City of Port Isabel v. FERC*, 111 F.4th 1198, 1211, 2024 WL 3659344, at *8 (D.C. Cir. Aug. 6, 2024) (same).

The Project and the Cumberland Gas Plant are connected actions under this rubric. They lack substantial independent utility because they are "functionally and financially interdependent" and the Project has no "logical termini" without the gas plant. *Del. Riverkeeper*, 753 F.3d at 1315, 1319; *see also* 40 C.F.R. § 1501.9(e)(1)(iii) (focusing on interdependence). The Commission "plainly was aware of the physical, functional, and financial links between the two projects."

38

*Del. Riverkeeper*, 753 F.3d at 1318. Physically, the site of the Cumberland Gas Plant is the Project's only delivery point; without the gas plant, the Project is a pipeline to nowhere. *See* Certificate Order PP3–5, JA001–002. Functionally, the sole purpose of the Project is to "provide additional firm transportation service for TVA to support a new natural gas-fired power plant in Stewart County, Tennessee." Certificate Order P3, JA001. Financially, the Commission relied on the contract between Tennessee Gas and TVA for all of the Project's capacity to conclude that the Project satisfied the criteria in the Certificate Policy Statement. Certificate Order P19, JA008–009. FERC did not attempt to justify—and on this record could not have justified—approving the Project except by reference to its relationship with the Cumberland Gas Plant.

The Project and the Cumberland Gas Plant also exhibit "temporal overlap." *Del. Riverkeeper*, 753 F.3d at 1318. They share a close temporal nexus based on their parallel reviews and approvals. *See supra* pp. 9–12. Even the Commission concedes "some overlap between [the] project approval timelines." Rehearing Order P63 n.258, JA095. "Because of the temporal overlap of the projects, the scope and interrelatedness of the work should have been evident to FERC." *Del. Riverkeeper*, 753 F.3d at 1318.

On rehearing, the Commission defended its separate treatment by arguing the Cumberland Gas Plant has "substantial independent utility and will serve a

39

significant purpose even if the Cumberland Project is not built." Rehearing Order

P63, JA094–095 (internal quotation marks omitted). This is simply wrong. To start,

the Rehearing Order is explicitly contradictory about this point, since it also states

that "construction and operation of the Cumberland Gas Plant *would not occur*" if

FERC decided not to approve the Project. Rehearing Order P19, JA062 (emphasis

added). The Commission's defense also points to its deeper inconsistencies. If

FERC wanted to credit the Project with causing the retirement of the Cumberland

Fossil Plant by supporting the Cumberland Gas Plant, FERC could not

simultaneously claim the gas plant would be built and operated without the Project.

FERC cannot have it both ways. In short, the Commission's arbitrary and

inconsistent definition of the no-action alternative undermines this defense.

The Commission's assertion also runs counter to the record before FERC.

Most notably, TVA repeatedly claimed the gas plant could not go it alone. TVA told

the Commission it "needs the Cumberland Project to help implement its action to

construct and operate the Cumberland Gas Plant." Letter from Jacinda B.

Woodward, TVA, to Chairman Phillips and Commissioners Clements and Christie,

FERC, at 1, *Tenn. Gas Pipeline Co.*, Docket No. CP22-493, Accession No.

20240103-5125 (Jan. 3, 2024), JA303. TVA also stated in the Power Plant EIS that

operation of the Cumberland Gas Plant "would require construction of

approximately 32 miles of a new single, 30-inch-diameter natural gas pipeline

40

lateral and associated gas system infrastructure, together formally known as the Cumberland Pipeline Project, in Dickson, Houston, and Stewart counties in Tennessee." Power Plant EIS 33, JA379. In fact, TVA called the Project and the Cumberland Gas Plant "connected actions." Power Plant EIS iii, JA356.

Finally, even if the Commission's defense had support in the record, it finds no support in the law. Where this Court has found FERC projects *not* connected, *each* action could be justified alone. *See Food & Water Watch v. FERC*, 28 F.4th 277, 291 (D.C. Cir 2022) (each allegedly connected action was independently useful); *City of Bos. Delegation v. FERC*, 897 F.3d 241, 252 (D.C. Cir. 2018) (same); *Myersville Citizens for a Rural Community v. FERC*, 783 F.3d 1301, 1326 (D.C. Cir. 2015) (same). In fact, the Court has held "that projects have substantial independent utility for purposes of the connected-action inquiry only when both projects are independently useful." *City of Port Isabel*, 111 F.4th at 1212, 2024 WL 3659344, at *9. In other words, even if FERC had support in the record backing its claims about the Cumberland Gas Plant, that would satisfy only half the test.

### B.    The connected actions requirement applies even when multiple federal agencies are involved.

Beyond its mistaken claims about independent utility, the Commission also asserted that the connected actions requirement does not apply where "another federal agency is involved." Rehearing Order P61, JA093–094; *see also* Rehearing Order P60, JA092–093 ("NEPA does not require the Commission to evaluate major

federal actions outside of its control, such as TVA's system and its projects.");

Final EIS App. I-82, JA236 (same). FERC is wrong. Not only does the connected

actions requirement of 40 C.F.R. § 1501.9(e)(1) apply in situations involving two

or more agencies, but the functional interdependence of the Project and the

Cumberland Gas Plant as actions involving two federal agencies also triggered a

further obligation under 40 C.F.R. § 1501.7(a) for FERC to initiate a holistic

review of both actions.

Start with the text of 40 C.F.R. § 1501.9(e)(1). The regulation instructs that,

"[t]o determine the scope of environmental impact statements, agencies shall

consider . . . [a]ctions (other than unconnected single actions) that may be

connected actions, which means that they are closely related and therefore should

be discussed in the same impact statement." 40 C.F.R. § 1501.9(e)(1). There is no

one-agency limitation to this unequivocal command. In fact, the regulation

expressly contemplates the involvement of multiple agencies, since it allocates

responsibility for compliance with its terms to "the lead agency." 40 C.F.R.

§ 1501.9(e).

The other available authorities confirm that the connected actions

requirement applies when multiple agencies are involved. Although Petitioners are

aware of no case with a holding squarely on point, this Court has assumed that the

rule applies to actions by multiple agencies. In *Sierra Club v. U.S. Army Corps of*

*Engineers*, 803 F.3d 31 (D.C. Cir. 2015), this Court explained that "[t]he point of the connected actions doctrine is to prevent *the government* from 'segment[ing]' its own 'federal actions into separate projects and thereby fail[ing] to address the true scope and impact of the activities that should be under consideration.'" *Id.* at 49–50 (emphasis added) (quoting *Del. Riverkeeper,* 753 F.3d at 1313). That case involved a challenge to approvals and easements from multiple federal agencies for construction of a crude oil pipeline. *See id.* at 33–34. The Court considered it an "accurate statement of the connected actions doctrine" to say that several federal agencies' actions "should have been analyzed together" due to their connected nature, but the Court but concluded that the claim had not been preserved. *Id.* at 51.

The Council on Environmental Quality shares the same view. In the preamble to a recent rulemaking, CEQ elaborated on the "longstanding provisions" of the connected actions requirement, agreeing with this Court's characterization in *Sierra Club* and explaining that "the purpose of the doctrine is to prevent *the Federal Government* from segmenting Federal actions into separate projects and thereby failing to consider the scope and impact of the Federal activity." National Environmental Policy Act Implementing Regulations Revisions Phase 2, 89 Fed. Reg. at 35,462 (emphasis added) (citing *Sierra Club*, 803 F.3d at 49–50). And contrary to what FERC claimed on rehearing about the purpose of the doctrine being to prevent agencies from "segmenting" their actions to downplay their

43

significance, *see* Rehearing Order P60, JA092–093, CEQ explains that the rule against segmentation is just one of two "related but distinct requirements" underpinning the connected actions regulation, 89 Fed. Reg. at 35,462. The other requirement is the one implicated here: a broader obligation "to review together closely related connected actions." *Id.* (internal quotation marks omitted).

Finally, the involvement of a different agency did not excuse FERC from complying with 40 C.F.R. § 1501.9(e)(1)—it triggered an additional regulatory command to consider the Project and the Cumberland Gas Plant together. Multiple actions must be studied in the same EIS under the supervision of a lead agency "if more than one Federal agency . . . [i]s involved in a group of actions directly related to each other because of their functional interdependence or geographical proximity." 40 C.F.R. § 1501.7(a)(2). Whether this regulation is a gloss on the connected actions criteria in 40 C.F.R. § 1501.9(e)(1)(iii) or a different test altogether, the Project and the Cumberland Gas Plant fit the bill due to their "functional interdependence" and "geographical proximity." *Id.* § 1501.7(a)(2). Accordingly, the Commission was under an independent obligation to initiate a NEPA process that considered these actions holistically.

On rehearing, the Commission invoked this Court's decision in *Center for Biological Diversity v. FERC*, 67 F.4th 1176 (D.C. Cir. 2023) ("*Alaska LNG*"), to defend its approach. But neither *Alaska LNG* nor *Alabama Municipal Distributors*

*Group v. FERC*, 100 F.4th 207 (D.C. Cir. 2024), support what FERC did here. If anything, they underscore the Commission's error in this case. *Alaska LNG* and *Alabama Municipal Distributors* involved challenges to FERC authorizations for infrastructure supporting gas export facilities, and their holdings turn on the limits of FERC's authority in that unique regulatory context. Because "[t]he Natural Gas Act excludes authority over *foreign* transport from FERC's authority over *interstate* transport," this Court has held that FERC need not consider the indirect effects of export-bound gas under NEPA. *Ala. Mun. Distribs.*, 100 F.4th at 213. Based on the limited scope of FERC's authority in that arena, *Alaska LNG* and *Alabama Municipal Distributors* held that FERC was not required to treat Department of Energy export authorizations as connected actions. *Alaska LNG*, 67 F.4th at 1185; *Ala. Mun. Distribs.*, 100 F.4th at 213 n.9. In other words, *Alaska LNG* and *Alabama Municipal Distributors* do not endorse an all-purpose limitation on the connected actions rule.

Unlike the export cases, this case falls within the heartland of FERC jurisdiction: interstate transportation and domestic consumption of gas. When regulating in this sphere, "the Commission's power under Section 7 to consider the public interest . . . extends generally to all factors bearing on the public interest, and specifically extends to permit FERC to look into matters excluded from the Commission's direct regulatory jurisdiction." *Off. of Consumers' Couns. v. FERC*,

45

655 F.2d 1132, 1147 n.31 (D.C. Cir. 1980) (citing *Fed. Power Comm'n v. Transcon. Gas Pipe Line Corp.*, 365 U.S. 1, 8 (1961)). The Commission's broad authority carries a commensurate responsibility under NEPA, *Sabal Trail*, 867 F.3d at 1373, and the involvement of another agency with its own bailiwick did not divest FERC of its power or excuse FERC from its obligations under 40 C.F.R. § 1501.9(e)(1) and 40 C.F.R. § 1501.7(a).

The Commission's failure to consider the Project and the Cumberland Gas Plant as connected actions directly prejudiced FERC's understanding of the Project's environmental impacts. FERC argued harmless error on rehearing because FERC says it accounted for the impacts of the Cumberland Gas Plant and the Cumberland Fossil Plant retirement in its cumulative impacts analysis. Rehearing Order P64, JA095–096. This defense misses the point. To start, the Commission was forced to correct its greenhouse gas estimates throughout this proceeding because it repeatedly missed changes in the information that TVA disclosed in its parallel NEPA process. *See* Certificate Order P48 & n.110, JA022–024 (conceding that the Final EIS relied on outdated information TVA later changed); Rehearing Order P42 & n.175, JA080–082 (making additional corrections based on information TVA changed again). Had FERC acknowledged its obligation under 40 C.F.R. § 1501.9(e)(1) and § 1501.7(a) to consider the two actions holistically, it could have better apprised itself of these changes and

46

enabled a less haphazard evaluation. More fundamentally, the cramped scope of FERC's review is at least partially responsible for FERC's apparent confusion about what would happen to the power plants absent the Project, which led to the errors and inconsistencies plaguing its definition of the no-action alternative. *See supra* pp. 20–26. As discussed above, those errors and inconsistencies were arbitrary and capricious, and they frustrated FERC's ability to take a hard look at the Project's downstream greenhouse gas emissions.

## V. FERC's Decision Under the Natural Gas Act Was Arbitrary and Capricious.

The Natural Gas Act directs the Commission to issue a certificate for a proposed pipeline only if the pipeline "is or will be required by the present or future public convenience and necessity." 15 U.S.C. § 717f(e). At the threshold, FERC must find "that there is a market need for the project." *Env't Def. Fund*, 2 F.4th at 961. And if FERC finds a market need, FERC must then balance the project's purported benefits against its adverse impacts. *Id.*; *see also N.J. Conservation Found. v. FERC*, 111 F.4th 42, 50 (D.C. Cir. 2024) ("If FERC finds a market need, it moves on to the second step, where it must determine whether adverse impacts are outweighed by public benefits.").

The Commission shirked its duty and acted arbitrarily and capriciously at both steps. First, the record before FERC contained extensive evidence, including from the Environmental Protection Agency ("EPA"), that the precedent agreement

47

between Tennessee Gas and TVA is the outgrowth of a flawed economic analysis by an unregulated utility—TVA—and will harm captive ratepayers in TVA's service area. Faced with this evidence, the Commission was obligated to look behind the precedent agreement when determining whether the Project would serve a market need or public benefit. *Env't Def. Fund*, 2 F.4th at 974–75. Instead, FERC explicitly disavowed its own authority under the Natural Gas Act to scrutinize the precedent agreement and ceded its independent role to TVA. Certificate Order P15, JA007. This was arbitrary, capricious, and contrary to law.

Second, and relatedly, FERC gerrymandered its analysis to omit important factors bearing on the public interest that also happened to implicate TVA. Certificate Order P15, JA007. The result of FERC's blinkered approach was a failure to conduct the sort of meaningful balancing of adverse impacts against purported benefits that the Natural Gas Act and this Court's precedents demand. *See N.J. Conservation Found.*, 111 F.4th at 62.

## A.    FERC did not confront material challenges to the precedent agreement.

The Commission's decision to approve the Project was arbitrary and capricious because FERC did not confront significant evidence undercutting the purported need for the Project. The Commission based its determination of market need on the precedent agreement between Tennessee Gas and TVA. Certificate Order P19, JA008–009; Rehearing Order P16, JA060. But when confronted with

material challenges to the probative value of that agreement, which should have prompted FERC to engage with the contrary evidence before it, FERC disclaimed the power to do so. The Commission treated "issues related to TVA's authority and jurisdiction" as beyond FERC's power under the Natural Gas Act. Rehearing Order P9, JA055–056. But the Commission's jurisdiction is not so limited, and its "ostrich-like" approach "did not satisfy the requirements of reasoned decisionmaking." *Env't Def. Fund*, 2 F.4th at 975.

Although precedent agreements are always *important* evidence of demand for a project, they are not "always *sufficient* to show that construction of a proposed new pipeline 'is or will be required by the present or future public convenience and necessity.'" *Env't Def. Fund*, 2 F.4th at 972 (quoting 15 U.S.C. § 717f(e)). If the record in a proceeding contains evidence undermining reliance on a precedent agreement, the Commission must consider and respond to that evidence. *Id.*; *see also N.J. Conservation Found.*, 111 F.4th at 60 ("[T]he mere existence of precedent agreements does not allow FERC to disregard contradictory evidence showing a lack of market need for a project.").

The record before FERC was replete with evidence that the precedent agreement between Tennessee Gas and TVA was not reliable evidence of need or public benefit. This is an unusual case because TVA is an unusual utility. As Petitioners repeatedly explained, two circumstances converged in this proceeding

49

to demand that the Commission look beyond the precedent agreement when determining whether the record contained sufficient evidence of a market need and public benefit to be served by the Project. *See* Request for Rehearing 34–41, JA338–345; Appalachian Voices and Sierra Club's Supplement to Protest of the Cumberland Pipeline 4–13, *Tenn. Gas Pipeline Co.*, Docket No. CP22-493, Accession No. 20231002-5351 (Oct. 2, 2023), JA241–250.

First, TVA's unique nature deprived the Commission of the market competition and regulatory oversight that can validate a precedent agreement as something more than a piece of paper. *See, e.g.*, *NEXUS Gas Transmission, LLC*, 164 FERC ¶ 61,054 P39 (July 25, 2018) (state commission oversight gave FERC "confidence that the contracts" between pipeline company and electric utility were "good evidence of need and good evidence that the project is in the public interest"). Here, as the Commission acknowledges, TVA does not face normal competitive dynamics within its service territory, Rehearing Order P14 & n.43, JA058–060, and its generation investment decisions are not subject to routine oversight from a utility regulator like a state commission, *see* Rehearing Order P14 & n.43, JA059.

Second, the record before the Commission contained independent warnings that the Project would harm captive ratepayers in TVA's service area. The Certificate Policy Statement anticipates that "the evidence necessary to establish

the need for [a] project will usually include a market study." Certification of New Interstate Natural Gas Pipeline Facilities, 88 FERC ¶ 61,227 at 61,748. But the closest thing to a market study in this proceeding was TVA's choice of the Cumberland Gas Plant following a decisional process bedeviled by errors. The record before the Commission showed that EPA sounded the alarm about TVA's "rel[iance] on inaccurate underlying economic information." Letter from Jeaneanne M. Gettle, EPA, to Ashley Pilakowski, TVA, at Encl. 1 (Jan. 6, 2023), filed as Attachment 1 to Appalachian Voices and Sierra Club's Supplement to Protest of the Cumberland Pipeline, *Tenn. Gas Pipeline Co.*, Docket No. CP22-493, Accession No. 20231002-5351 (Oct. 2, 2023), JA255. EPA was especially perturbed that TVA "d[id] not fully account for the economic effects and opportunities of the Inflation Reduction Act," and concluded that TVA's justifications for the Cumberland Gas Plant do "not reflect a balanced economic assessment of the alternatives." *Id.*, JA255.

Other evidence before the Commission raised similar red flags. A pair of reports from an independent power sector consulting firm, Grid Strategies, LLC, found that the Cumberland Gas Plant would cost ratepayers at least an extra $1.79 billion over twenty years compared to a non-gas alternative—and likely considerably more when accounting for incentive provisions of the Inflation Reduction Act. *See* Michael Goggin, Grid Strategies, LLC, *Critique of TVA's*

51

*Alternatives Analysis* 13–19, 41, filed as Attachment 2 to Appalachian Voices and Sierra Club's Supplement to Protest of the Cumberland Pipeline, *Tenn. Gas Pipeline Co.*, Docket No. CP22-493, Accession No. 20231002-5351 (Oct. 2, 2023), JA260–266, JA268; Michael Goggin, Grid Strategies, LLC, *Analysis of TVA's "Cumberland Fossil Plant Retirement"* 13, filed as Attachment 3 to Appalachian Voices and Sierra Club's Supplement to Protest of the Cumberland Pipeline, *Tenn. Gas Pipeline Co.*, Docket No. CP22-493, Accession No. 20231002-5351 (Oct. 2, 2023), JA281 (net present value cost differential following Inflation Reduction Act "approach[ed] $3 billion"). Another report, from the Applied Economics Clinic, demonstrated that after the passage of the Inflation Reduction Act, TVA's integrated resource plan was badly out of date and could not support the conclusion that the Cumberland Gas Plant was the least-cost option. Liz Stanton, et al., Applied Econ. Clinic, *TVA Resource Planning Assessment Phase I* 8–9, filed as Attachment 4 to Appalachian Voices and Sierra Club's Supplement to Protest of the Cumberland Pipeline, *Tenn Gas Pipeline Co.*, Docket No. 22-493, Accession No. 20231002-5351 (Oct. 2, 2023), JA292–293.

On this record, the Commission was not free to start and end its inquiry at the precedent agreement. At a minimum, FERC was required to confront the countervailing evidence and provide non-arbitrary responses. *Env't Def. Fund*, 2 F.4th at 975. But FERC refused. It openly disregarded the economic critiques

leveled by EPA and others. *See* Rehearing Order P15 & n.46, JA060. Instead, FERC asserted that it could not look beyond the precedent agreement because the TVA Board has exclusive jurisdiction to evaluate generation needs within its service area. Certificate Order P15, JA007; Rehearing Order PP13–15, JA058–060.

Whatever the scope of TVA's authority, the Commission has an independent obligation under the Natural Gas Act to consider "all factors bearing on the public interest." *Atl. Refin. Co.*, 360 U.S. at 391. The Commission is empowered to "exercise a veto power over proposed transportation" for an "inferior" downstream use "when a balance of all the circumstances weighs against certification"—even where, as here, direct jurisdiction over the downstream use lies with another authority. *Transcon. Gas Pipe Line Corp.*, 365 U.S. at 16–17; *see also Off. of Consumers' Couns.*, 655 F.2d at 1146 n.31 (D.C. Cir. 1980) (FERC's power to consider the public interest "specifically extends to permit FERC to look into matters excluded from the Commission's direct regulatory jurisdiction").

The Commission identified no compelling support for its supposed powerlessness here and none exists. On rehearing, FERC enumerated three provisions of the TVA Act concerning the utility's least-cost planning requirement and the TVA Board's authority to "construct power houses" and study ways to "promote the wider and better use of electric power." Rehearing Order P14 & n.43,

JA058–060 (citing 16 U.S.C. §§ 831m-1, 831c, 831i). But nothing about these provisions suggests any intent by Congress—much less a "clear and manifest" one—to oust FERC's traditional power under the Natural Gas Act just because TVA is the shipper. *Epic Sys. Corp. v. Lewis*, 584 U.S. 497, 510 (2018) (internal quotation marks omitted). Under these circumstances, FERC's refusal to seriously engage with the evidence was arbitrary and capricious. *Env't Def. Fund*, 2 F.4th at 960.

### B.    FERC did not meaningfully balance harms and benefits.

The Commission's abdication to TVA did not just undermine its determination of market need. By disregarding the economic evidence undermining the probative value of the precedent agreement, FERC also left important factors off the scale when balancing the public interest. *Env't Def. Fund*, 2 F.4th at 975–76.

As an initial matter, the Commission's public-interest balancing was arbitrary and capricious from the beginning because it relied on FERC's flawed understanding of the Project's environmental impacts. *Vecinos*, 6 F.4th at 1331.

Beyond environmental factors, the economic critiques from EPA and others should have prompted concern from FERC that approving the Project to support the Cumberland Gas Plant would abet harm to captive utility ratepayers by driving electricity costs up unnecessarily. *See, e.g.*, Michael Goggin, Grid Strategies, LLC,

*Critique of TVA's Alternatives Analysis* 18–19, filed as Attachment 2 to

Appalachian Voices and Sierra Club's Supplement to Protest of the Cumberland

Pipeline, *Tenn. Gas Pipeline Co.*, Docket No. CP22-493, Accession No. 20231002-

5351 (Oct. 2, 2023), JA265–266 (estimating cost of Cumberland Gas Plant to

ratepayers at $1.79 billion more than non-gas alternative over twenty-year period).

This evidence went to the heart of the Commission's public-interest balancing

itself. The Certificate Policy Statement explains that FERC may consider costs to

consumers when considering whether a pipeline confers a public benefit. *See*

Certification of New Interstate Natural Gas Pipeline Facilities, 88 FERC ¶ 61,227

at 61,748. If consumer costs can weigh in favor of the public interest, so too can

they weigh against it. But here, the Commission did not weigh the evidence at all,

and instead dismissed it as beyond the scope of FERC's authority. Rehearing Order

P15, JA060. In sum, "FERC made a conclusory decision that the benefits will

outweigh the potential adverse impacts without conducting the needed analysis."

*N.J. Conservation Found.*, 111 F.th at 63. This was arbitrary and capricious.

## VI.    Vacatur Is the Appropriate Remedy.

Vacatur is the normal remedy for unsustainable agency action. *Env't Def.*

*Fund*, 2 F.4th at 976. "The decision whether to vacate depends on the seriousness

of the order's deficiencies (and thus the extent of doubt whether the agency chose

correctly) and the disruptive consequences of an interim change that may itself be

changed." *Id.* (quoting *Allied-Signal, Inc. v. Nuclear Regul. Comm'n*, 988 F.2d 146, 150–51 (D.C. Cir. 1993)).

Vacatur is warranted here. First, the Commission's errors are serious and pervasive. Based on its violations of NEPA, the Commission did not have a clear picture of the Project's adverse impacts and its supposed benefits before the Commission purported to weigh them. And because the Commission did not confront serious record evidence undermining the market need and public benefit that the Project would supposedly serve, the Commission did not discharge its duties under the Natural Gas Act.

Second, the consequences of vacatur are not severely disruptive. The Project remains in its earliest post-authorization stages, and Tennessee Gas received approval to commence construction just one week before Petitioners filed their proof opening brief. *See* FERC, Notice to Proceed with Construction and Approval of Modifications, *Tenn. Gas Pipeline Co.*, Docket No. CP22-493, Accession No. 20240829-3030 (Aug. 29, 2024). Regardless, any disruptive consequences are outweighed by the gravity of FERC's errors here.

## CONCLUSION

For the foregoing reasons, the Court should vacate the Certificate Order, Rehearing Order, and Final EIS, and remand to the Commission.

DATED: December 31, 2024

Respectfully submitted,

/s/ *Spencer Gall*

Spencer Gall
Southern Environmental Law Center
120 Garrett Street
Suite 400
Charlottesville, Virginia 22902
Telephone: (434) 977-4090
Email: sgall@selcva.org

Delaney King
Southern Environmental Law Center
1033 Demonbreun Street
Suite 205
Nashville, Tennessee 37203
Telephone: (615) 921-9470
Email: dking@selctn.org

*Counsel for Sierra Club and*
*Appalachian Voices*

## CERTIFICATE OF COMPLIANCE

1.      I certify that this brief complies with the type-volume limitation of Federal Rule of Appellate Procedure 32(a)(7)(B) because it contains 12,920 words excluding the parts of the brief exempted by Federal Rule of Appellate Procedure 32(f) and Circuit Rule 32(e)(1).

2.      I further certify that this brief complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and type-style requirements of Federal Rule of Appellate Procedure 32(a)(6) because it has been prepared in a proportionally spaced typeface using Microsoft Word in Times New Roman 14-point font.


DATED: December 31, 2024              /s/ *Spencer Gall*
                                      Spencer Gall
                                      Southern Environmental Law Center

58

**CERTIFICATE OF SERVICE**

I certify that on December 31, 2024, I filed the foregoing document and

addendum using the Court's CM/ECF system. Counsel for all parties are registered

CM/ECF users and will be served by the CM/ECF system.


DATED: December 31, 2024          /s/ *Spencer Gall*
                                  Spencer Gall
                                  Southern Environmental Law Center