# United States Court of Appeals
### FOR THE DISTRICT OF COLUMBIA CIRCUIT

———

Argued March 4, 2025          Decided September 30, 2025

No. 24-1099

SIERRA CLUB AND APPALACHIAN VOICES,
PETITIONERS

v.

FEDERAL ENERGY REGULATORY COMMISSION,
RESPONDENT

TENNESSEE GAS PIPELINE COMPANY, L.L.C., ET AL.,
INTERVENORS

———

Consolidated with 24-1198

———

On Petitions for Review of Orders of the
Federal Energy Regulatory Commission

———

*Spencer Gall* argued the cause for petitioners. With him
on the briefs was *Delaney King*.

*J. Houston Shaner*, Attorney, Federal Energy Regulatory
Commission, argued the cause for respondent. With him on

2

the brief were *Matthew R. Christiansen*, General Counsel, at the time the brief was filed, and *Robert H. Solomon*, Solicitor.

*David A. Super* argued the cause for intervenors in support of respondent.   With him on the brief were *David D. Ayliffe*, *Brian D. O'Neill*, *Michael R. Pincus*, *Kevin A. Ewing*, *Ann D. Navaro*, and *John P. Coyle*.

Before: PILLARD, KATSAS and WALKER, *Circuit Judges*.

Opinion for the Court filed by *Circuit Judge* WALKER, with whom *Circuit Judge* PILLARD joins except as to Parts II.B.3.a and III.

WALKER, *Circuit Judge*:

## *"The bedrock principle of judicial review in NEPA cases can be stated in a word: Deference."*[1]

The Tennessee Valley Authority decided to replace a coal-fired power unit with a natural-gas turbine.   That swap will significantly reduce greenhouse gas emissions.   But the Sierra Club contends that environmental laws call for more.[2]   So it sued to pause the TVA's plans.[3]

---

[1]  *Seven County Infrastructure Coalition v. Eagle County, Colorado*, 145 S. Ct. 1497, 1515 (2025) (emphasis added).

[2]  For simplicity, we refer to Petitioners Sierra Club and Appalachian Voices collectively as the Sierra Club.

[3]  *See, e.g.*, *Sierra Club v. Tennessee Department of Environment and Conservation*, 133 F.4th 661, 678 (6th Cir. 2025) (rejecting the Sierra Club's challenge to a Tennessee agency's issuance of a water quality certificate for the same pipeline at issue in this case); Amended Complaint at 37-53, *Appalachian Voices v. TVA*, No. 3:23-cv-00604 (M.D. Tenn. Aug. 8, 2023), ECF No. 16 (alleging the TVA's decision to build the natural-gas turbine failed to comply with federal environmental laws).

3

This suit concerns a 32-mile pipeline that will supply natural gas to the TVA's new turbine. The Federal Energy Regulatory Commission approved that pipeline after publishing a 576-page environmental impact statement. The Sierra Club says FERC's decision violates the National Environmental Policy Act and the Natural Gas Act.

Because FERC's approval is consistent with NEPA, the Natural Gas Act, and related regulations, we deny the petitions.

## I. Background

### A. Upgrading the Cumberland Fossil Plant

The Tennessee Valley Authority is a federal agency charged with leveraging "the resources of the Tennessee Valley region" to "make life better for the people who call it home." *About TVA*, https://perma.cc/XES6-FMWV. The TVA is required to "produce, distribute, and sell electric power" at the lowest system cost," which includes the cost of "environmental compliance." 16 U.S.C. §§ 831d(*l*), 831m-1(b)(1), (3). Congress also requires the TVA when selecting new energy resources to "evaluate[] the full range of existing and incremental resources," including "renewable energy." *Id.* § 831m-1(b)(1). Its power plants include a coal-fired facility in Tennessee called the Cumberland Fossil Plant.

Several years ago, the TVA decided to retire the Cumberland facility's two coal-fired units. It will replace one of the coal-fired units with a natural-gas turbine. To provide the new turbine with a steady supply of gas, the Tennessee Gas Pipeline Company plans to build a 32-mile pipeline.

4

**B. Statutory Framework**

**1. National Environmental Policy Act**

The National Environmental Policy Act requires agencies to prepare an environmental impact statement when they approve a "major Federal action[] significantly affecting the quality of the human environment."    42 U.S.C. § 4332(2)(C). The agency must "look hard at the environmental effects" of the federal action.    *Minisink Residents for Environmental Preservation and Safety v. FERC*, 762 F.3d 97, 102 (D.C. Cir. 2014) (cleaned up).    It must also consider any "reasonable alternatives."    *Id.* (cleaned up).

However, "NEPA imposes no substantive environmental obligations or restrictions."    *Seven County Infrastructure Coalition v. Eagle County, Colorado*, 145 S. Ct. 1497, 1507 (2025).    As "a purely procedural statute," "NEPA does not require the agency to weigh environmental consequences in any particular way.    Rather, an agency may weigh environmental consequences as the agency reasonably sees fit under its governing statute and any relevant substantive environmental laws."    *Id.*

**2. Natural Gas Act**

The Natural Gas Act regulates "the business of transporting and selling natural gas for ultimate distribution to the public."    15 U.S.C. § 717(a).    Relevant here, a company must obtain a "certificate of public convenience and necessity" from FERC before building or expanding an interstate natural-gas pipeline.    *Id.* § 717f(c).    FERC "shall" issue a certificate if the proposed project "is or will be required by the present or future public convenience and necessity."    *Id.* § 717f(e).

Before issuing a certificate, FERC must confirm that the proposed project will not require subsidization from existing

5

natural-gas customers. *Minisink*, 762 F.3d at 101. This is called "market need." FERC must also balance the project's benefits and harms. *Id.* That analysis includes "all factors bearing on the public interest, including environmental ones." *Food & Water Watch v. FERC*, 104 F.4th 336, 341 (D.C. Cir. 2024) (cleaned up).

### C. FERC Proceedings

In January 2024, FERC issued a certificate of public convenience and necessity for Tennessee Gas's 32-mile pipeline. That decision rested on two main conclusions:

- *First*, market need was established by the TVA's promise to buy 100% of the pipeline's capacity for 20 years.

- *Second*, the pipeline's benefits outweigh its harms. FERC's 576-page environmental impact statement explained that most environmental effects will be less than significant.[4] FERC also noted that the new natural-gas turbine will emit less greenhouse gas than the coal-fired unit that it will replace, resulting in a net emissions reduction. Reasoning that the pipeline will enable the operation of the new turbine, FERC credited the pipeline for the reduction in net emissions.[5]

---

[4] The TVA separately produced a 1,662-page environmental impact statement evaluating the environmental impacts from the retirement of the coal-fired unit and various replacement generation sources, including the natural-gas turbine the TVA has decided to build.

[5] FERC granted the Sierra Club's request for rehearing. In its initial order, FERC had erroneously stated that the natural-gas turbine would replace *both* Cumberland coal-fired units. So FERC issued a modified order clarifying that the gas turbine would replace only

6

The Sierra Club petitioned this court for review. It argues that FERC violated NEPA and the Natural Gas Act.

## II. Analysis

The Sierra Club's petitions are meritless.

### A. Standard of Review

The Administrative Procedure Act tells courts how to review an agency's legal interpretations and policy choices. "As a general matter, when an agency interprets a statute, judicial review of the agency's interpretation is *de novo*." *Seven County Infrastructure Coalition v. Eagle County, Colorado*, 145 S. Ct. 1497, 1511 (2025) (citing *Loper Bright Enterprises v. Raimondo*, 144 S. Ct. 2244, 2261 (2024)). "But when an agency exercises discretion granted by a statute, judicial review is typically conducted under the Administrative Procedure Act's deferential arbitrary-and-capricious standard." *Id.*; *see* 5 U.S.C. § 706(2) (instructing reviewing courts to "hold unlawful and set aside agency action, findings, and conclusions found to be . . . arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law").

When conducting arbitrary-and-capricious review, "a court asks not whether it agrees with the agency decision, but rather only whether the agency action was reasonable and reasonably explained." *Seven County*, 145 S. Ct. at 1511 (citing *FCC v. Prometheus Radio Project*, 141 S. Ct. 1150, 1158 (2021); *Motor Vehicle Manufacturers Association of the United States, Inc. v. State Farm Mutual Automobile Insurance Co.*, 463 U.S. 29, 43 (1983)).

_____

*one* of the retiring coal-fired units. But because FERC continued to find that the pipeline would result in a net decrease in emissions, it declined to rescind its approval of the pipeline.

7

Yet this court's "precedent applying NEPA," *id.* at 1510, has sometimes applied a more probing review in conflict with NEPA's "statutory text and common sense," *id.* at 1514. That led to a recent "course correction," *id.*, directed by the Supreme Court in *Seven County Infrastructure Coalition v. Eagle County, Colorado*. It reaffirmed that "NEPA does not authorize a court to interject itself within the area of discretion as to the choice of the action to be taken by the agency." *Id.* (cleaned up). Instead, "[c]ourts should afford substantial deference and should not micromanage those agency choices so long as they fall within a broad zone of reasonableness." *Id.* at 1513.

In other words, NEPA does not require an agency to make the decision that the reviewing judges "would have reached had they been members of the decisionmaking unit of the agency." *Id.* (quoting *Vermont Yankee Nuclear Power Corp. v. NRDC*, 435 U.S. 519, 558 (1978)). Rather, the "role of a court in reviewing the sufficiency of an agency's consideration of environmental factors is a limited one. The bedrock principle of judicial review in NEPA cases can be stated in a word: Deference." *Id.* at 1514-15 (cleaned up).

Under the Natural Gas Act, we "review FERC's public convenience and necessity determination for whether it was based on a consideration of the relevant factors and whether there has been a clear error of judgment." *Citizens Action Coalition of Indiana, Inc. v. FERC*, 125 F.4th 229, 236-37 (D.C. Cir. 2025) (cleaned up). While we "cannot substitute our judgment for that of the Commission," we must nonetheless ensure "that the Commission's decisionmaking is reasoned, principled, and based upon the record." *Minisink Residents for Environmental Preservation and Safety v. FERC*, 762 F.3d 97, 106 (D.C. Cir. 2014) (cleaned up). That standard reflects the APA's deferential standard of review and the Natural Gas Act's policy decision "to encourage the orderly development

8

of plentiful supplies of . . . natural gas at reasonable prices."
*NAACP v. Federal Power Commission*, 425 U.S. 662, 670
(1976), while keeping "environmental and conservation factors
in mind," *Public Utilities Commission of California v. FERC*,
900 F.2d 269, 281 (D.C. Cir. 1990).

## B. FERC Complied with NEPA

The Sierra Club challenges (1) FERC's calculation of
downstream greenhouse gas emissions, (2) FERC's discussion
of the no-action alternative, and (3) FERC's decision not to
analyze the pipeline and power plant together as connected
actions.

### 1. Emissions Analysis

The Sierra Club challenges FERC's downstream
emissions analysis in three ways. One way or another, these
challenges overlook the "Deference" that is a "bedrock
principle of judicial review in NEPA cases." *See Seven
County*, 145 S. Ct. at 1515.

*First*, the Sierra Club says FERC incorrectly credited the
pipeline with enabling the emissions reduction from the gas-
for-coal swap. The Sierra Club believes that the TVA will
retire the coal-fired unit regardless of whether it builds the gas
turbine or FERC approves the pipeline project, so the
retirement of the coal-fired unit cannot be an effect of the
project.

But the Sierra Club's belief is unfounded. The TVA said
that absent a replacement generation source, it "would need to
continue operating the coal-fired units." JA 417. And FERC
explained that the Cumberland pipeline was essential to the
anticipated gas-for-coal swap because it would "serve TVA's
need for firm natural gas transportation capacity" to the new
gas plant. JA 79. So FERC did not err when it considered

9

*both* the retirement of the coal-powered unit *and* the emissions from the new gas turbine as effects of the pipeline for its downstream emissions analysis.

Circuit precedent supports that decision. *Cf. Citizens Action Coalition of Indiana*, 125 F.4th at 243 (finding no Natural Gas Act violation from FERC's decision to credit a proposed gas pipeline with net emissions reductions associated with the retirement of coal-fired units in favor of new gas turbines). And economic logic compels it: If the TVA retires its coal-fired unit without a replacement gas turbine or an adequate gas supply, the TVA cannot adequately supply electricity to its customers. *See* JA 365. We do not require FERC to "blind itself to this practical reality." *Citizens Action Coalition*, 125 F.4th at 243.

*Second*, the Sierra Club alternatively argues that "even if FERC could lawfully credit the Project with some emissions reductions associated with the retirement of the Cumberland Fossil Plant, the record could not support emissions offsets beyond 2035" — the latest year the coal-fired units will operate. Pet'r Br. 30. Thus, the Sierra Club says that "FERC ignored at least ten years of emissions from the Cumberland Gas Plant — from 2036 through 2045 — that could not be netted out." Pet'r Br. 34.

But again, the TVA's plans to retire the coal-fired unit do not exist in a vacuum. Without a replacement generation source with requisite fuel, the TVA might instead upgrade and operate the coal-fired unit well into the future, as the TVA's no-action alternative contemplated. So even though the TVA hopes to replace its coal-fired units by 2035, FERC made the reasonable choice to credit the pipeline with a net emissions reduction covering the entire forecast period.

Could FERC have taken a different approach? Perhaps. But we must "defer to agencies' decisions about where to draw

10

the line" in their analyses of "indirect environmental effects." *Seven County*, 145 S. Ct. at 1513.

*Third*, the Sierra Club faults FERC for presenting estimates of emissions on an annualized basis, rather than on a cumulative basis. But it doesn't matter which way FERC presented the estimates. Anyone with a calculator — or the ability to perform basic addition — can convert the annualized estimates into a cumulative estimate, as the Sierra Club did in its brief. *See* Pet'r Br. 35. FERC's failure to do so itself did not "frustrate[ ]" NEPA's "goal of ensuring that relevant information is available to those participating in agency decision-making" and was therefore, at worst, "harmless error." *Nevada v. Department of Energy*, 457 F.3d 78, 90 (D.C. Cir. 2006).

## 2. No-Action Alternative

Recall that the TVA's gas turbine will emit less greenhouse gas than the coal-fired unit it will replace. And recall that FERC decided to consider those net reductions as a benefit of the pipeline project. The Sierra Club says that decision is inconsistent with the analysis in FERC's "no action alternative," in which FERC assumed that the natural-gas turbine would replace the coal-fired unit even if the proposed pipeline is not built. *See* Pet'r Br. 22-23; *see* 42 U.S.C. § 4332(2)(C)(iii) (agencies must consider "a reasonable range of alternatives to the proposed agency action, including . . . a no action alternative"). The Sierra Club argues that the project cannot be considered the cause of an emissions reduction that would have occurred regardless of whether the pipeline is built.

We disagree with the Sierra Club. To start, its logic would require us to hold that FERC should not have attributed to the pipeline *any* of the plant-specific emissions from TVA's gas-for-coal swap — neither the emissions from the gas

11

turbine nor the credit from retiring the coal plant.  But the Sierra Club elsewhere asserts, to the contrary, that downstream gas-plant emissions are caused by the pipeline.  *See* Pet'r Br. 27-28; Reply Br. 10-11.  That position essentially concedes that there is no inconsistency between FERC's analysis of the no-action alternative and its attribution of downstream emissions effects to the pipeline.

It was also reasonable for FERC to assume that even if it did not certify Tennessee Gas's proposed pipeline — in which case *this* pipeline would "not be constructed, the potential impacts from the Proposed Action would not occur, and the Project's objectives would not be met," JA 190 — *another* pipeline could still be proposed, certified, and built.  *See* JA 237.  That other pipeline would allow the TVA to retire its coal-fired units and replace a coal-fired unit with a gas turbine.

So understood, there is no tension between the no-action alternative and FERC's judgment that the net emissions reduction is an indirect effect of the pipeline.  The two are separate inquiries: the former establishes the baseline for comparing "reasonable alternatives" to the project, 40 C.F.R. § 1502.14(a), and the latter estimates the downstream effects "caused by" the pipeline if FERC approves it, *id.* § 1508.1(g)(2).  Multiple alternatives can result in the same outcome and still independently qualify as legal causes of that outcome for purposes of the indirect-effects analysis.  Said otherwise, because FERC was predicting the effects of mutually exclusive decisions, it was reasonable to attribute emissions reductions to the proposed 32-mile pipeline (Scenario 1) and also to conclude that if that pipeline were not built (Scenario 2), a different pipeline would be constructed to effectuate a gas-for-coal swap and thus cause the net reduction in emissions.  Our prior decisions have endorsed just such logic.  *See Citizens Action Coalition*, 125 F.4th at 243 (accepting as reasonable FERC's consideration of both "gross" and "net" downstream emissions).

12

Perhaps FERC's no-action analysis could have been clearer about its assumption that if the TVA decides to build its gas turbine, *some* pipeline will be certified to supply it with gas. But "a reviewing court must be at its *most deferential*" when an agency makes "speculative assessments or predictive or scientific judgments" about alternatives. *Seven County*, 145 S. Ct. at 1512 (emphasis added) (cleaned up). So we cannot fault FERC for reasonably assuming that the gas turbine will be built even if this particular pipeline is rejected.[6]

### 3. Connected-Action Requirement

The Sierra Club next argues that the pipeline and the TVA's power plant should have been analyzed together as connected actions.

### a. FERC Did Not Err

Under regulations issued by the Council on Environmental Quality and adopted by FERC, federal actions that "are closely related . . . should be discussed in the same impact statement."

---

[6] The Sierra Club points to one instance where FERC contradicted its refrain that the gas plant will be built without this pipeline. Pet'r Br. 24 ("if the Commission selects the no-action alternative, the Cumberland Project facilities would not be constructed [and] the potential impacts from TVA's construction and operation of the Cumberland Gas Plant would not occur" (quoting JA 62) (emphasis omitted)). This cited language is a garbled paraphrase of a statement in the environmental impact statement that, if FERC had selected a no-action alternative, "the Cumberland Pipeline project facilities would not be constructed," JA 190, and so the potential impacts *of the proposed pipeline* would not occur. None of that undercuts FERC's consistently made point that *some* pipeline would be built and would cause net emissions reductions, and the Sierra Club's concern with FERC's inartful phrasing amounts to "flyspecking." *Minisink*, 762 F.3d at 112.

13

40 C.F.R. § 1501.9(e)(1) (July 1, 2023).[7]    Regardless of whether, in the past, this Court construed the CEQ regulations often to require agencies to consider actions within another agency's regulatory jurisdiction, *cf. Sierra Club v. FERC*, 867 F.3d 1357, 1373 (D.C. Cir. 2017) ("*Sabal Trail*") ("the question is not 'what activities does FERC regulate?' but instead 'what factors can FERC consider when regulating?'" (cleaned up)), *Seven County* held that an agency's duty to "consult with" other agencies cannot compel it "to speculate about the effects of a separate project that is outside its regulatory jurisdiction."   145 S. Ct. at 1516 (first quoting 42 U.S.C. § 4332(2)(C), then citing *Department of Transportation v. Public Citizen*, 541 U.S. 752, 767-68 (2004)).   *Seven County* rested that conclusion on the text of NEPA itself, which focuses the environmental impact statement on some specific "proposed agency action," 42 U.S.C. § 4332(2)(C).   *See* 145 S. Ct. at 1512, 1515.   So, the same conclusion must also inform our interpretation of CEQ regulations implementing the statute, including the connected-actions regulation.   In sum, after *Seven County*, agencies are no longer "required to analyze the effects of projects over which they do not exercise regulatory authority."   *Id.* at 1516.

The Sierra Club's argument fails because it asks us to demand exactly what *Seven County* says we cannot demand. FERC lacks "jurisdiction . . . over facilities used for the generation of electric energy" — like the TVA's power plant. 16 U.S.C. § 824(b)(1).   So in NEPA parlance, the proposed pipeline and the TVA's power plant are not "connected actions" that must be analyzed in the same environmental impact statement.   *Cf. El Puente v. U.S. Army Corps of*

---

[7] Although the Council on Environmental Quality regulations were amended after FERC approved this pipeline, 89 Fed. Reg. 35442 (May 1, 2024), and have since been rescinded, 90 Fed. Reg. 10610 (Feb. 25, 2025), the parties agree that the regulations in effect at the time of FERC's decision control.

14

*Engineers*, 100 F.4th 236, 249 (D.C. Cir. 2024) ("the Corps convincingly argues that it was not required to consider the potential impact of LNG conversion, at least as a 'connected action,' because the Corps has no regulatory authority over the construction or operation of LNG terminals"); *Alabama Municipal Distributors Group v. FERC*, 100 F.4th 207, 213 (D.C. Cir. 2024) (FERC is not required to analyze the effects of exported natural gas because exports fall within the jurisdiction of the Department of Energy); *Center for Biological Diversity v. FERC* (*Alaska LNG*), 67 F.4th 1176, 1185 (D.C. Cir. 2023) (same).

### b. Even Assuming Error, It Was Harmless

Even if the connected-action requirement did apply, we would not vacate FERC's approval of the pipeline "absent reason to believe that the agency might disapprove the project if it" had analyzed the pipeline and the TVA's power plant as connected actions (as the Sierra Club demands) rather than as projects with cumulative effects (as FERC did). *Seven County*, 145 S. Ct. at 1514; *see* JA 93-96; *see also* 5 U.S.C. § 706 ("due account shall be taken of the rule of prejudicial error"). The Sierra Club has not identified any additional information it seeks that is not already provided in FERC's environmental impact statement. So another environmental impact statement "would serve no purpose." *Public Citizen*, 541 U.S. at 767 (cleaned up); *see also Oglala Sioux Tribe v. Nuclear Regulatory Commission*, 45 F.4th 291, 300 (D.C. Cir. 2022) (courts should uphold agency action "in the NEPA context when the agency has undertaken the required analysis but failed to comply precisely with NEPA procedures" (cleaned up)). The claimed error is particularly immaterial here, where TVA itself — the agency with exclusive jurisdiction over the choice of power generation — did consider the power plant and pipeline as connected actions and analyzed them both in its own environmental impact statement, *see* JA 366, 379-80; *see also* 40 C.F.R. § 1501.9(e)(1) (July 1,

2023), which FERC in turn referenced as part of its environmental analysis, *see, e.g.*, JA 173-74, 185.

The Sierra Club also argues that if FERC and the TVA had conducted a joint environmental impact statement, FERC could have avoided its initial confusion as to the number of coal-fired units the gas turbine would replace. Maybe so. But that error was harmless because FERC corrected it in the rehearing order.

Finally, the Sierra Club contends that by combining the two environmental impact statements, FERC might have avoided the alleged errors related to its no-action analysis. But as already discussed, that analysis was reasonable.

## C. FERC Complied with the Natural Gas Act

FERC complied with the Natural Gas Act when it analyzed the market need for the pipeline and the public interest.

### 1. Market Need Analysis

Before certifying a pipeline, FERC must confirm a market need by evaluating "whether the project can proceed without subsidies from the existing pipeline's customers." *Minisink*, 762 F.3d at 101 (cleaned up). Here, FERC determined that there was a market need for the project because the TVA entered into a 20-year precedent agreement with Tennessee Gas to purchase 100% of the pipeline's capacity.[8]

As a general rule, FERC may find market need by relying solely on a precedent agreement. *Minisink*, 762 F.3d at 111

---

[8] "A precedent agreement is a long-term contract subscribing to expanded natural gas capacity." *Myersville Citizens for a Rural Community, Inc. v. FERC*, 783 F.3d 1301, 1310 (D.C. Cir. 2015).

16

n.10. There is an exception to that rule when an agreement involves affiliated entities and there is "plausible evidence of self-dealing." *Environmental Defense Fund v. FERC*, 2 F.4th 953, 975 (D.C. Cir. 2021). But the TVA and Tennessee Gas are not affiliated, and the Sierra Club has not alleged self-dealing. So that exception does not apply.

Instead, the Sierra Club argues that FERC should have more thoroughly scrutinized the market need because the TVA is an "unregulated utility" that is "not subject to routine oversight from a utility regulator like a state commission." Pet'r Br. 48, 50.

We disagree. Though the TVA is not subject to state supervision, it is hardly a rogue entity. The TVA must follow a statutorily prescribed "least-cost planning" framework in making investment decisions; it is subject to congressional oversight and must annually notify Congress of any "major new energy resource"; and its investment decisions are subject to public notice and comment. 16 U.S.C. § 831m-1(a), (d).

We also reject the Sierra Club's argument that FERC ignored evidence about green-energy subsidies available under the Inflation Reduction Act. Once again, absent self-dealing, FERC was entitled to rely on the precedent agreement without considering additional evidence. And even if there had been a need for FERC to look beyond the precedent agreement, FERC had no obligation to consider information about the TVA's choice of natural gas over a renewable alternative. *See* 16 U.S.C. § 824(b)(1) (FERC "shall not have jurisdiction . . . over facilities used for the generation of electric energy"). As FERC explained, FERC's role is limited to reviewing whether *this pipeline* is in the public interest, and FERC does not have veto power over the TVA's natural-gas turbine.

## 2. Public Interest Balancing

Finally, the Sierra Club argues that FERC improperly weighed the pipeline's benefits and harms because it misunderstood the pipeline's environmental impacts and failed to consider whether non-gas generation methods might result in lower costs for energy consumers. This argument simply repeats objections that we have already considered and rejected. FERC's environmental assessment was adequate. And while FERC's power under § 7 of the Natural Gas Act permits it "to look into matters excluded from [its] direct regulatory jurisdiction," it may not purport[] to regulate" matters outside that jurisdiction. *Office of Consumers' Counsel v. FERC*, 655 F.2d 1132, 1146 n.31, 1147-48 (D.C. Cir. 1980); *see Federal Power Commission v. Transcontinental Gas Pipe Line Corp.*, 365 U.S. 1, 7-9, 17, 20 (1961). FERC generally has no jurisdiction "over facilities used for the generation of electric energy." 16 U.S.C. § 824(b)(1). The agency thus reasonably declined to leverage its § 7 power to reconsider the TVA's gas-for-coal decision.

## III. Conclusion

NEPA requires federal agencies to prepare environmental impact statements for "major Federal actions significantly affecting the quality of the human environment." 42 U.S.C. § 4332(2)(C). In the past ten years, FERC has issued final environmental impact statements for approximately 60 natural-gas transportation projects. Some of those environmental impact statements were *thousands* of pages long. *See, e.g.*, Alaska LNG Project, Final Environmental Impact Statement, No. CP17-178 (Mar. 6, 2020) (5,078-page final EIS for natural-gas export infrastructure).

At oral argument, we asked the Sierra Club if *any* of those environmental impact statements were legally adequate. It could not identify one. *Cf. Appalachian Voices v. FERC*, 139

18

F.4th 903, 916 (D.C. Cir. 2025) (denying the Sierra Club's petition); *Healthy Gulf v. FERC*, 132 F.4th 544, 555 (D.C. Cir. 2025) (same); *Center for Biological Diversity v. FERC*, 67 F.4th 1176, 1188 (D.C. Cir. 2023) (same); *Sierra Club v. FERC*, 38 F.4th 220, 235 (D.C. Cir. 2022) (same); *Sierra Club v. FERC*, 672 F. App'x 38, 39 (D.C. Cir. 2016) (same).

The Sierra Club is entitled to the expansive view of NEPA that its answer reflects, and it is free to argue for robust judicial scrutiny of environmental impact statements. But the Sierra Club's understanding of NEPA is not shared by the Supreme Court. This year, in *Seven County Infrastructure Coalition v. Eagle County, Colorado*, the Supreme Court repudiated NEPA arguments like those raised by the Sierra Club in this case. *See, e.g.*, 145 S. Ct. 1497, 1513 (2025).

After *Seven County* was decided, the Sierra Club informed this court that though "it may apply in other cases, *Seven County* has little utility here." Sierra Club Rule 28(j) Letter at 1 (June 6, 2025). That is incorrect. The Sierra Club's briefing depended on circuit precedent abrogated by *Seven County*, including this court's decision in *Sabal Trail*, which the Sierra Club cited on pages 19, 26, 27, 29, 36, and 46 of its opening brief. *Compare Seven County*, 145 S. Ct. at 1516 ("agencies are not required to analyze the effects of projects over which they do not exercise regulatory authority"), *with Sierra Club v. FERC* (*Sabal Trail*), 867 F.3d 1357, 1371 (D.C. Cir. 2017) (requiring FERC to consider "power-plant carbon emissions that the pipelines will make possible" even though FERC lacks regulatory jurisdiction over power generation facilities).

After *Seven County*, the era of searching NEPA review is over — or at least it should be.

19

\*    \*    \*

Because FERC reasonably discharged its NEPA and Natural Gas Act duties, we deny the Sierra Club's petitions.

*So ordered.*